Issued by
The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974
as "Barecon 'A'" and "Barecon 'B'". Revised and amalgamated 1989. Revised 2001

Printed by BIMCO's idea

Copyright, published by
The Baltic and International Maritime Council (BIMCO), Copenhagen, issued November 2001

| 1. Shipbroker | BIMCO STANDARD BAREBOAT CHARTER |
|---|---|
| N/A | CODE NAME: "BARECON 2001" |
| | PART I |

**2. Place and date**

29 September 2010

| 3. Owners/Place of business (Cl. 1) | 4. Bareboat Charterers/Place of business (Cl. 1) |
|---|---|
| ICON AMAZING, LLC | Amazing Shipping Ltd. |
| c/o ICON Capital Corp. | 198, Old Bakery Street |
| 100 Fifth Avenue, 4th Floor | Valletta, VLT 09 |
| New York NY10011 | Malta |
| USA | Tel: +90 212 319 2100 |
| Tel: +1 212 418 4700 | Fax: +90 212 283 1604 |
| Fax: +1 212 418 4739 | Email: gedenlines@gedenlines.com |
| Email: dverlizzo@iconcapital.com | chartering@gedenlines.com |

*Registered office: Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH 96960*

**5. Vessel's name, call sign and flag (Cl. 1 and 3)**

m.v. "AMAZING", 9HA233D, Malta

| 6. Type of Vessel | 7. GT/NT |
|---|---|
| Bulk Carrier | GT: 33,044/NT: 19,231 |

| 8. When/Where built | 9. Total DWT (abt.) in metric tons on summer freeboard |
|---|---|
| 2010/COSCO Shipyard Group Co., Ltd. | Not less than 57,000 |

| 10. Classification Society (Cl. 3) | 11. Date of last special survey by the Vessel's classification society |
|---|---|
| Bureau Veritas | N/A |

**12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3)**

As per MOA dated even date hereto for the Vessel

| 13. Port or Place of delivery (Cl. 3) | 14. Time for delivery (Cl. 4) | 15. Cancelling date (Cl. 5) |
|---|---|---|
| See Clause 32 - in accordance with the MOA | See Clause 32 | 15 October 2010 |

| 16. Port or Place of redelivery (Cl. 15) | 17. No. of months' validity of trading and class certificates upon redelivery (Cl. 15) |
|---|---|
| At an international port mutually agreeable to Owners and Charterers and if no agreement is reached Singapore | N/A |

| 18. Running days' notice if other than stated in Cl. 4 | 19. Frequency of dry-docking (Cl. 10(a)) |
|---|---|
| As agreed between the parties | As required by class |

**20. Trading limits (Cl. 6)**

Subject to Clause 6, World Wide always within I.W.L., but excluding any waters with US Embargo (which includes, without limitation, Cuba, the Islamic Republic of Iran and the Democratic People's Republic of Korea (aka North Korea))

| 21. Charter period (Cl. 2) | 22. Charter hire (Cl. 11) |
|---|---|
| Maximum 7 years from the Delivery Date as per Clause 50 | See Clause 34 |

**23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 23)(Cl. 10(a)(ii))**

For Charterers' account

EXHIBIT
B

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of this BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

| | |
|---|---|
| 24. Rate of interest payable acc. to Cl. 11 (f) and, if applicable, acc. to PART IV<br><br>**See Clause 35** | 25. Currency and method of payment (Cl. 11)<br><br>**United States Dollars, see Clause 35** |
| 26. Place of payment; also state beneficiary and bank account (Cl. 11)<br><br>**See Clause 35** | 27. Bank guarantee/bond (sum and place) (Cl. 24) (optional)<br><br>**See Clause 39** |
| 28. Mortgage(s), if any (state whether 12(a) or (b) applies; if 12(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 12)<br><br>**DVB Bank SE**<br>**Parklaan 2**<br>**3016**<br>**Rotterdam**<br>**The Netherlands**<br><br>**Clause 12b to apply. See Clause 40** | 29. Insurance (hull and machinery and war risks) (state value acc. to Cl. 13(l) or, if applicable, acc. to Cl. 14(k)) (also state if Cl. 14 applies)<br><br>**See Clause 45. Clause 14 does not apply** |
| 30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))<br><br>**N/A** | 31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))<br><br>**See Clause 45** |
| 32. Latent defects (only to be filled in if period other than stated in Cl. 3)<br><br>**N/A** | 33. Brokerage commission and to whom payable (Cl. 27)<br><br>**N/A** |
| 34. Grace period (state number of clear banking days) (Cl. 28)<br><br>**See Clause 46** | 35. Dispute Resolution (state 30(a), 30(b) or 30(c); if 30(c) agreed Place of Arbitration must be stated (Cl. 30)<br><br>**See Clause 58** |
| 36. War cancellation (indicate countries agreed) (Cl. 26(f))<br><br>**N/A** | |
| 37. Newbuilding Vessel (indicate with "yes" or "no" whether PART III applies) (optional)<br><br>**No** | 38. Name and place of Builders (only to be filled in if PART III applies)<br><br>**N/A** |
| 39. Vessel's Yard Building No. (only to be filled in if PART III applies)<br><br>**N/A** | 40. Date of Building Contract (only to be filled in if PART III applies)<br><br>**N/A** |
| 41. Liquidated damages and costs shall accrue to (state party acc. to Cl. 1)<br><br>a) **N/A**<br><br>b)<br><br>c) | |
| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether PART IV applies) (optional)<br><br>**No** | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies) (optional)<br><br>**Yes** |
| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies)<br><br>**Malta** | 45. Country of the Underlying Registry (only to be filled in if PART V applies)<br><br>**Malta** |
| 46. Number of additional clauses covering special provisions, if agreed<br><br>**32-60** | |

**PREAMBLE** - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | MEHMET MAT |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

1.  **Definitions** See also Clause 60  1
In this Charter, the following terms shall have the  2
meanings hereby assigned to them:  3
*"The Owners"* shall mean the party identified in Box 3;  4
*"The Charterers"* shall mean the party identified in Box 4;  5
*"The Vessel"* shall mean the vessel named in Box 5 and  6
with particulars as stated in Boxes 6 to 12;  7
*"Financial Instrument/Finance Documents"* means the  8
mortgage, deed of
Covenant, assignment of insurances or other such  9
financial security instrument as
annexed to this Charter and stated in Box 28, or such  10
other mortgages or vessel related financial security
instruments as may at a later date be granted by the
Owners to any bank or financial institution in
accordance with Clause 40.

2.  **Charter Period**  11
In consideration of the hire detailed in Box 22,  12
the Owners have agreed to let and the Charterers have  13
agreed to hire the Vessel for the period stated in Box 21  14
("The Charter Period").  15

3.  **Delivery**  16
(not applicable when Part III applies, as indicated in Box 37)  17
~~(a)    The Owners shall before and at the time of delivery~~  18
~~exercise due diligence to make the Vessel seaworthy~~  19
~~And in every respect ready in hull, machinery and~~  20
~~equipment for service under this Charter.~~  21
The Vessel shall be delivered by the Owners and taken  22
over by the Charterers at the port or place indicated in  23
Box 13 ~~in such ready safe berth as the Charterers may~~  24
~~Direct.~~  25
~~(b)    The Vessel shall be properly documented on~~  26
~~delivery in accordance with the laws of the flag State~~  27
~~indicated in Box 5 and the requirements of the~~  28
~~classification society stated in Box 10. The Vessel upon~~  29
~~delivery shall have her survey cycles up to date and~~  30
~~trading and class certificates valid for at least the number~~  31
~~of months agreed in Box 12.~~  32
(c)    The delivery of the Vessel by the Owners and the  33
taking over of the Vessel by the Charterers shall  34
constitute a full performance by the Owners of all the  35
Owners' obligations under this Clause 3, and thereafter  36
the Charterers shall not be entitled to make or assert  37
any claim against the Owners on account of any  38
conditions, representations or warranties expressed or  39
implied with respect to the Vessel ~~but the Owners shall~~  40
~~be liable for the cost of but not the time for repairs or~~  41
~~renewals occasioned by latent defects in the Vessel,~~  42
~~her machinery or appurtenances, existing at the time of~~  43
~~delivery under this Charter, provided such defects have~~  44
~~manifested themselves within twelve (12) months after~~  45
~~delivery unless otherwise provided in Box 32.~~  46

4.  **Time for Delivery**  47
(not applicable when Part III applies, as indicated in Box 37)  48
~~The Vessel shall not be delivered before the date~~  49
~~indicated in Box 14 without the Charterers' consent and~~  50
~~the Owners shall exercise due diligence to deliver the~~  51
~~Vessel not later than the date indicated in Box 15.~~  52
~~Unless otherwise agreed in Box 18, the Owners shall~~  53
~~give the Charterers not less than thirty (30) running days'~~  54
~~preliminary and not less than fourteen (14) running days'~~  55
~~definite notice of the date on which the Vessel is~~  56
~~expected to be ready for delivery.~~  57
~~The Owners shall keep the Charterers closely advised~~  58
~~of possible changes in the Vessel's position.~~  59

5.  **Cancelling**  60
(not applicable when Part III applies, as indicated in Box 37)  61
~~(a)    Should the Vessel not be delivered latest by the~~  62
~~cancelling date indicated in Box 15, the Charterers shall~~  63
~~have the option of cancelling this Charter by giving the~~  64
~~Owners notice of cancellation within thirty-six (36)~~  65
~~running hours after the cancelling date stated in Box~~  66
~~15, failing which this Charter shall remain in full force~~  67

~~and effect.~~  68
~~(b)    If it appears that the Vessel will be delayed beyond~~  69
~~the cancelling date, the Owners may, as soon as they~~  70
~~are in a position to state with reasonable certainty the~~  71
~~day on which the Vessel should be ready, give notice~~  72
~~thereof to the Charterers asking whether they will~~  73
~~exercise their option of cancelling, and the option must~~  74
~~then be declared within one hundred and sixty eight~~  75
~~(168) running hours of the receipt by the Charterers of~~  76
~~such notice or within thirty-six (36) running hours after~~  77
~~the cancelling date, whichever is the earlier. If the~~  78
~~Charterers do not then exercise their option of cancelling,~~  79
~~the seventh day after the readiness date stated in the~~  80
~~Owners' notice shall be substituted for the cancelling~~  81
~~date indicated in Box 15 for the purpose of this Clause 5.~~  82
~~(c)    Cancellation under this Clause 5 shall be without~~  83
~~prejudice to any claim the Charterers may otherwise~~  84
~~have on the Owners under this Charter.~~  85

6.  **Trading Restrictions**  86
The Vessel shall be employed in lawful trades for the  87
carriage of suitable lawful merchandise in such waters  88
and environments as the Charterers' capabilities and
specifications allow within the trading
limits indicated in Box 20.  89
The Charterers undertake not to employ the Vessel or  90
suffer the Vessel to be employed otherwise than in  91
conformity with the terms of the contracts of insurance  92
(including any warranties expressed or implied therein)  93
without first obtaining the consent of the insurers to such  94
employment and complying with such requirements as  95
to extra premium or otherwise as the insurers may  96
prescribe. Without prejudice to the foregoing, the  97
Charterers undertake not to employ the Vessel or
suffer the Vessel to be employed in any Listed Areas
unless they have (i) received the prior consent of the
Vessel's insurers and (ii) placed any additional war
risks insurances, at its own expense, as may be
required by the Vessel's insurers. Any additional war
risks insurances placed as a consequence of the
Vessel's employment in a Listed Area shall form part
of the "Assigned Property" under the General
Assignment.
The Charterers also undertake not to employ the Vessel  98
or suffer her employment in any trade or business which  99
is forbidden by US Embargo and/or the law of any  100
country to which the Vessel
may sail or is otherwise illicit or in carrying illicit or  101
prohibited goods or in any manner whatsoever which  102
may render her liable to condemnation, destruction,  103
seizure or confiscation.  104
Notwithstanding any other provisions contained in this  105
Charter it is agreed that nuclear fuels or radioactive  106
products or waste are specifically excluded from the  107
cargo permitted to be loaded or carried under this  108
Charter. This exclusion does not apply to radio-isotopes  109
used or intended to be used for any industrial,  110
commercial, agricultural, medical or scientific purposes  111
provided the Owners' prior approval has been obtained  112
to loading thereof.  113

7.  **Surveys on Delivery and Redelivery** See also Clause  114
32
(not applicable when Part III applies, as indicated in Box 37)  115
The Owners ~~and Charterers~~  shall each  appoint  116
surveyors for the purpose of determining and agreeing  117
in writing the condition of the Vessel at the time of  118
delivery and redelivery hereunder. ~~The Owners shall~~  119
~~bear all expenses of the On-hire Survey including loss~~  120
~~of time, if any, and t~~The Charterers shall bear all  121
expenses
of the Off-hire Survey including loss of time, if any, at  122
the daily equivalent to the rate of hire or pro rata thereof.  123

8.  **Inspection**  124
The Owners and/or nominees (inclusive of the  125

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Mortgagee) shall have the right at any time after giving 126
reasonable notice to the Charterers to inspect or survey 127
the Vessel or instruct a duly authorised surveyor to carry 128
out such survey on their behalf provided it does not
interfere with operation of the Vessel and/or crew:-
(a)   to ascertain the condition of the Vessel and satisfy 129
themselves that the Vessel is being properly repaired 130
and maintained. The costs and fees for such inspection 131
or survey shall be paid by the Owners unless the Vessel 132
is found to require repairs or maintenance in order to 133
achieve the condition so provided; 134
(b)   in dry-dock if the Charterers have not dry-docked 135
Herthe Vessel in accordance with Clause 10(g). The 136
costs and fees
for such inspection or survey shall be paid by the 137
Charterers; and 138
(c)   for any other commercial reason they consider 139
necessary (provided it does not unduly interfere with 140
the commercial operation of the Vessel). The costs and 141
fees for such inspection and survey shall be paid by the 142
Owners. 143
All time used in respect of inspection, survey or repairs 144
shall be for the Charterers' account and form part of the 145
Charter Period. 146
The Charterers shall also permit the Owners to inspect 147
the Vessel's log books whenever requested and shall 148
whenever required by the Owners furnish them with full 149
information regarding any casualties or other accidents 150
or damage to the Vessel. 151

**9.    Inventories, Oil and Stores** 152
An ~~complete~~ inventory list of the Vessel's entire 153
equipment,
outfit including spare parts, appliances and of all 154
consumable stores on board the Vessel shall be made 155
by the Charterers in conjunction with the Owners on 156
delivery and again on redelivery of the Vessel. ~~The~~ 157
~~Charterers and the Owners, respectively, shall at the~~ 158
~~time of delivery and redelivery take over and pay for all~~ 159
~~bunkers, lubricating oil, unbreached provisions, paints,~~ 160
~~ropes and other consumable stores (excluding spare~~ 161
~~parts) in the said Vessel at the then current market prices~~ 162
~~at the ports of delivery and redelivery, respectively.~~ The 163
Charterers shall ensure that all spare parts listed in the 164
inventory and used during the Charter Period are 165
replaced at their expense prior to redelivery of the 166
Vessel. 167

**10.   Maintenance and Operation** 168
(a)(i)Maintenance and Repairs - During the Charter 169
Period the Vessel shall be in the full possession 170
and at the absolute disposal for all purposes of the 171
Charterers and under their complete control in 172
every respect. The Charterers shall maintain the 173
Vessel, her machinery, boilers, appurtenances and 174
spare parts in a good state of repair, in efficient 175
operating condition and in accordance with good 176
commercial maintenance practice and, ~~except as~~ 177
~~provided for in Clause 14(l),~~ if applicable, at their 178
own expense they shall at all times keep the 179
Vessel's Class fully up to date with the Classification 180
Society indicated in Box 10 and maintain all other 181
necessary certificates in force at all times. 182
(ii)   New Class and Other Safety Requirements — In the 183
event of any improvement, structural changes or 184
new equipment becoming necessary for the 185
continued operation of the Vessel by reason of new 186
class requirements or by compulsory legislation then 187
the Charterers shall promptly comply with the
same and the cost of compliance shall be for the
Charterers' account. See also Clause 37.
~~costing (excluding the Charterers' loss of time)~~ 188
~~more than the percentage stated in Box 23, or if~~ 189
~~Box 23 is left blank, 5 per cent of the Vessel's~~ 190
~~insurance value as stated in Box 29, then the~~ 191

~~extent, if any, to which the rate of hire shall be varied~~ 192
~~and the ratio in which the cost of compliance shall~~ 193
~~be shared between the parties concerned in order~~ 194
~~to achieve a reasonable distribution thereof as~~ 195
~~between the Owners and the Charterers having~~ 196
~~regard, inter alia, to the length of the period~~ 197
~~remaining under this Charter shall, in the absence~~ 198
~~of agreement, be referred to the dispute resolution~~ 199
~~method agreed in Clause 30.~~ 200
(iii)   Financial Security - The Charterers shall maintain 201
financial security or responsibility in respect of third 202
party liabilities as required by any government, 203
including federal, state or municipal or other division 204
or authority thereof, to enable the Vessel, without 205
penalty or charge, lawfully to enter, remain at, or 206
leave any port, place, territorial or contiguous 207
waters of any country, state or municipality in 208
performance of this Charter without any delay. This 209
obligation shall apply whether or not such 210
requirements have been lawfully imposed by such 211
government or division or authority thereof. 212
The Charterers shall make and maintain all arrange- 213
ments by bond or otherwise as may be necessary to 214
satisfy such requirements at the Charterers' sole 215
expense and the Charterers shall indemnify the Owners 216
against all consequences whatsoever (including loss of 217
time) for any failure or inability to do so. 218
(b)   Operation of the Vessel - The Charterers shall at 219
their own expense and by their own procurement man, 220
victual, navigate, operate, supply, fuel and, whenever 221
required, repair the Vessel during the Charter Period 222
and they shall pay all charges and expenses of every 223
kind and nature whatsoever incidental to their use and 224
operation of the Vessel under this Charter, including 225
annual flag State fees and any foreign general 226
municipality and/or state taxes. The Master, officers 227
and crew of the Vessel shall be the servants of the Charterers 228
for all purposes whatsoever, even if for any reason 229
appointed by the Owners. 230
Charterers shall comply with the regulations regarding 231
officers and crew in force in the country of the Vessel's 232
flag or any other applicable law. 233
(c)   The Charterers shall keep the Owners and the 234
mMortgagee(s) advised of the intended employment, 235
planned dry-docking and major repairs of the Vessel, 236
as reasonably required. 237
(d)   Flag and Name of Vessel – During the Charter 238
Period, the Charterers shall have the liberty to paint the 239
Vessel in their own colours, install and display their 240
funnel insignia and fly their own house flag. The 241
Charterers shall also have the liberty, with the Owners' 242
consent, which shall not be unreasonably withheld, to 243
change the flag and/or the name of the Vessel during 244
the Charter Period. Painting and re-painting, instalment 245
and re-instalment, registration and re-registration, if 246
required by the Owners, shall be at the Charterers' 247
expense and time. 248
(e)   Changes to the Vessel -- Subject to Clause 10(a)(ii) 249
and Clause 37,
the Charterers shall make no structural changes in the 250
Vessel or changes in the machinery, boilers, appurten- 251
ances or spare parts thereof without in each instance 252
first securing the Owners' approval thereof. If the Owners 253
so agree, the Charterers shall, if the Owners so require, 254
restore the Vessel to its former condition before the 255
termination of this Charter. 256
(f)   Use of the Vessel's Outfit, Equipment and 257
Appliances - The Charterers shall have the use of all 258
outfit, equipment, and appliances on board the Vessel 259
at the time of delivery, provided the same or their 260
substantial equivalent shall be returned to the Owners 261
on redelivery in the same good order and condition as 262
when received, ordinary wear and tear excepted. The 263
Charterers shall from time to time during the Charter 264
Period replace such items of equipment as shall be so 265

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

damaged or worn as to be unfit for use. The Charterers 266
are to procure that all repairs to or replacement of any 267
damaged, worn or lost parts or equipment be effected 268
in such manner (both as regards workmanship and 269
quality of materials) as not to diminish the value of the 270
Vessel. The Charterers have the right to fit additional 271
equipment at their expense and risk but the Charterers 272
shall remove such equipment at the end of the period if 273
requested by the Owners. Any equipment including radio 274
equipment on hire on the Vessel at time of delivery shall 275
be kept and maintained by the Charterers and the 276
Charterers shall assume the obligations and liabilities 277
of the Owners under any lease contracts in connection 278
therewith and shall reimburse the Owners for all 279
expenses incurred in connection therewith, also for any 280
new equipment required in order to comply with radio 281
regulations. 282

(g) Periodical Dry-Docking - The Charterers shall dry- 283
dock the Vessel and clean and paint her underwater 284
parts whenever the same may be necessary, but not 285
less than any period as may be required by the 286
Classification Society or flag state ~~once during the~~ 286
~~period stated in Box 19 or, if~~ 287
~~Box 19 has been left blank, every sixty (60) calendar~~ 287
~~months after delivery or such other period as may be~~ 288
~~required by the Classification Society or flag State.~~ 289

11. Hire See also Clauses 34 and 35 290
(a) The Charterers shall pay hire due to the Owners 291
punctually in accordance with the terms of this Charter 292
in respect of which time shall be of the essence. 293
(b) ~~The Charterers shall pay to the Owners for the hire~~ 294
~~of the Vessel a lump sum in the amount indicated in~~ 295
~~Box 22 which shall be payable not later than every thirty~~ 296
~~(30) running days in advance, the first lump sum being~~ 297
~~payable on the date and hour of the Vessel's delivery to~~ 298
~~the Charterers.~~ Hire shall be paid continuously 299
throughout the Charter Period. 300
(c) Payment of hire shall be made in cash without 301
discount in the currency and in the manner indicated in 302
Box 25 and at the place mentioned in Box 26. 303
(d) Final payment of hire, if for a period of less than 304
thirty (30) running days, shall be calculated proportionally 305
according to the number of days and hours remaining 306
before redelivery and advance payment to be effected 307
accordingly. 308
(e) ~~Should the Vessel be lost or missing, hire shall~~ 309
~~cease from the date and time when she was lost or last~~ 310
~~heard of. The date upon which the Vessel is to be treated~~ 311
~~as lost or missing shall be ten (10) days after the Vessel~~ 312
~~was last reported or when the Vessel is posted as~~ 313
~~missing by Lloyd's, whichever occurs first. Any hire paid~~ 314
~~in advance to be adjusted accordingly.~~ 315
(f) Any delay in payment of hire shall entitle the 316
Owners to interest at the rate per annum as agreed 317
in Box 24. If Box 24 has not been filled in, the three months 318
interbank offered rate in London (LIBOR or its successor) 319
for the currency stated in Box 25, as quoted by the British 320
Bankers' Association (BBA) on the date when the hire 321
fell due, increased by 2 per cent., shall apply. 322
(g) Payment of interest due under sub-clause 11(f) 323
shall be made within seven (7) running days of the date 324
of the Owners' invoice specifying the amount payable 325
or, in the absence of an invoice, at the time of the next 326
hire payment date. 327

12. Mortgage 328
(only to apply if Box 28 has been appropriately filled in) 329
*) (a) ~~The Owners warrant that they have not effected~~ 330
~~any mortgage(s) of the Vessel and that they shall not~~ 331
~~effect any mortgage(s) without the prior consent of the~~ 332
~~Charterers, which shall not be unreasonably withheld.~~ 333
*) (b) The Vessel chartered under this Charter is financed 334
by a mortgage ~~according to the Financial Instrument.~~ 335
according to the Finance Documents. 335

The Charterers undertake to comply, and provide such 336
information and documents to enable the Owners to 337
comply, with all ~~such instructions or directions~~covenants 338
and obligations in regard 338
To the employment, insurances, operation, repairs and 339
maintenance of the Vessel as laid down in the Finance 340
Documents ~~Financial~~ 340
~~Instrument or as may be~~ directed from time to time during 341
the currency of the Charter by the m̶Mortgagee(s) in 342
conformity with the Mortgage and the Finance 343
Documents~~Financial Instrument~~. The Charterers 344
confirm that, for this purpose, they have acquainted 344
themselves with all relevant terms, conditions and 345
provisions of the Mortgage and the Finance 346
Documents~~Financial Instrument~~ and agree to 346
acknowledge this in writing in any form that may be 347
required by the m̶Mortgagee(s). ~~The Owners warrant that~~ 348
~~they have not effected any mortgage(s) other than stated~~ 349
~~in Box 28 and that they shall not agree to any~~ 350
~~amendment of the mortgage(s) referred to in Box 28 or~~ 351
~~effect any other mortgage(s) without the prior consent~~ 352
~~of the Charterers, which shall not be unreasonably~~ 353
~~withheld.~~ 354
*) (Optional, Clauses 12(a) and 12(b) are alternatives; 355
indicate alternative agreed in Box 28). 356

13. Insurance and Repairs See also Clause 45 357
(a) During the Charter Period the Vessel shall be kept 358
insured by the Charterers at their expense against hull 359
and machinery, war and Protection and Indemnity risks 360
(and any risks against which it is compulsory to insure 361
for the operation of the Vessel, including maintaining 362
financial security in accordance with sub-clause 363
10(a)(iii)) in such form as the Owners shall in writing 364
approve, which approval shall not be un-reasonably 365
withheld. Such insurances shall be arranged by the 366
Charterers to protect the interests of both the Owners 367
and the Charterers and the mortgagee(s) (if any), and 368
The Charterers shall be at liberty to protect under such 369
insurances the interests of any managers they may 370
appoint. Insurance policies shall cover the Owners and 371
the Charterers according to their respective interests. 372
Subject to the provisions of the ~~Financial Instrument~~ 373
Finance Documents and this Charter, if 373
any, and the approval of the Owners and the insurers, 374
the Charterers shall effect all insured repairs and shall 375
undertake settlement and reimbursement from the 376
insurers of all costs in connection with such repairs as 377
Well as insured charges, expenses and liabilities to the 378
extent of coverage under the insurances herein provided 379
for. 380
The Charterers also to remain responsible for and to 381
effect repairs and settlement of costs and expenses 382
incurred thereby in respect of all other repairs not 383
covered by the insurances and/or not exceeding any 384
possible franchise(s) or deductibles provided for in the 385
insurances. 386
All time used for repairs under the provisions of sub- 387
clause 13(a) and in respect of any other repairs and/for 388
~~repairs of latent defects according~~ 388
~~to Clause 3(c) above,~~ including any deviation, shall be 389
for the Charterers' account. 390
(b) If the conditions of the above insurances permit 391
additional insurance to be placed by the parties, such 392
cover shall be limited to the amount for each party set 393
out in Box 30 and Box 31, respectively. The Owners or 394
the Charterers as the case may be shall immediately 395
furnish the other party with particulars of any additional 396
insurance effected, including copies of any cover notes 397
or policies and the written consent of the insurers of 398
any such required insurance in any case where the 399
consent of such insurers is necessary. 400
(c) The Charterers shall upon the request of the 401
Owners, provide information and promptly execute such 402
documents as may be required to enable the Owners to 403

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

comply with the Insurance provisions of the Finance 404
Documents Financial
Instrument. 405
(d) Subject to the provisions of any Finance 406
Documents the Financial Instru-
Ment and this Charter, if any, should the Vessel become 407
an actual,
constructive, compromised or agreed total loss under 408
the insurances required under sub-clause 13(a), all 409
insurance payments for such loss shall be paid to the 410
Owners who shall distribute the moneys between the 411
Owners and the Charterers according to their respective 412
interests. The Charterers undertake to notify the Owners 413
and the mMortgagee(s), if any, of any occurrences in 414
consequence of which the Vessel is likely to become a 415
tTotal lLoss as defined in this Clause. 416
(e) The Owners shall upon the request of the 417
Charterers, promptly execute such documents as may 418
be required to enable the Charterers to abandon the 419
Vessel to Insurers and claim a constructive total loss. 420
(f) For the purpose of Insurance coverage against hull 421
and machinery and war risks under the provisions of 422
sub-clause 13(a), the value of the Vessel is the sum 423
indicated in Box 29. 424

**14. Insurance, Repairs and Classification** 425
(Optional, only to apply if expressly agreed and stated 426
in Box 29, in which event Clause 13 shall be considered 427
deleted). 428
(a) During the Charter Period the Vessel shall be kept 429
insured by the Owners at their expense against hull and 430
machinery and war risks under the form of policy or 431
policies attached hereto. The Owners and/or Insurers 432
shall not have any right of recovery or subrogation 433
against the Charterers on account of loss of or any 434
damage to the Vessel or her machinery or appurt- 435
enances covered by such insurance, or on account of 436
payments made to discharge claims against or liabilities 437
of the Vessel or the Owners covered by such insurance. 438
Insurance policies shall cover the Owners and the 439
Charterers according to their respective interests. 440
(b) During the Charter Period the Vessel shall be kept 441
insured by the Charterers at their expense against 442
Protection and Indemnity risks (and any risks against 443
which it is compulsory to insure for the operation of the 444
Vessel, including maintaining financial security in 445
accordance with sub-clause 10(a)(iii)) in such form as 446
the Owners shall in writing approve which approval shall 447
not be unreasonably withheld. 448
(c) In the event that any act or negligence of the 449
Charterers shall vitiate any of the Insurance herein 450
provided, the Charterers shall pay to the Owners all 451
losses and indemnify the Owners against all claims and 452
demands which would otherwise have been covered by 453
such insurance. 454
(d) The Charterers shall, subject to the approval of the 455
Owners or Owners' Underwriters, effect all insured 456
repairs, and the Charterers shall undertake settlement 457
of all miscellaneous expenses in connection with such 458
repairs as well as all insured charges, expenses and 459
liabilities, to the extent of coverage under the insurances 460
provided for under the provisions of sub-clause 14(a). 461
The Charterers to be secured reimbursement through 462
the Owners' Underwriters for such expenditures upon 463
presentation of accounts. 464
(e) The Charterers to remain responsible for and to 465
effect repairs and settlement of costs and expenses 466
incurred thereby in respect of all other repairs not 467
covered by the Insurances and/or not exceeding any 468
possible franchise(s) or deductibles provided for in the 469
insurances. 470
(f) All time used for repairs under the provisions of 471
sub-clauses 14(d) and 14(e) and for repairs of latent 472
defects according to Clause 2 above, including any 473
deviation, shall be for the Charterers' account and shall 474

form part of the Charter Period. 475
The Owners shall not be responsible for any expenses 476
as are incident to the use and operation of the Vessel 477
for such time as may be required to make such repairs. 478
(g) If the conditions of the above Insurances permit 479
additional insurance to be placed by the parties such 480
cover shall be limited to the amount for each party set 481
out in Box 30 and Box 31, respectively. The Owners or 482
the Charterers as the case may be shall immediately 483
furnish the other party with particulars of any additional 484
insurance effected, including copies of any cover notes 485
or policies and the written consent of the insurers of 486
any such required insurance in any case where the 487
consent of such insurers is necessary. 488
(h) Should the Vessel become an actual, constructive, 489
compromised or agreed total loss under the insurances 490
required under sub-clause 14(a), all insurance payments 491
for such loss shall be paid to the Owners, who shall 492
distribute the moneys between themselves and the 493
Charterers according to their respective interests. 494
(i) If the Vessel becomes an actual, constructive, 495
compromised or agreed total loss under the insurances 496
arranged by the Owners in accordance with sub-clause 497
14(a), this Charter shall terminate as of the date of such 498
loss. 499
(j) The Charterers shall upon the request of the 500
Owners, promptly execute such documents as may be 501
required to enable the Owners to abandon the Vessel 502
to the Insurers and claim a constructive total loss. 503
(k) For the purpose of insurance coverage against hull 504
and machinery and war risks under the provisions of 505
sub-clause 14(a), the value of the Vessel is the sum 506
indicated in Box 29. 507
(l) Notwithstanding anything contained in sub-clause 508
40(a), it is agreed that under the provisions of Clause 509
14, if applicable, the Owners shall keep the Vessel's 510
Class fully up to date with the Classification Society 511
indicated in Box 10 and maintain all other necessary 512
certificates in force at all times. 513

**15. Redelivery** 514
At the expiration of the Charter Period the Vessel shall 515
be redelivered by the Charterers to the Owners at a 516
safe and ice-free port or place as indicated in Box 16. In 517
such ready safe berth as the Owners may direct. The 518
Charterers shall give the Owners not less than thirty 519
(30) running days' preliminary notice of expected date, 520
range of ports of redelivery or port or place of redelivery 521
and not less than fourteen (14) running days' definite 522
notice of expected date and port or place of redelivery, 523
Any changes thereafter in the Vessel's position shall be 524
notified immediately to the Owners. 525
The Charterers warrant that they will not permit the 526
Vessel to commence a voyage (including any preceding 527
ballast voyage) which cannot reasonably be expected 528
to be completed in time to allow redelivery of the Vessel 529
within the Charter Period. Notwithstanding the above, 530
should the Charterers fail to redeliver the Vessel within 531
the Charter Period, the Charterers shall pay the daily 532
equivalent to the rate of hire stated in Box 22 plus 10 533
per cent. or to the market rate, whichever is the higher, 534
for the number of days by which the Charter Period is 535
exceeded. All other terms, conditions and provisions of 536
this Charter shall continue to apply. 537
Subject to the provisions of Clause 10, the Vessel shall 538
be redelivered to the Owners in the same or as good 539
structure, state, condition and class as that in which she 540
was delivered, fair wear and tear not affecting class 541
excepted. 542
The Vessel upon redelivery shall have her survey cycles 543
up to date and trading and class certificates valid for at 544
least the number of months agreed in Box 17. 545

**16. Non-Lien** 546
The Charterers will not suffer, nor permit to be continued, 547

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

any lien or encumbrance incurred by them or their 548
agents, which might have priority over the title and 549
interest of the Owners and/or the Mortgagees in the 550
Vessel. The Charterers
further agree to fasten to the Vessel Master's office and 551
on the navigation bridge ~~in a conspicuous~~
~~Place~~ and to keep so fastened during the Charter Period 552
a notice reading as follows: 553
"This Vessel is the property of (name of Owners). It is 554
under charter to (name of Charterers) and is mortgaged 555
to DVB Bank SE and by the terms
of the Charter Party and the Mortgage neither the 556
Charterers nor the
Master have any right, power or authority to create, incur 557
or permit to be imposed on the Vessel any lien 558
whatsoever." 559

**17. Indemnity See also Clause 38** 560
(a) The Charterers shall indemnify the Owners against 561
any loss, damage or expense incurred by the Owners 562
arising out of or in relation to the operation of the Vessel 563
by the Charterers, and against any lien of whatsoever 564
nature arising out of an event occurring during the 565
Charter Period, if the Vessel be arrested or otherwise 566
detained by reason of claims or liens arising out of her 567
operation hereunder by the Charterers, the Charterers 568
shall at their own expense take all reasonable steps to 569
secure that within a reasonable time the Vessel is 570
released, including the provision of bail. 571
Without prejudice to the generality of the foregoing, the 572
Charterers agree to indemnify the Owners against all 573
consequences or liabilities arising from the Master, 574
officers or agents signing Bills of Lading or other 575
documents. 576
(b) If the Vessel be arrested or otherwise detained by 577
reason of a claim or claims against the Owners, the 578
Owners shall at their own expense take all reasonable 579
steps to secure that within a reasonable time the Vessel 580
is released, including the provision of bail. 581
In such circumstances the Owners shall indemnify the 582
Charterers against any loss, damage or expense 583
incurred by the Charterers (including hire paid under 584
this Charter) as a direct consequence of such arrest or 585
detention. 586

**18. Lien** 587
The Owners to have a lien upon all cargoes, sub-hires 588
and sub-freights belonging or due to the Charterers or 589
any sub-charterers and any Bill of Lading freight for all 590
claims under this Charter, ~~and the Charterers to have a~~ 591
~~lien on the Vessel for all moneys paid in advance and~~ 592
~~not earned.~~ 593

**19. Salvage** 594
All salvage and towage performed by the Vessel shall 595
be for the Charterers' benefit and the cost of repairing 596
damage occasioned thereby shall be borne by the 597
Charterers. 598

**20. Wreck Removal** 599
In the event of the Vessel becoming a wreck or 600
obstruction to navigation the Charterers shall indemnify 601
the Owners against any sums whatsoever which the 602
Owners shall become liable to pay and shall pay in 603
consequence of the Vessel becoming a wreck or 604
obstruction to navigation. 605

**21. General Average** 606
The Owners shall not contribute to General Average. 607

**22. Assignment, Sub-Charter and Sale See also Clauses** 608
**41 and 49**
(a) The Charterers shall not assign this Charter without 609
the prior written consent of the Owners and the
Mortgagee nor
sub-charter the Vessel on a bareboat basis except with 610
the prior consent in writing of the Owners, ~~which shall~~ 611

~~not be unreasonably withheld; and which shall be~~ 612
~~subject to such terms~~
~~and conditions as the Owners and the Mortgagee shall~~ 613
~~approve.~~
~~(b) The Owners shall not sell the Vessel during the~~ 614
~~currency of this Charter except with the prior written~~ 615
~~consent of the Charterers, which shall not be unreason-~~ 616
~~ably withheld, and subject to the buyer accepting an~~ 617
~~assignment of this Charter.~~ 618

**23. Contracts of Carriage** 619
*) (a) The Charterers are to procure that all Bills of 620
Lading issued under this Charter are the Charterers' Bills
of Lading and that all documents
issued during the Charter Period evidencing the terms 621
and conditions agreed in respect of carriage of goods 622
shall contain a paramount clause incorporating any 623
legislation relating to carrier's liability for cargo 624
compulsorily applicable in the trade; if no such legislation 625
exists, the documents shall incorporate the Hague-Visby 626
Rules. The documents shall also contain the New Jason 627
Clause and the Both-to-Blame Collision Clause. 628
*) ~~(b) The Charterers are to procure that all passenger~~ 629
~~tickets issued during the Charter Period for the carriage~~ 630
~~of passengers and their luggage under this Charter shall~~ 631
~~contain a paramount clause incorporating any legislation~~ 632
~~relating to carrier's liability for passengers and their~~ 633
~~luggage compulsorily applicable in the trade; if no such~~ 634
~~legislation exists, the passenger tickets shall incorporate~~ 635
~~the Athens Convention Relating to the Carriage of~~ 636
~~Passengers and their Luggage by Sea, 1974, and any~~ 637
~~protocol thereto.~~ 638
*) Delete as applicable. 639

**24. Bank Guarantee** 640
(Optional, only to apply if Box 27 filled in) 641
~~The Charterers undertake to furnish, before delivery of~~ 642
~~the Vessel, a first class bank guarantee or bond in the~~ 643
~~sum and at the place as indicated in Box 27 as guarantee~~ 644
~~for full performance of their obligations under this~~ 645
~~Charter.~~ 646

**25. Requisition/Acquisition See also Clause 45** 647
(a) In the event of the Requisition for Hire of the Vessel 648
by any governmental or other competent authority 649
(hereinafter referred to as "Requisition for Hire") 650
irrespective of the date during the Charter Period when 651
"Requisition for Hire" may occur and irrespective of the 652
length thereof and whether or not it be for an indefinite 653
or a limited period of time, and irrespective of whether it 654
may or will remain in force for the remainder of the 655
Charter Period, this Charter shall not be deemed thereby 656
or thereupon to be frustrated or otherwise terminated 657
and the Charterers shall continue to pay the stipulated 658
hire in the manner provided by this Charter until the time 659
when the Charter would have terminated pursuant to 660
any of the provisions hereof always provided however 661
that in the event of "Requisition for Hire" any Requisition 662
Hire or compensation received or receivable by the 663
Owners shall be payable to the Charterers during the 664
remainder of the Charter Period or the period of the 665
"Requisition for Hire" whichever be the shorter. 666
~~(b) In the event of the Owners being deprived of their~~ 667
~~ownership in the Vessel by any Compulsory Acquisition~~ 668
~~of the Vessel or requisition for title by any governmental~~ 669
~~or other competent authority (hereinafter referred to as~~ 670
~~"Compulsory Acquisition"), then, irrespective of the date~~ 671
~~during the Charter Period when "Compulsory Acqui-~~ 672
~~sition" may occur, this Charter shall be deemed~~ 673
~~terminated as of the date of such "Compulsory~~ 674
~~Acquisition". In such event Charter Hire to be considered~~ 675
~~as earned and to be paid up to the date and time of~~ 676
~~such "Compulsory Acquisition".~~ 677

**26. War** 678
(a) For the purpose of this Clause, the words "War 679

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being
made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss,
damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Risks" shall include any war (whether actual or 680
threatened), war of war, civil war, hostilities, revolution, 681
rebellion, civil commotion, warlike operations, the laying 682
of mines (whether actual or reported), acts of piracy, 683
acts of terrorists, acts of hostility or malicious damage, 684
blockades (whether imposed against all vessels or 685
imposed selectively against vessels of certain flags or 686
ownership, or against certain cargoes or crews or 687
otherwise howsoever), by any person, body, terrorist or 688
political group, or the Government of any state 689
whatsoever, which may be dangerous or are likely to be 690
or to become dangerous to the Vessel, her cargo, crew 691
or other persons on board the Vessel. 692

(b)   ~~The Vessel, unless the written consent of the~~ 693
~~Owners be first obtained, shall not continue to or go~~ 694
~~through any port, place, or area (whether of land~~ 695
~~or sea), or any waterway or canal, where it reasonably~~ 696
~~appears that the Vessel, her cargo, crew or other~~ 697
~~persons on board the Vessel, in the reasonable~~ 698
~~judgement of the Owners, may be, or are likely to be,~~ 699
~~exposed to War Risks. Should the Vessel be within any~~ 700
~~such place as aforesaid, which only becomes danger-~~ 701
~~ous, or is likely to be or to become dangerous, after her~~ 702
~~entry into it, the Owners shall have the right to require~~ 703
~~the Vessel to leave such area.~~ 704

(c)   ~~The Vessel shall not load contraband cargo, or to~~ 705
~~pass through any blockade, whether such blockade be~~ 706
~~imposed on all vessels, or is imposed selectively in any~~ 707
~~way whatsoever against vessels of certain flags or~~ 708
~~ownership, or against certain cargoes or crews or~~ 709
~~otherwise howsoever, or to proceed to an area where~~ 710
~~she shall be subject, or is likely to be subject to~~ 711
~~a belligerent's right of search and/or confiscation.~~ 712

(d)   ~~If the insurers of the war risks insurance, when~~ 713
~~Clause 14 is applicable, should require payment of~~ 714
~~premiums and/or calls because, pursuant to the~~ 715
~~Charterers' orders, the Vessel is within, or is due to enter~~ 716
~~and remain within, any area or areas which are specified~~ 717
~~by such insurers as being subject to additional premiums~~ 718
~~because of War Risks, then such premiums and/or calls~~ 719
~~shall be reimbursed by the Charterers to the Owners at~~ 720
~~the same time as the next payment of hire is due.~~ 721

(e)   ~~The Charterers shall have the liberty:~~ 722
(i)   ~~to comply with all orders, directions, recommend-~~ 723
~~ations or advice as to departure, arrival, routes,~~ 724
~~sailing in convoy, ports of call, stoppages,~~ 725
~~destinations, discharge of cargo, delivery, or in any~~ 726
~~other way whatsoever, which are given by the~~ 727
~~Government of the Nation under whose flag the~~ 728
~~Vessel sails, or any other Government, body or~~ 729
~~group whatsoever acting with the power to compel~~ 730
~~compliance with their orders or directions;~~ 731
(ii)   ~~to comply with the orders, directions or recom-~~ 732
~~mendations of any war risks underwriters who have~~ 733
~~the authority to give the same under the terms of~~ 734
~~the war risks insurance;~~ 735
(iii)   ~~to comply with the terms of any resolution of the~~ 736
~~Security Council of the United Nations, any~~ 737
~~directives of the European Community, the effective~~ 738
~~orders of any other Supranational body which has~~ 739
~~the right to issue and give the same, and with~~ 740
~~national laws aimed at enforcing the same to which~~ 741
~~the Owners are subject, and to obey the orders~~ 742
~~and directions of those who are charged with their~~ 743
~~enforcement.~~ 744

(f)   ~~In the event of outbreak of war (whether there be a~~ 745
~~declaration of war or not) (i) between any two or more~~ 746
countries 
~~of the following countries: the United States of America;~~ 747
~~Russia; the United Kingdom; France; and the People's~~ 748
~~Republic of China, (ii) between any two or more of the~~ 749
~~countries stated in Box 36, both the Owners and the~~ 750
~~Charterers shall have the right to cancel this Charter,~~ 751
~~whereupon the Charterers shall redeliver the Vessel to~~ 752
~~the Owners in accordance with Clause 15. If the Vessel~~ 753

~~has cargo on board after discharge thereof at~~ 754
~~destination, or if debarred under this Clause from~~ 755
~~reaching or entering it at a near, open and safe port as~~ 756
~~directed by the Owners, or if the Vessel has no cargo~~ 757
~~on board, at the port at which the Vessel then is or if at~~ 758
~~sea at a near, open and safe port as directed by the~~ 759
~~Owners. In all cases hire shall continue to be paid in~~ 760
~~accordance with Clause 11 and Clauses 34 and 35 and~~ 761
~~except as aforesaid all~~
other provisions of this Charter shall apply until the end 762
of the Charter Period. 
Redelivery. 763

27.   ~~Commission~~ 764
~~(a)   The Owners to pay a commission at the rate indicated~~ 765
~~in Box 33 to the Brokers named in Box 33 on any hire~~ 766
~~paid under the Charter. If no rate is indicated in Box 33,~~ 767
~~the commission to be paid by the Owners shall cover~~ 768
~~The actual expenses of the Brokers and a reasonable~~ 769
~~fee for their work.~~ 770
~~If the full hire is not paid owing to breach of the Charter~~ 771
~~by either of the parties the party liable thereto shall~~ 772
~~indemnify the Brokers against their loss of commission.~~ 773
~~Should the parties agree to cancel the Charter, the~~ 774
~~Owners shall indemnify the Brokers against any loss of~~ 775
~~commission but in such case the commission shall not~~ 776
~~exceed the brokerage on one year's hire.~~ 777

28.   Termination  See also Clauses 46 and 47 778
~~(a)   Charterers' Default~~ 779
~~The Owners shall be entitled to withdraw the Vessel from~~ 780
~~the service of the Charterers and terminate the Charter~~ 781
~~with immediate effect by written notice to the Charterers if:~~ 782
(i)   ~~the Charterers fail to pay hire in accordance with~~ 783
~~Clause 11. However, where there is a failure to~~ 784
~~make punctual payment of hire due to oversight,~~ 785
~~negligence, errors or omissions on the part of the~~ 786
~~Charterers or their bankers, the Owners shall give~~ 787
~~the Charterers written notice of the number of clear~~ 788
~~banking days stated in Box 34 (as recognised at~~ 789
~~the agreed place of payment) in which to rectify~~ 790
~~the failure, and when so rectified within such~~ 791
~~number of days following the Owners' notice, the~~ 792
~~payment shall stand as regular and punctual.~~ 793
~~Failure by the Charterers to pay hire within the~~ 794
~~number of days stated in Box 34 of their receiving~~ 795
~~the Owners' notice as provided herein, shall entitle~~ 796
~~the Owners to withdraw the Vessel from the service~~ 797
~~of the Charterers and terminate the Charter without~~ 798
~~further notice;~~ 799
(ii)   ~~the Charterers fail to comply with the requirements of:~~ 800
~~(1) Clause 6 (Trading Restrictions)~~ 801
~~(2) Clause 13(a) (Insurance and Repairs)~~ 802
~~provided that the Owners shall have the option, by~~ 803
~~written notice to the Charterers, to give the~~ 804
~~Charterers a specified number of days grace within~~ 805
~~which to rectify the failure without prejudice to the~~ 806
~~Owners' right to withdraw and terminate under this~~ 807
~~Clause if the Charterers fail to comply with such~~ 808
~~notice;~~ 809
(iii)   ~~the Charterers fail to rectify any failure to comply~~ 810
~~with the requirements of sub-clause 10(a)(i)~~ 811
~~(Maintenance and Repairs) as soon as practically~~ 812
~~possible after the Owners have requested them in~~ 813
~~writing so to do and in any event so that the Vessel's~~ 814
~~insurance cover is not prejudiced.~~ 815
~~(b)   Owners' Default~~ 816
~~If the Owners shall by any act or omission be in breach~~ 817
~~of their obligations under this Charter to the extent that~~ 818
~~the Charterers are deprived of the use of the Vessel~~ 819
~~and such breach continues for a period of fourteen (14)~~ 820
~~running days after written notice thereof has been given~~ 821
~~by the Charterers to the Owners, the Charterers shall~~ 822
~~be entitled to terminate this Charter with immediate effect~~ 823
~~by written notice to the Owners.~~ 824

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

(c) Loss of Vessel 825
This Charter shall be deemed to be terminated if the 826
Vessel becomes a total loss or is declared as a 827
constructive or compromised or arranged total loss. For 828
the purpose of this sub-clause, the Vessel shall not be 829
deemed to be lost unless she has either become an 830
actual total loss or agreement has been reached with 831
her underwriters in respect of her constructive, 832
compromised or arranged total loss or if such agreement 833
with her underwriters is not reached it is adjudged by a 834
competent tribunal that a constructive loss of the Vessel 835
has occurred. 836
(d) Either party shall be entitled to terminate this 837
Charter with immediate effect by written notice to the 838
other party. In the event of an order being made or 839
resolution passed for the winding up, dissolution, 840
liquidation or bankruptcy of the other party (otherwise 841
than for the purpose of reconstruction or amalgamation) 842
or if a receiver is appointed, or if it suspends payment, 843
ceases to carry on business or makes any special 844
arrangement or composition with its creditors. 845
(e) The termination of this Charter shall be without 846
prejudice to all rights accrued due between the parties 847
prior to the date of termination and to any claim that 848
either party might have. 849

29. **Repossession** See also Clause 47 850
In the event of the termination of this Charter in 851
accordance with the applicable provisions of Clause 28 852
Clause 47, 853
the Owners shall have the right to repossess the Vessel 853
from the Charterers at her current or next port of call or at 854
sea, or 854
at a port or place convenient to them without hindrance 855
or interference by the Charterers, courts or local 856
authorities. Pending physical repossession of the Vessel 857
in accordance with this Clause 29 and Clause 47, the 858
Charterers shall 858
hold the Vessel as gratuitous bailee only to the Owners 859
and shall continue to maintain class and insure the 859
Vessel as required by the terms of this Charter 859
notwithstanding the termination of the chartering of 859
the Vessel. 859
The Owners shall arrange for an authorised represent- 860
ative to board the Vessel as soon as reasonably 861
practicable following the termination of the Charter. The 862
Vessel shall be deemed to be repossessed by the 863
Owners from the Charterers upon the boarding of the 864
Vessel by the Owners' representative. All arrangements 865
and expenses relating to the settling of wages, 866
disembarkation and repatriation of the Charterers' 867
Master, officers and crew shall be the sole responsibility 868
of the Charterers. 869

30. **Dispute Resolution** See Clause 58 870
*) (a) This Contract shall be governed by and construed 871
in accordance with English law and any dispute arising 872
out of or in connection with this Contract shall be referred 873
to arbitration in London in accordance with the Arbitration 874
Act 1996 or any statutory modification or re-enactment 875
thereof save to the extent necessary to give effect to 876
the provisions of this Clause. 877
The arbitration shall be conducted in accordance with 878
the London Maritime Arbitrators Association (LMAA) 879
Terms current at the time when the arbitration proceed- 880
ings are commenced. 881
The reference shall be to three arbitrators. A party 882
wishing to refer a dispute to arbitration shall appoint its 883
arbitrator and send notice of such appointment in writing 884
to the other party requiring the other party to appoint its 885
own arbitrator within 14 calendar days of that notice and 886
stating that it will appoint its arbitrator as sole arbitrator 887
unless the other party appoints its own arbitrator and 888
gives notice that it has done so within the 14 days 889
specified. If the other party does not appoint its own 890

arbitrator and give notice that it has done so within the 891
14 days specified, the party referring a dispute to 892
arbitration may, without the requirement of any further 893
prior notice to the other party, appoint its arbitrator as 894
sole arbitrator and shall advise the other party 895
accordingly. The award of a sole arbitrator shall be 896
binding on both parties as if he had been appointed by 897
agreement. 898
Nothing herein shall prevent the parties agreeing in 899
writing to vary these provisions to provide for the 900
appointment of a sole arbitrator. 901
In cases where neither the claim nor any counterclaim 902
exceeds the sum of US$50,000 (or such other sum as 903
the parties may agree) the arbitration shall be conducted 904
in accordance with the LMAA Small Claims Procedure 905
current at the time when the arbitration proceedings are 906
commenced. 907
*) (b) This Contract shall be governed by and construed 908
in accordance with Title 9 of the United States Code 909
and the Maritime Law of the United States and any 910
dispute arising out of or in connection with this Contract 911
shall be referred to three persons at New York, one to 912
be appointed by each of the parties hereto, and the third 913
by the two so chosen; their decision or that of any two 914
of them shall be final, and for the purposes of enforcing 915
any award, judgement may be entered on an award by 916
any court of competent jurisdiction. The proceedings 917
shall be conducted in accordance with the rules of the 918
Society of Maritime Arbitrators, Inc. 919
In cases where neither the claim nor any counterclaim 920
exceeds the sum of US$50,000 (or such other sum as 921
the parties may agree) the arbitration shall be conducted 922
in accordance with the Shortened Arbitration Procedure 923
of the Society of Maritime Arbitrators, Inc. current at 924
the time when the arbitration proceedings are commenced. 925
*) (c) This Contract shall be governed by and construed 926
in accordance with the laws of the place mutually agreed 927
by the parties and any dispute arising out of or in 928
connection with this Contract shall be referred to 929
arbitration at a mutually agreed place, subject to the 930
procedures applicable there. 931
(d) Notwithstanding (a), (b) or (c) above, the parties 932
may agree at any time to refer to mediation any 933
difference and/or dispute arising out of or in connection 934
with this Contract. 935
In the case of a dispute in respect of which arbitration 936
has been commenced under (a), (b) or (c) above, the 937
following shall apply: 938
(i) Either party may at any time and from time to time 939
elect to refer the dispute or part of the dispute to 940
mediation by service on the other party of a written 941
notice (the "Mediation Notice") calling on the other 942
party to agree to mediation. 943
(ii) The other party shall thereupon within 14 calendar 944
days of receipt of the Mediation Notice confirm that 945
they agree to mediation, in which case the parties 946
shall thereafter agree a mediator within a further 947
14 calendar days, failing which on the application 948
of either party a mediator will be appointed promptly 949
by the Arbitration Tribunal ("the Tribunal") or such 950
person as the Tribunal may designate for that 951
purpose. The mediation shall be conducted in such 952
place and in accordance with such procedure and 953
on such terms as the parties may agree or, in the 954
event of disagreement, as may be set by the 955
mediator. 956
(iii) If the other party does not agree to mediate, that 957
fact may be brought to the attention of the Tribunal 958
and may be taken into account by the Tribunal when 959
allocating the costs of the arbitration as between 960
the parties. 961
(iv) The mediation shall not affect the right of either 962
party to seek such relief or take such steps as it 963
considers necessary to protect its interest. 964
(v) Either party may advise the Tribunal that they have 965

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being
made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss,
damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

agreed to mediation. The arbitration procedure shall    966
continue during the conduct of the mediation but    967
the Tribunal may take the mediation timetable into    968
account when setting the timetable for steps in the    969
arbitration.    970
(vi) Unless otherwise agreed or specified in the    971
mediation terms, each party shall bear its own costs    972
incurred in the mediation and the parties shall share    973
equally the mediator's costs and expenses.    974
(vii) The mediation process shall be without prejudice    975
and confidential and no information or documents    976
disclosed during it shall be revealed to the Tribunal    977
except to the extent that they are disclosable under    978
the law and procedure governing the arbitration.    979
*(Note: The parties should be aware that the mediation*    980
*process may not necessarily interrupt time limits.)*    981
(c) If Box 35 in Part I is not appropriately filled in, sub-clause    982
30(a) of this Clause shall apply. Sub-clause 30(d) shall    983
Apply in all cases.    984
*) Sub-clauses 30(a), 30(b) and 30(c) are alternatives;    985
indicate alternative agreed in Box 35.    986

31.   **Notices** See Clause 59    987
(a) Any notice to be given by either party to the other    988
party shall be in writing and may be sent by fax, telex,    989
registered or recorded mail or by personal service.    990
(b) The address of the Parties for service of such    991
communication shall be as stated in Boxes 3 and 4    992
respectively.    993

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being
made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply, BIMCO assumes no responsibility for any loss,
damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# "BARECON 2001" Standard Bareboat Charter

## PART III
## PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY
(Optional, only to apply if expressly agreed and stated in Box 37)

| | |
|---|---|
| **1. Specifications and Building Contract** | 1 |
| (a)  The Vessel shall be constructed in accordance with | 2 |
| the Building Contract (hereafter called "the Building | 3 |
| Contract") as annexed to this Charter, made between the | 4 |
| Builders and the Owners and in accordance with the | 5 |
| specifications and plans annexed thereto, such Building | 6 |
| Contract, specifications and plans having been counter- | 7 |
| signed as approved by the Charterers. | 8 |
| (b)  No change shall be made in the Building Contract or | 9 |
| in the specifications or plans of the Vessel as approved by | 10 |
| the Charterers as aforesaid, without the Charterers' | 11 |
| consent. | 12 |
| (c)  The Charterers shall have the right to send their | 13 |
| representative to the Builders' Yard to inspect the Vessel | 14 |
| during the course of her construction to satisfy themselves | 15 |
| that construction is in accordance with such approved | 16 |
| specifications and plans as referred to under sub-clause | 17 |
| (a) of this Clause. | 18 |
| (d)  The Vessel shall be built in accordance with the | 19 |
| Building Contract and shall be of the description set out | 20 |
| therein. Subject to the provisions of sub-clause 2(c)(ii) | 21 |
| hereunder, the Charterers shall be bound to accept the | 22 |
| Vessel from the Owners, completed and constructed in | 23 |
| accordance with the Building Contract, on the date of | 24 |
| delivery by the Builders. The Charterers undertake that | 25 |
| having accepted the Vessel they will not thereafter raise | 26 |
| any claims against the Owners in respect of the Vessel's | 27 |
| performance or specification or defects, if any. | 28 |
| Nevertheless, in respect of any repairs, replacements or | 29 |
| defects which appear within the first 12 months from | 30 |
| delivery by the Builders, the Owners shall endeavour to | 31 |
| compel the Builders to repair, replace or remedy any defects | 32 |
| or to recover from the Builders any expenditure incurred in | 33 |
| carrying out such repairs, replacements or remedies. | 34 |
| However, the Owners' liability to the Charterers shall be | 35 |
| limited to the extent the Owners have a valid claim against | 36 |
| the Builders under the guarantee clause of the Building | 37 |
| Contract (a copy whereof has been supplied to the | 38 |
| Charterers). The Charterers shall be bound to accept such | 39 |
| sums as the Owners are reasonably able to recover under | 40 |
| this Clause and shall make no further claim on the Owners | 41 |
| for the difference between the amount(s) so recovered and | 42 |
| the actual expenditure on repairs, replacement or | 43 |
| remedying defects or for any loss of time incurred. | 44 |
| Any liquidated damages for physical defects or deficiencies | 45 |
| shall accrue to the account of the party stated in Box 41(a) | 46 |
| or if not filled in shall be shared equally between the parties. | 47 |
| The costs of pursuing a claim or claims against the Builders | 48 |
| under this Clause (including any liability to the Builders) | 49 |
| shall be borne by the party stated in Box 41(b) or if not | 50 |
| filled in shall be shared equally between the parties. | 51 |
| **2. Time and Place of Delivery** | 52 |
| (a)  Subject to the Vessel having completed her | 53 |
| acceptance trials including trials of cargo equipment in | 54 |
| accordance with the Building Contract and specifications | 55 |
| to the satisfaction of the Charterers, the Owners shall give | 56 |
| and the Charterers shall take delivery of the Vessel afloat | 57 |
| when ready for delivery and properly documented at the | 58 |
| Builders' Yard or some other safe and readily accessible | 59 |
| dock, wharf or place as may be agreed between the parties | 60 |
| hereto and the Builders. Under the Building Contract the | 61 |
| Builders have estimated that the Vessel will be ready for | 62 |
| delivery to the Owners as therein provided but the delivery | 63 |
| date for the purpose of this Charter shall be the date when | 64 |
| the Vessel is in fact ready for delivery by the Builders after | 65 |
| completion of trials whether that be before or after as | 66 |
| indicated in the Building Contract. The Charterers shall not | 67 |
| be entitled to refuse acceptance of delivery of the Vessel | 68 |

| | |
|---|---|
| and upon and after such acceptance, subject to Clause | 69 |
| 4(d), the Charterers shall not be entitled to make any claim | 70 |
| against the Owners in respect of any conditions, | 71 |
| representations or warranties, whether express or implied, | 72 |
| as to the seaworthiness of the Vessel or in respect of delay | 73 |
| in delivery. | 74 |
| (b)  If for any reason other than a default by the Owners | 75 |
| under the Building Contract, the Builders become entitled | 76 |
| under that Contract not to deliver the Vessel to the Owners, | 77 |
| the Owners shall upon giving to the Charterers written | 78 |
| notice of Builders becoming so entitled, be excused from | 79 |
| giving delivery of the Vessel to the Charterers and upon | 80 |
| receipt of such notice by the Charterers this Charter shall | 81 |
| cease to have effect. | 82 |
| (c)  If for any reason the Owners become entitled under | 83 |
| the Building Contract to reject the Vessel the Owners shall, | 84 |
| before exercising such right of rejection, consult the | 85 |
| Charterers and thereupon | 86 |
| (i) If the Charterers do not wish to take delivery of the Vessel | 87 |
| they shall inform the Owners within seven (7) running days | 88 |
| by notice in writing and upon receipt by the Owners of such | 89 |
| notice this Charter shall cease to have effect; or | 90 |
| (ii) If the Charterers wish to take delivery of the Vessel | 91 |
| they may by notice in writing within seven (7) running days | 92 |
| require the Owners to negotiate with the Builders as to the | 93 |
| terms on which delivery should be taken and/or refrain from | 94 |
| exercising their right to rejection and upon receipt of such | 95 |
| notice the Owners should be under an obligation to negotiate | 96 |
| or take delivery of the Vessel from the Builders and deliver | 97 |
| her to the Charterers; | 98 |
| (iii) In no circumstances shall the Charterers be entitled to | 99 |
| reject the Vessel unless the Owners are able to reject the | 100 |
| Vessel from the Builders; | 101 |
| (iv) If this Charter terminates under sub-clause (b) or (c) of | 102 |
| this Clause, the Owners shall thereafter not be liable to the | 103 |
| Charterers for any claim under or arising out of this Charter | 104 |
| or its termination. | 105 |
| (d)  Any liquidated damages for delay in delivery under the | 106 |
| Building Contract and any costs incurred in pursuing a claim | 107 |
| therefor shall accrue to the account of the party stated in | 108 |
| Box 41(c) or if not filled in shall be shared equally between | 109 |
| the parties. | 110 |
| **3. Guarantee Works** | 111 |
| If not otherwise agreed, the Owners authorise the | 112 |
| Charterers to arrange for the guarantee works to be | 113 |
| performed in accordance with the building contract terms, | 114 |
| and hire to continue during the period of guarantee works. | 115 |
| The Charterers have to advise the Owners about the | 116 |
| performance to the extent the Owners may request. | 117 |
| **4. Name of Vessel** | 118 |
| The name of the Vessel shall be mutually agreed between | 119 |
| the Owners and the Charterers and the Vessel shall be | 120 |
| painted in the colours, display the funnel insignia and fly | 121 |
| the house flag as required by the Charterers. | 122 |
| **5. Survey on Redelivery** | 123 |
| The Owners and the Charterers shall appoint surveyors | 124 |
| for the purpose of determining and agreeing in writing the | 125 |
| condition of the Vessel at the time of re-delivery. | 126 |
| Without prejudice to Clause 15 (Part II), the Charterers | 127 |
| shall bear all survey expenses and all other costs, if any, | 128 |
| including the cost of docking and undocking, if required, | 129 |
| as well as all repair costs incurred. The Charterers shall | 130 |
| also bear all loss of time spent in connection with any | 131 |
| docking and undocking as well as repairs, which shall be | 132 |
| paid at the rate of hire per day or pro rata. | 133 |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

OPTIONAL PART

## "BARECON 2001" Standard Bareboat Charter

### PART IV
### HIRE/PURCHASE AGREEMENT
*(Optional, only to apply if expressly agreed and stated in Box 42)*

> OPTIONAL
> PART

On expiration of this Charter and provided the Charterers have fulfilled their obligations according to Part I and II as well as Part III, if applicable, it is agreed, that on payment of the final payment of hire as per Clause 11 the Charterers have purchased the Vessel with everything belonging to her and the Vessel is fully paid for. — 1–7

In the following paragraphs the Owners are referred to as the Sellers and the Charterers as the Buyers. — 8–9

The Vessel shall be delivered by the Sellers and taken over by the Buyers on expiration of the Charter. — 10–11

The Sellers guarantee that the Vessel, at the time of delivery, is free from all encumbrances and maritime liens or any debts whatsoever other than those arising from anything done or not done by the Buyers or any existing mortgage agreed not to be paid off by the time of delivery. Should any claims, which have been incurred prior to the time of delivery be made against the Vessel, the Sellers hereby undertake to indemnify the Buyers against all consequences of such claims to the extent it can be proved that the Sellers are responsible for such claims. Any taxes, notarial, consular and other charges and expenses connected with the purchase and registration under Buyers' flag, shall be for Buyers' account. Any taxes, consular and other charges and expenses connected with closing of the Sellers' register, shall be for Sellers' account. — 12–27

In exchange for payment of the last month's hire instalment the Sellers shall furnish the Buyers with a Bill of Sale duly attested and legalized, together with a certificate setting out the registered encumbrances, if any. On delivery of the Vessel the Sellers shall provide for deletion of the Vessel from the Ship's Register and deliver a certificate of deletion to the Buyers. — 28–34

The Sellers shall, at the time of delivery, hand to the Buyers all classification certificates (for hull, engines, anchors, chains, etc.), as well as all plans which may be in Sellers' possession. — 35–38

The Wireless Installation and Nautical Instruments, unless on hire, shall be included in the sale without any extra payment. — 39–41

The Vessel with everything belonging to her shall be at Sellers' risk and expense until she is delivered to the Buyers, subject to the conditions of this Contract and the Vessel with everything belonging to her shall be delivered and taken over as she is at the time of delivery, after which the Sellers shall have no responsibility for possible faults or deficiencies of any description. — 42–48

The Buyers undertake to pay for the repatriation of the Master, officers and other personnel if appointed by the Sellers to the port where the Vessel entered the Bareboat Charter as per Clause 3 (Part II) or to pay the equivalent cost for their journey to any other place. — 49–53

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# PART V
## PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY
*(Optional, only to apply if expressly agreed and stated in Box 43)*

1. **Definitions** — 1
   For the purpose of this PART V, the following terms shall — 2
   have the meanings hereby assigned to them: — 3
   *"The Bareboat Charter Registry"* shall mean the registry — 4
   of the State whose flag the Vessel will fly and in which — 5
   the Charterers are registered as the bareboat charterers — 6
   during the period of the Bareboat Charter. — 7
   *"The Underlying Registry"* shall mean the registry of the — 8
   state in which the Owners of the Vessel are registered — 9
   as Owners and to which jurisdiction and control of the — 10
   Vessel will revert upon termination of the Bareboat — 11
   Charter Registration. — 12

2. ~~Mortgage~~ — 13
   ~~The Vessel chartered under this Charter is financed by~~ — 14
   ~~a mortgage and the provisions of Clause 12(b) (Part II)~~ — 15
   ~~shall apply.~~ — 16

3. ~~Termination of Charter by Default~~ — 17
   ~~If the Vessel chartered under this Charter is registered~~ — 18
   ~~in a Bareboat Charter Registry as stated in Box 44, and~~ — 19
   ~~if the Owners shall default in the payment of any amounts~~ — 20
   ~~due under the mortgage(s) specified in Box 28, the~~ — 21
   ~~Charterers shall, if so required by the mortgagee, direct~~ — 22
   ~~the Owners to re-register the Vessel in the Underlying~~ — 23
   ~~Registry as shown in Box 45.~~ — 24
   ~~In the event of the Vessel being deleted from the~~ — 25
   ~~Bareboat Charter Registry as stated in Box 44, due to a~~ — 26
   ~~default by the Owners in the payment of any amounts~~ — 27
   ~~due under the mortgage(s), the Charterers shall have~~ — 28
   ~~the right to terminate this Charter forthwith and without~~ — 29
   ~~prejudice to any other claim they may have against the~~ — 30
   ~~Owners under this Charter.~~ — 31

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Rider Clauses

to

Bareboat Charter Party

between

ICON AMAZING, LLC

(the "Owners")

and

AMAZING SHIPPING LTD.

(the "Charterers")

in respect of

m.v. "AMAZING"

## 32.  MOA AND TIME FOR DELIVERY

The Owners' obligations to charter the Vessel to the Charterers under this Charter are conditional upon delivery of the Vessel to the Owners by the Charterers pursuant to the MoA.

Immediately following the Vessel being delivered to, the Owners pursuant to the MoA, the Charterers shall, be deemed to have taken delivery of the Vessel under this Charter at the port or place of delivery under the MoA.

The date of delivery for the purpose of this Charter shall, unless the Owners require otherwise, be the date (the "Delivery Date") when the Vessel is in fact delivered by the Charterers to the Owners pursuant to the MoA, whether that be before or after the delivery window under the MoA, and the Owners shall be under no responsibility for any delay whatsoever in delivery of the Vessel to the Charterers under this Charter.

The Charterers undertake that in the event the Vessel is not delivered and accepted under the MoA for any reason which is not directly attributable to default on the part of the Owners, the Charterers will promptly upon the Owners' written demand reimburse the Owners in full for any liabilities, losses, costs or expenses incurred by the Owners in respect of such non-delivery. (See also Clause 38.)

Without prejudice to any other provisions of this Charter, the Owners and the Charterers shall on the Delivery Date sign a Protocol of Delivery and Acceptance evidencing delivery of the Vessel under this Charter.

A list of the mutually agreed inventory, spare parts and other equipment pertaining to the Vessel on board and on shore is attached hereto as a Schedule 1.

(a)     If the MoA is cancelled for any reasons whatsoever, then (i) this Charter shall be deemed to have been cancelled forthwith and (ii) the Owners obligations to charter the Vessel to the Charterers under this Charter shall terminate, in each case and without any liability whatsoever on the Owners towards the Charterers. The Charterers' indemnities set out in this Clause 32 and Clause 38 shall survive any such cancelation.

(b)     (i)     The Charterers have no rights whatsoever to refuse to accept delivery of the Vessel once the Vessel is delivered to the Owners under the MoA and the Charterers acknowledge and agree that the Owners make no condition, term, representation or warranty, express or implied (and whether statutory or otherwise) as to title (except for legal title in the name of the Owners), seaworthiness, merchantability, condition, design, operation, performance, capacity or fitness for use of the Vessel or as to the eligibility of the Vessel for any particular trade or operation or any other condition, term, representation or warranty whatsoever, express or implied, with respect to the Vessel. Delivery to the Charterers or (as the case may be) deemed delivery of the Vessel under this Charter shall be conclusive proof that, for the purpose of the obligations and liabilities of the Owners under this Charter or in connection herewith, the Vessel is at that time seaworthy, in accordance with the provisions of this Charter, in good working order and repair and without defect or inherent vice whether or not discoverable by the Charterers and free and clear of all Encumbrances whatsoever, save for the mortgage referred to in Clauses 12 and 40 of this Charter (and other than (x) any such arising from or in connection with the use or operation of the Vessel by the Charterers or any permitted sub-charterers and (y) any maritime liens).

        (ii)    The Charterers agree that the Owners shall be under no liability to supply any replacement vessel or any piece or part thereof during any period when the Vessel is unusable and shall not be liable to the Charterers or any other person as a result of the Vessel being unusable, and if any latent defect should occur, same to be repaired by the Charterers at their cost and time.

        (iii)   The Charterers hereby waive all their rights in respect of any condition, term, representation, or warranty express or implied (and whether statutory or otherwise) on the part of the Owners in respect of the Vessel and all their claims against the Owners howsoever and whensoever the same may arise at any time in respect of or arising out of the operation, condition, merchantability, design, capacity, fitness of use or performance of the Vessel and the chartering thereof under this Charter (including in respect of the seaworthiness or otherwise of the Vessel) and, in particular and without prejudice to the generality of the foregoing, the Owners shall be under no liability to the Charterers whatsoever and howsoever arising in respect of any losses, costs, charges, expenses, fees, payments, liabilities, penalties, fines, damages or other sanctions of a monetary nature in respect of the injury, death, loss, damage or delay of or to or in connection with any person (which expression includes, but is not limited to, states, governments, municipalities and local authorities) or property whatsoever, whether on board the Vessel or elsewhere, irrespective of whether or when or where such injury, death, loss, damage or delay shall arise or of whether it shall arise as a result of the Vessel not being seaworthy or otherwise or of whether or not the Vessel or any part thereof is in the possession or under the control of the Charterers.

(c)     The Charterers will upon delivery have title to and shall not pay for bunkers, lubricating oil, water and unbroached provisions, paints, oil, ropes and other consumable stores in the Vessel on delivery.

33.     CONDITIONS PRECEDENT

The provisions of clause 17 of the MoA shall have been satisfied to the satisfaction of the Owners.

34.     CHARTER HIRE

Commencing from the Delivery Date, the Charterers shall pay charter hire ("**Charter Hire**") to the Owners monthly in advance at the net rate of USD13,500 (United States Dollars thirteen thousand five hundred) per day. The first payment of Charter Hire shall be payable on the Delivery Date with subsequent payments of Charter Hire being paid at one monthly intervals thereafter.

35.     PAYMENTS

(a)     Notwithstanding anything to the contrary contained in this Charter, the Charter Hire and other payments to be made by the Charterers under this Charter (whether by way of hire or otherwise) shall be made as follows;

        (i)     not later than 10.00 a.m. (New York time) on the date on which the relevant payment is due under the terms of this Charter; and

        (ii)    in United States Dollars in funds with the same day value to the Owners' account number as advised by the Owners in a separate letter to the Charterers prior to or on the Delivery Date of the Vessel under this Charter (or such other bank or banks as may from time to time be notified in writing by the Owners to the Charterers) for the account of the Owners under reference to the Vessel's name.

(b)     If any day for the making of any payment under this Charter shall not be a Banking Day the due date for payment of the same shall be the next following Banking Day unless, in the case of a payment of Charter Hire under this Charter, the next following Banking Day falls in the following calendar month, in which case the due date for the relevant payment of Charter Hire shall be the immediately preceding Banking Day.

(c)     All payments under this Charter shall be made net of all commissions (unless otherwise agreed) and without any set-off or counterclaim whatsoever and free and clear of any withholding or deduction for, or on account of, any present or future income, freight, stamp and other taxes, levies, imposts, duties, fees, charges, restrictions or conditions of any nature. If the Charterers are required by any authority in any country to make any withholding or deduction from any such payment, the Charterers shall make such deduction and pay such taxes to the appropriate taxation authority or government, and the sum due from the Charterers in respect of such payment will be increased to the extent necessary to ensure that, after the making of such withholding or deduction the Owners receive a net sum equal to the amount which they would have received had no such deduction or withholding been required to be made. The Charterers will promptly deliver to the Owners any receipts, certificates or other proof evidencing the amounts (if any) paid or payable, in respect of any such deduction or withholding as aforesaid.

(d)     The obligation of the Charterers to pay the Charter Hire and all other sums required to be paid under this Charter is absolute and unconditional and shall not be subject to any right of set-off, counterclaim, recoupment, defence, suspension, withholding, deferment or reduction. The Charterers shall not have any right to terminate this Charter or to be released, relieved, or discharged from any obligation or liability under this Charter by any circumstances whatsoever, including, without limitation:

(i)     any set-off, counterclaim, recoupment, defence or other right which the Charterers may at any time have against the Owners or any other person for any reason whatsoever;

(ii)    any change, extension, indulgence or other act or omission in respect of any indebtedness or obligation of the Charterers, or any sale, exchange, release or surrender of, or other dealing in, any security for any such indebtedness or obligation;

(iii)   any title defect or Encumbrance or any dispossession of the Vessel by title paramount of otherwise;

(iv)    any defect in the condition, design, operation, merchantability, seaworthiness or fitness for use or purpose of the Vessel or the ineligibility of the Vessel for any particular trade or use;

(v)     any damage to or loss (including a Total Loss, subject to the terms of this Charter), destruction, capture, seizure, judicial attachment or arrest, forfeiture or marshal's or other sale of the Vessel;

(vi)    any libel, attachment, levy, detention, sequestration or taking into custody of the Vessel or any restriction or prevention of or interference with or interruption or cessation in the use or possession thereof by the Charterers for any reason whatsoever, or any inability to engage in any particular trade;

(vii)   any insolvency, bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceedings by or against the Owners or the Charterers;

(viii)  any lack of due authorizations or documentation for the Vessel for any particular trade or use or invalidity or illegality of or other defect in this Charter; or

(ix)    any circumstances which, but for this provision, might operate to exonerate the Charterers from liability, whether in whole or in part, under this Charter,

whether or not the Charterers shall have notice or knowledge of any of the foregoing, it being the declared intention of the parties that the obligations of the Charterers to pay the Charter Hire and all other sums required to be paid under this Charter shall survive any frustration and the Charterers hereby waive any and all rights which they may now have or which at any time hereafter may be conferred upon them, by statute or otherwise, to terminate or cancel the demise of the Vessel due to the occurrence of any act of frustration, the terms of this Charter prevailing over any relevant statute or law, to the extent permitted by such statute or law. The Charterers shall not seek to recover all or any part of the Charter Hire or any other payments made by the Charterers under this Charter from the Owners for any reason whatsoever.

(e)    In the event of failure by the Charterers to pay on the due date for payment thereof, or in the case of a sum payable on demand, the date of demand therefor, any hire or other amount payable by them under this Charter, the Charterers will pay to the Owners interest on such amount from the date of such failure to the date of actual payment (both before and after any relevant judgement or winding-up of the Charterers) at the rate equal to the default rate in Clause 7.8 of the Facility Agreement computed from the relevant due date. Interest payable by the Charterers as aforesaid shall be payable on demand.

(f)    Any interest payable under this Charter shall accrue from day to day and shall be calculated on the actual number of days elapsed and a three hundred and sixty (360) day year.

## 36. MAINTENANCE AND OPERATIONS

(a)    The Charterers undertake throughout the Charter Period that they will at their sole cost and expense maintain the Vessel and keep it in a good and efficient state of repair and safe operating condition, seaworthy in all respects and in accordance with good maintenance practice (fair wear and tear excepted having regard to the type and age of the Vessel).

(b)    The technical and commercial management of the Vessel shall be the responsibility of the Charterers during the currency of this Charter. The Charterers shall appoint the Managers to undertake all the commercial and technical management of the Vessel and shall not change the commercial and/or technical management of the Vessel without the prior written consent of the Owners and the Mortgagee (which shall not be unreasonably withhold so long as the Mortgagee provides its prior written consent under the Mortgage or any other Finance Document) and shall procure that (i) the Managers do not sub-contract or delegate the commercial or technical management of the Vessel to any third party without the prior written consent of the Owners and the Mortgagee and (ii) that the Managers provide a Manager's Undertaking in a form acceptable to the Mortgagee. Notwithstanding the preceding provisions, subject to the terms and conditions of the Finance Documents, if an Event of Default occurs the Owners shall be entitled to appoint on behalf of the Charterers (and at the Charterers' expense) a replacement commercial and/or technical manager for the Vessel for such part of the Charter Period and on such terms and conditions as the Owners may require and the Charterers shall be responsible for any fees payable to that outgoing Managers as a result of such termination. The Owners shall then procure that the new Managers provide a Manager's Undertaking in a form acceptable to the Mortgagee.

(c)    Notwithstanding anything to the contrary set out in Clause 10 above, the Charterers shall procure that the Vessel throughout the Charter Period is maintained in accordance with first class maintenance practices.

## 37. IMPROVEMENT AND ADDITIONS

The Charterers shall have the right to fit additional equipment and to make severable improvements and additions at their expense and risk, provided such additional equipment, improvements and additions do not diminish or otherwise reduce the market value of the Vessel or impair the utility, marketability and remaining economic life of the Vessel (in which case the approval of the Owners shall be required (which approval the Owners may give or withhold in their absolute discretion) and may be removed from the Vessel without causing any damage to the Vessel (any such removal and damage being made good by the Charterers at their time and expense), or the Owners may elect to keep the equipment, free of charge. Any such

improvements and/or additions which affect the structure, stability, speed, type of vessel or class shall be subject to the approval of the Owners (which approval the Owners may give or withhold in their absolute discretion) and the Vessel's Classification Society.

38. **INDEMNITY**

(a) The Charterers agree, from time to time on demand, to indemnify and keep indemnified the Owners against:

    (i) any costs, charges or expenses which the Charterers have agreed to pay under this Charter and which shall be claimed or assessed against or paid in by the Owners; and

    (ii) all Losses suffered or incurred by the Owners arising directly or indirectly out of the design, manufacture, delivery, non-delivery, purchase, importation, registration, chartering, sub-chartering, possession, control, use, operation, condition, maintenance, repair, replacement, refurbishment, conversion, upgrade, modification, overhaul, insurance, sale or other disposal, return or storage or of loss of or damage to the Vessel or otherwise in connection with the Vessel, including any and all claims in tort or in contract by any sub-charterer of the Vessel or by the holders of any bills of lading issued by the Charterers, provided always that the indemnity in respect of Losses contained in this sub-clause (ii) shall not extend to any Losses of the Owners as a consequence of the value of the Vessel at the end of the Charter Period unless such Losses shall have resulted from any breach by the Charterers of the terms of this Charter; and

    (iii) all Losses suffered or incurred by the Owners in preventing or attempting to prevent the arrest, confiscation, seizure, taking in execution, impounding, forfeiture or detention of the Vessel, or in securing the release of the Vessel therefrom including, without limitation, any Losses incurred in discharging any liens over the Vessel;

    (iv) all Taxes, imposed on or payable by the Owners which are directly or indirectly connected to the acquisition by the Owners of the Vessel under the MoA and the chartering of the Vessel by the Owners to the Charterers under this Charter; and

    (v) all Taxes (other than Tax on the overall net income of the Owners), imposed on or payable by the Owners which are directly or indirectly connected to the ownership, operation, trading, and/or manning of the Vessel and/or receipt of hire from the Charterers and/or any transfer of ownership of the Vessel to the Charterers pursuant to the provisions of Clause 47, Clause 50 or Clause 51;

    (vi) any Losses incurred by the Owners arising from any Environmental Claim or as a result of any pollution caused by the Vessel including, without limitation, any oil, liquid, gas or other substance spilling or emanating or threatening to spill or emanate from the Vessel;

    (vii) any Losses incurred or suffered by the Owners as a result of or in connection with any Event of Default (whether or not the same results in a termination of the chartering of the Vessel under Clauses 46 and 47) including, without limitation, all Losses incurred or suffered by the Owners under any Loan Agreement as a result of any such Event of Default;

(viii) all Losses of whatsoever kind and nature, imposed on, incurred or suffered by, or asserted against the Owners in any way relating to or arising in respect of the insurances over the Vessel or to incidents covered by such insurances; and

(ix) any costs, charges or expenses which are directly or indirectly connected to the transfer of ownership of the Vessel to the Charterers pursuant to the provisions of Clause 47, Clause 50 or Clause 51 and discharging or reassigning any of the Encumbrances created pursuant to the Relevant Documents.

(x) any costs, charges or expenses incurred by the Owners under any of the Loan Agreements in respect of transaction expenses, funding costs, breakage costs, currency conversion costs, costs incurred as a result of any requirement from any central bank, or any fiscal, monetary or other authority (including as a result of the implementation, application or compliance with the Basel II Accord or any other Basel II Regulation).

(xi) any additional payments made by the Owners to the Mortgagee pursuant to any Loan Agreement necessary to ensure that the Mortgagee receives a net sum equal to the sum the Mortgagee would have received before any deductions or withholding from any payment required by any law have been made.

(xii) any costs, charges or expenses which are directly or indirectly connected with the provision of additional security by the Owners to the Mortgagee pursuant to any Loan Agreement but only to the extent that it arises as a result of a breach of Clause 40(c).

(xiii) any costs, charges or expenses arising as a result of any enforcement or other legal process being taken against the Vessel, or the Owners, as a result of a default (caused directly or indirectly by the Charterers) under any Loan Agreement.

(b) If as a result of a judgment against the Charterers or the liquidation of the Charterers under any applicable law or for any other reason, any payment to be made by the Charterers under or in connection with this Charter is made or is recovered in a currency other than the currency (the "currency of obligation") in which it is payable pursuant to this Charter then, to the extent that the payment (when converted into the currency of obligation at the rate of exchange on the date of payment or, in the case of a liquidation, the latest date for the determination of liabilities permitted by the applicable law) falls short of the amount to be paid by the Charterers under this Charter, the Charterers shall as a separate and independent obligation, fully indemnify the Owners, from time to time on demand, against the amount of the shortfall; and for the purposes of this sub-clause "rate of exchange" means the actual rate at which the Owners are able on the relevant date to purchase the currency of obligation in New York with that other currency.

(c) In order to provide a fixed rate of charter hire and at the Charterers' request, the Owners have entered or may from time to time enter into certain loan agreements and/or financing agreements (before and hereinafter referred to as the "Loan Agreements" and as further described at Clause 60), together with certain interest hedging swap agreements in respect of the Loan Agreements (before and hereafter referred to as the "Swap Agreements" and as further described at Clause 60) covering the whole or part of the Charter Period, and the Charterers shall fully indemnify the Owners, from time to time on demand, for any Losses incurred by the Owners under or in connection with any Loan Agreement (including, without limitation, break costs, unwind costs, late funding costs, prepayment

fees and legal fees (but excluding for the avoidance of doubt any swap break costs under any Swap Agreement) due to (i) the delayed delivery of the Vessel under the MoA for any reason other than directly arising as a result of a default by the Owners under the MoA or (ii) non-delivery of the Vessel under the MoA for any reason other than directly arising as a result of a default by the Owners under the MoA (and in such circumstances, this indemnity shall also cover the Bank Fees) or (iii) any early termination of the chartering of the Vessel under this Charter pursuant to Clauses 46 and 47, or (iv) a Total Loss or (v) the Charterers exercise of the Purchase Option (whether or not the sale under the Purchase Option actually occurs) according to Clause 50. If the Charterers are considering exercising the Purchase Option, they may request the Owners to inform them of the potential loss or gain that such exercise could trigger in terms of break fees, prepayment fees and unwind costs under any Loan Agreement prior to declaring the Purchase Option. Notwithstanding the foregoing, the Charterers will not be responsible for Losses incurred by the Owners from interest rate derivate transactions over and above that required to hedge up to the maximum amount of interest accruing in respect of the loans under the Loan Agreements.

Notwithstanding the aforementioned indemnity, the Charterers shall not be liable to pay any break costs or unwind costs in relation to the exercise of the Purchase Option on the 7th anniversary date of Delivery Date or on any anniversary date thereafter.

(d) Without prejudice to the foregoing provisions of this Clause 38, all costs and expenses arising in connection with the registration of the Vessel in the name of the Owners under the flag of Malta (including registration of the Mortgage) or in connection with the maintenance of such registration (including annual tonnage tax fees) shall be borne by the Charterers.

(e) The Charterers will indemnify the Owners from time to time on demand for all amounts paid or payable by the Owners to the Mortgagee in connection with the Owners' obligations under any Loan Agreement and/or the Mortgage (or any other Finance Documents) to reimburse the Mortgagee for all costs, premiums and expenses paid or incurred by the Mortgagee in connection with any Mortgagees' Insurances.

(f) Upon any termination of the chartering of the Vessel pursuant to Clauses 46 and 47 the Charterers shall fully indemnify the Owners, from time to time on demand, from and against all Losses of whatsoever kind and nature imposed on, incurred or suffered by, or asserted against the Owners in any way relating to or arising in connection therewith including, without limitation, in relation to recovering possession of, and in moving (inclusive of pilotage and towage fees), navigating, storing (inclusive of port fees), insuring and maintaining the Vessel until she is at the designated port of the Owners as referred to in Clause 47(c) and in carrying out any works, drydocking, surveys, repairs or modifications as referred to in Clauses 47(c) and 47(d).

(g) The indemnities contained in this Clause 38, and each other indemnity contained in this Charter, shall survive any termination or other ending of this Charter and any breach of, or repudiation or alleged repudiation by the Charterers or the Owners of this Charter.

39. GUARANTEE AND SECURITY

The performance by the Charterers of all their obligations under this Charter shall be:

(a) guaranteed by the Parent Company via the Parent Guarantee; and

(b)     secured by the Charterers via the General Assignment.

All the aforementioned documents shall be in form and substance acceptable to the Owners and the Mortgagee.

40.     MORTGAGES

(a)     The Charterers agree that the Owners shall be entitled, on or at any time after the Delivery Date, to grant to DVB Bank SE or any other reputable bank or financial institution (each a "Mortgagee" and as further described at Clause 60) (i) one or more mortgages and deeds of covenants (if applicable) on the Vessel (each and together with the relevant deed of covenants, a "Mortgage") and (ii) one or more assignment(s), pledge or charge (as applicable) of this Charter, the earnings generated by this Charter, the insurances and requisition compensation over the Vessel, the Sub-Charters, the Owner's rights under the Parent Guarantee, the Owners' rights under its earnings or retention account(s) and all other rights of the Owners under the Relevant Documents (inclusive of the property assigned, pledged or charged thereunder), including, without limitation, the General Assignment, all as security for any loan or hedging facilities arranged by the Owners under any Loan Agreement and any Swap Agreement) in relation to the finance or re-finance of the acquisition cost of the Vessel, or for cross collateralization purposes to constitute part of a security package securing the funding of the acquisition cost of the Related Vessel by the Related Owner. Provided that on any such re-finance the aggregate amount of the debt shall not be increased to an amount in excess of the Purchase Obligation Price.

(b)     The Charterers agree with the Owners to (i) sign an acknowledgement to and agree to be bound by any notices of any assignment of this Charter, the earnings generated by this Charter, the insurances and requisition compensation over the Vessel and the Owner's rights under the Parent Guarantee in relation to any assignment executed in favour of the Mortgagee and (ii) to enter into the General Assignment for the purposes described in Clause 40(a) and to sign any acknowledgements in respect of such General Assignment in favour of the Mortgagee.

(c)     If the Fair Market Value falls below the Permitted LTV, the Charterers shall at the option of the Charterers (i) provide additional Security to the Owners to the satisfaction of the Owners and/or (ii) pay to the Owners additional Charter Hire within 30 days of the breach of the Permitted LTV sufficient to satisfy the Permitted LTV. In the event that payment of additional Charter Hire is made, the Purchase Option Price, the Agreed Termination Value, the Minimum Insured Value and Purchase Obligation Price shall be reduced by the amount equal to the Future Value.

41.     SALE /DISPOSAL OF VESSEL

(a)     The Owners may, at any time during the Charter Period transfer the ownership of the Vessel to any third party and the benefit of the security documents referred to at Clause 39 so long as (i) the prospective owners agree to take over the benefit and burden of this Charter, (ii) such ownership change does not result in any reflagging of the Vessel, (iii) such ownership change does not result in the Charterers being obliged to increase any payment under this Charter pursuant to Clause 35(c), (iv) such ownership change does not increase the actual or contingent obligations of the Charterers under this Charter and (v) the new owners undertake to be bound by exactly the same terms as this Charter.

(b) The Charterers agree and undertake to enter into all necessary documents as the Owners shall reasonably require to complete or perfect the transfer of the Vessel (with the benefit and burden of this Charter and the security documents referred to at Clause 39) pursuant to Clause 41(a) above, any costs or expenses whatsoever arising in relation thereto to be borne by the Owners.

## 42. THE VESSEL'S FLAG

The Vessels shall from the Delivery Date and throughout the Charter Period be registered in the name of the Owners under Maltese flag. Any request by the Charterers of a change in the Vessel's flag shall require the prior written consent of the Owners and the Mortgagee. All costs (including, without limitation, all costs and expense related to changing the Vessel's ownership structure, if required by the flag state or to maintain the equivalent Tax treatment arising from the Owners' ownership of the Vessel and all costs and expenses in restructuring any loan or hedging facilities provided under any Loan Agreement and/or any Swap Agreement) related to the change in the Vessel's flag shall in such case be for the Charterers' account.

Should Owners require any change in the Vessel's flag, the prior written consent of the Mortgagee and the Charterers shall be obtained (such consent not to be unreasonably withheld). All costs (including, without limitation, all costs and expense related to changing the Vessel's ownership structure, if required by the flag state or to maintain the equivalent Tax treatment arising from the Owners' ownership of the Vessel and all costs and expenses in restructuring any loan or hedging facilities provided under any Loan Agreement and/or any Swap Agreement) related to change in the Vessel's flag shall in such case be for the Owners' account.

Notwithstanding the aforementioned, the Owners shall be entitled to change the Vessel's flag without the prior written consent of the Charterers (and subject to the terms of the relevant Loan Agreement and Finance Documents) at any time during which an Event of Default is continuing and all costs (including those referred to above) related to the change in the Vessel's flag shall be for the account of the Charterers.

## 43. REPRESENTATIONS AND WARRANTIES

The Charterers acknowledge that the Owners have entered into this Charter in full reliance on the representations and warranties by the Charterers set out in this Clause 43. The Charterers make the representations and warranties set out in this Clause 43 to the Owners on the date of this Charter:

(i) the Charterers are duly incorporated and validly existing as a limited liability company under the laws of Malta;

(ii) the Charterers have the power to conduct their business as it is now carried on, to own and hold or lease their assets, to execute, deliver and perform their obligations under the Relevant Documents to which they are a party, and all necessary corporate, shareholder and other action has been taken to authorise the execution, delivery and performance of those Relevant Documents;

(iii) each Relevant Document to which they are a party constitutes, or will upon execution constitute, the valid and legally binding and enforceable obligations of the Charterers ranking at least pari passu with all other unsecured obligations and liabilities (actual or contingent) of the Charterers other than those mandatorily preferred by law;

(iv)    the entry into and performance by the Charterers of each Relevant Document to which they are a party does not, and will not during the Charter Period, violate (A) any relevant law or regulation or any governmental of official authority or body, or (B) the constitutional documents of the Charterers or (C) any document to which the Charterers are a party or which is binding on the Charterers or any of their assets;

(v)     all consents, licences, approvals, authorisations filings and registrations required by the Charterers in connection with the entry into, performance, validity and enforceability of the Relevant Documents to which they are a party or to make such Relevant Documents admissible in evidence in the Republic of Malta have been obtained and are, or will prior to the Delivery Date be, in full force and effect;

(vi)    no litigation, arbitration or administrative proceeding of or before any court, arbitral body or agency is taking place, pending or, to the knowledge of the Charterers threatened against the Charterers or against any of their assets, which if adversely determined, could have a Material Adverse Effect;

(vii)   no Event of Default, and no event which with the giving of notice and/or lapse of time and/or relevant determination would constitute an Event of Default, has occurred and is continuing;

(viii)  all filings and registrations required by the Charterers in connection with the entry into, performance, validity and enforceability of the Relevant Documents to which they are a party have been effected or will be effected prior to the time period set out in Clause 39;

(ix)    the Charterers are not required by their jurisdiction of incorporation to make any deduction for or on account of Tax from any payment they may make under this Charter;

(x)     the choice of English law as the governing law of the Relevant Documents (other than the Mortgage) (and in the case of the Mortgage the choice of Maltese law as the governing law) to which they are a party and to which are expressed to be governed by English or (in the case of the Mortgage) Maltese law will be recognised in the jurisdiction of incorporation of the Charterers, and any judgment obtained in England in relation to any such Relevant Document will be recognised and enforced in the jurisdiction of incorporation of the Charterers;

(xi)    under the law of jurisdiction of incorporation of the Charterers it is not necessary that the Relevant Documents to which they are a party (other than as described in Clause 39) be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration or similar tax be paid on or in relation to those Relevant Documents or the transactions contemplated by those Relevant Documents;

(xii)   all factual information provided by the Charterers to the Owners and/or the Mortgagee was true and accurate in all material respects as at the date it was provided and the Charterers are not aware of any material facts or circumstances which have not been disclosed to the Owners and which might, if disclosed, have adversely affected the decision of a person considering whether or not to enter into a sale and leaseback transaction for the Vessel with the Charterers.

The representations and warranties contained in this Clause 43, shall be deemed to be repeated by the Charterers as of the Delivery Date and on each date for the payment of Charter Hire under this Charter as if made with reference to the facts and circumstances existing on each such date,

and the rights of the relevant party in respect of this Charter shall survive delivery of the Vessel under this Charter.

## 44. UNDERTAKINGS

The Charterers undertake and agree that throughout the Charter Period they will:

(a)    provide to the Owners (for its own information and for passing to the Mortgagee):

        (i)    as soon as possible, but in no event later than ninety (90) days after the end of each financial year of the Charterers, the Charterers' management accounts and financial statements (together with an English translation thereof) for such financial year, (each set of accounts and financial statements delivered under this Clause shall be certified by a director or the Chief Financial Officer of the Charterers as giving a true and fair view of the financial condition and operations of the Charterers as at the date as at which those financial statements were drawn up);

        (ii)    as soon as possible, but in no event later than one hundred and twenty (120) days after the end of each financial year of the Guarantor, the Guarantor's audited accounts and financial statements for such financial year, such accounts and financial statements to be prepared in English in accordance with IFRS consistently applied (each set of accounts and financial statements delivered under this Clause shall be certified by a director or the Chief Financial Officer of the Guarantor as giving a true and fair view of the financial condition and operations of the Guarantor as at the date as at which those financial statements were drawn up);

        (iii)    as soon as possible, but in no event later than sixty (60) days after the end of each quarterly accounts period of the Charterers the Charterers' quarterly accounts to be prepared in English (each set of accounts delivered under this Clause shall be certified by a director or the Chief Financial Officer of the Charterers as fairly representing the financial condition and operations of the Charterers as at the date as at which those accounts were drawn up);

        (iv)    as soon as possible, but in no event later than sixty (60) days after the end of each quarterly accounts period of the Guarantor the Guarantor's quarterly accounts to be prepared in English (each set of accounts delivered under this Clause shall be certified by a director or the Chief Financial Officer of the Guarantor as fairly representing the financial condition and operations of the Guarantor as at the date as at which those accounts were drawn up);

        (v)    as soon as practicable after the same are instituted (or, in the case of any Guarantor, once the Charterers are aware of the same), details of any litigation, arbitration or administrative proceedings involving the Charterers and/or any Guarantor which are likely to be adversely determined and, if adversely determined, would have a Material Adverse Effect;

        (vi)    at or about each anniversary of the Delivery Date during the Charter Period, an up to date confirmation of class (without condition or recommendation (provided however that the Charterers shall have the opportunity to remedy such recommendations/qualifications within the time allotted by the Classification Society)) issued by the Classification Society together with overdue details of any

improvements, structural changes or new equipment made or added to the Vessel over the previous twelve (12) months as a consequence of Clause 10(a)(ii) and any other material improvements, structural changes or new equipment made or added to the Vessel over the previous twelve (12) months and to which the Owners' prior consent was not required pursuant to Clause 37 or any other term of this Charter;

(vii) at or about each anniversary of the Delivery Date during the Charter Period, one up to date valuation for the Vessel to be assessed by an Approved Broker appointed by the Charterers in the manner described in the definition of Fair Market Value and such valuation shall count towards determining the Fair Market Value; and

(viii) from time to time such additional financial or other information relating to the Charterers, the Vessel (including her employment, position and engagements) and their business as may be reasonably requested by the Owners;

(b) notify the Owners and the Mortgagee in writing of any Event of Default (or event of which they are aware which, with the giving of notice and/or lapse of time or other applicable condition would constitute an Event of Default);

(c) obtain, promptly renew from time to time and comply with, and will whenever so required, promptly furnish certified copies to the Owners of, all such authorisations, approvals, consents and licences as may be required under any applicable law or regulation to enable each Relevant Party to perform their obligations under the Relevant Documents to which they are a party or required for the validity or enforceability of those Relevant Documents;

(d) not, without the prior written consent of the Owners and the Mortgagee change or permit any change in the owning structure of the Charterers and thus maintain the Charterers as a wholly owned subsidiary of the Parent Company;

(e) at all times ensure the Vessel is operated in compliance with all applicable laws, international and port state conventions, codes and regulations including, without limitation, the ISM Code, the ISPS Code and Annex VI and ensure such compliance by the crews, employees, agents and representatives of the Charterers and the Managers;

(f) send to the Owners a copy of the Certificate of Financial Responsibility issued pursuant to the United States Oil Pollution Act 1990 if the Vessel is to operate in waters which require compliance with the United States Oil Pollution Act 1990, or copies of such certificates or other documentation evidencing compliance by Charterers with similar requirements under any other jurisdiction where the Vessel may operate;

(g) notify the Owners and the Mortgagee in writing promptly upon becoming aware of the same:

(i) of any Environmental Claim against the Charterers (or any other person) which is current, pending or threatened; and

(ii) of any facts or circumstances which will or are reasonably likely to result in any Environmental Claim being commenced or threatened against the Charterers (or any other person),

in relation to the Vessel.

(h) following an inspection of the Vessel by the Owners or their representatives pursuant to Clause 6 of the MoA, comply with any requests from the Owners for repairs to the Vessel if required to ensure that the Vessel is maintained in the class and condition required by this Charter and if the Charterers dispute the need for any such repairs the matter shall be referred to the Classification Society whose decision on such matter shall be binding on the Owners and the Charterers;

(i) at all times procure that the Owners shall be allowed to inspect the operating and insurance records of the Vessel, at reasonable times and on reasonable notice;

(j) keep the Vessel classed with Bureau Veritas or DNV (or such other IACS member as the Owners and the Mortgagee (as required by the Mortgage and any other Finance Document) may approve in writing) with the class notation as set out in Part I Box 10, and free from conditions and recommendations provided however that the Charterers shall have the opportunity to remedy such recommendations/qualifications within the time allotted by the Classification Society;

(k) notify the Owners and the Mortgagee of any accident to the Vessel involving repairs where the costs of repairs will or are likely to exceed USD250,000;

(l) promptly upon becoming aware of the same, notify the Owners and the Mortgagee of any arrest of the Vessel or the exercise or purported exercise of any lien on the Vessel;

(m) provide the Owners with ongoing class records upon reasonable request and as soon as reasonably practicable after such request and to provide the Owners with any survey reports obtained for the Vessel as soon as reasonably practicable following their issuance;

(n) do the following:

    (i) comply with all Environmental Law in relation to using and operating the Vessel;

    (ii) obtain, maintain and ensure compliance with all requisite Environmental Permits in relation to using and operating the Vessel; and

    (iii) implement procedures to monitor compliance with and to prevent liability under any Environmental Law applicable to the use and operation of the Vessel.

(o) carry on and conduct their business in a proper and efficient manner, keep in existence all its material rights and privileges and maintain its books and records in a proper and efficient manner;

(p) permit the inspection of its financial records and accounts in respect of the Vessel from time to time by the Owners;

(q) comply in all respects with all laws and contractual obligations to which it is subject;

(r) save for as required by this Charter, not without the prior written consent of the Owners and the Mortgagee create nor permit to subsist any Encumbrance or other third party rights over any of their present or future assets or undertaking nor dispose of any of those assets or of all or part of that undertaking;

(s) not without the prior written consent of the Owners and the Mortgagee enter into any amalgamation, demerger, merger or corporate reconstruction;

(t) not without the prior written consent of the Owners and the Mortgagee engage in any business other than the operation, chartering and management of the Vessel;

(u) not without the prior written consent of the Owners and the Mortgagee borrow any money or incur any capital expenditure;

(v) except in the ordinary course of business, not without the prior written consent of the Owners and the Mortgagee incur any liability to any third party;

(w) not without the prior written consent of the Owners make any loan nor enter into any guarantee or indemnity or otherwise voluntarily assume any actual or contingent liability in respect of any obligation of any other person except for loans made in the ordinary course of business in connection with the chartering, operation or repair of the Vessel;

(x) not without the prior written consent of the Owners and the Mortgagee pay any dividends or make any other distributions to shareholders at any during which an Event of Default in continuing;

(y) not without the prior written consent of the Owners and the Mortgagee reduce its registered share capital;

(z) not without the prior written consent of the Owners and the Mortgagee to lay the Vessel up; and

(aa) in the event of a capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture of the Vessel, use their best endeavours to procure that the Vessel is released and returned to the possession of the Owner or the Charterer (as applicable) within fourteen (14) days after such capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture in question.

45. (a) INSURANCES, TOTAL LOSS AND COMPULSORY ACQUISITION

For the purposes of this Charter, the term **"Total Loss"** shall mean:

(i) an actual, constructive, arranged, agreed or compromised total loss of the Vessel; or

(ii) the requisition for title or compulsory acquisition of the Vessel by any government or other competent authority (other than by way of requisition for hire); or

(iii) capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture of a Vessel (not falling within (ii) above), unless that Vessel is released and returned to the possession of the Owner or the Charterer within fourteen (14) days (and the Owner and the Charterer shall use their best endeavours for the release and return of the Vessel within such fourteen (14) days, or, at the request of the Charterer (and subject to the prior written consent of the Owner and the Lenders in their discretion) within one month after the capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture in question.

(b) The Charterers undertake with the Owners that throughout the Charter Period;

(i)    without prejudice to their obligations under Clause 13 of this Charter, they will keep the Vessel insured in the name of the Owners and the Charterers on the basis of Institute Time Clauses terms, as amended (or such other terms as may be approved by the Owners) (and against such further risks as may from time to time be required by the Mortgagee pursuant to the Mortgage and any other Finance Documents), with insurers (including Protection & Indemnity and war risks associations) who are a member of International Group of P&I Clubs (including the London Blocking and Trapping addendum) and as shall be reasonably acceptable to the Owners with deductibles reasonably acceptable to the Owners and the Mortgagee (it being agreed and understood by the Charterers that there shall be no element of self-insurance or insurance through captive insurance companies without the prior written consent of the Owners);

(ii)    the policies in respect of the insurances against fire and usual marine risks and the policies or entries in respect of the insurances against war risks (including the London Blocking and Trapping addendum), shall, in each case, be endorsed to the effect that the full payment of a claim for a Total Loss will be made to the Owners or the Mortgagee (as the case may be depending on the terms of the Mortgage and any other Finance Document);

(iii)    without the need for any request, the Charterers shall procure from time to time that duplicates of all cover notes, policies and certificates of entry shall be furnished to the Owners (for their or the Mortgagee's custody) promptly following their issuance or renewal;

(iv)    the Charterers shall procure that the insurers and the war risk and protection and indemnity associations with which the Vessel is entered, shall (A) furnish the Mortgagee with a letter or letters of undertaking in such form as may from time to time be reasonably required by the Owners and the Mortgagee, and (B) supply to the Owners and the Mortgagee such information in relation to the insurance effected, or to be effected, with them as the Owners and the Mortgagee may from time to time reasonably require; and

(v)    the Charterers will punctually pay all insurance premiums and calls on the Vessel (and if requested by the Owners, provide the Owners promptly with all relevant receipts) timely renew the insurance policies and the certificates of entry and shall use all reasonable efforts to procure that the policies and other instruments evidencing the insurances (other than the protection and indemnity cover) are endorsed to the effect that the insurers shall give to the Owners and the Mortgagee not less than ten (10) days prior written notifications of any amendment, suspension, cancellation or termination of the insurances.

(c)    Notwithstanding anything to the contrary contained in Clauses 13 and 45(b) of this Charter, the Vessel shall be kept insured during the Charter Period in respect of marine and war risks (including the London Blocking and Trapping addendum) on hull and machinery basis (as opposed to increased value or total loss only basis) and all other further risks as may be required from time to time by the Mortgagee pursuant to the Mortgage and any other Finance Documents for an amount equal to the higher of (such amount being in USD and referred to as the "**Applicable Insurance Amount**") (A) the Fair Market Value determined on or around each date of placing or renewing the insurances and (B) the amount specified in column (b) in the table set out below in respect of the relevant year during the Charter Period specified in column (a) against such amount (which

such insurance amount is hereinafter referred to as the "**Minimum Insured Value**"):

| (a) Period | (b) Minimum Insured Value (USD) |
|---|---|
| Year 1 (commencing from the Delivery Date) | USD 36,250,000 on the Delivery Date reducing by USD 3,425 per day thereafter subject to Clause 45(d) below |
| Year 2 (commencing from the 1st anniversary of the Delivery Date) | USD 35,000,000 on the 1st Anniversary of the Delivery Date reducing by USD 4,658 per day thereafter subject to Clause 45(d) below |
| Year 3 (commencing from the 2nd anniversary of the Delivery Date) | USD 33,300,000 on the 2nd anniversary of the Delivery Date reducing by USD 6,849 per day thereafter subject to Clause 45(d) below |
| Year 4 (commencing from the 3rd anniversary of the Delivery Date) | USD 30,800,000 on the 3rd anniversary of the Delivery Date reducing by USD 11,781 per day thereafter subject to Clause 45(d) below |
| Year 5 (commencing from the 4th anniversary of the Delivery Date) | USD 26,500,000 on the 4th anniversary of the Delivery Date reducing by USD 2,740 per day thereafter subject to Clause 45(d) below |
| Year 6 (commencing from the 5th anniversary of the Delivery Date) | USD 25,500,000 on the 5th anniversary of the Delivery Date reducing by USD 5,479 per day thereafter subject to Clause 45(d) below |
| Year 7 (commencing from the 6th anniversary of the Delivery Date) | USD 23,500,000 on the 6th anniversary of the Delivery Date reducing by USD 5,479 per day thereafter subject to Clause 45(d) below |

(d)     In the event that the Vessel becomes a Total Loss, the Charterers shall continue to pay Charter Hire until payment of the insurance proceeds in respect of the Total Loss in an amount no less than the then Minimum Insured Value is made in full and received by the Owners. Subject to (i) the prior consent of the Mortgagee under the terms and conditions of any Loan Agreement or Finance Document and (ii) no Payment Event of Default continuing, the Charterers shall be entitled to receive from the Owners all insurance proceeds in respect of the Total Loss received by the Owners in excess of the aggregate of the Minimum Insured Value, the Indemnity Sum and any interest accrued thereon pursuant to this Charter.

If payment of all insurance proceeds in respect of the Total Loss in the amount specified above in this Clause 45(d) has not been made within 90 (ninety) days of a Total Loss, the

Charterers shall pay to the Owners, on demand, an aggregate amount equivalent to (i) the then Minimum Insured Value (ii) the Indemnity Sum and (iii) any interest accrued under this Charter less, if applicable, the amount of any insurance proceeds actually paid to the Owners or, as the case may be, the Mortgagee at that stage in respect of the Total Loss (such aggregate payment amount being the **"Charterers' Insurance Proceed Payment"**). After the day the Charterers have paid the Charterers' Insurance Proceed Payment to the Owners, the Charterers shall be under no further obligation to pay Charter Hire and, subject to (i) the prior consent of the Mortgagee under the terms and conditions of any Loan Agreement or Finance Document and (ii) no Payment Event of Default continuing, the Owners shall assign any interest it has in all the insurances in respect of the Vessel to the Charterers and shall notify the relevant insurers of such assignment.

The Owners and Charterers agree that the amount of the Minimum Insured Value shall only step down as contemplated by Clause 45(c) to the extent that the Owners shall have actually received all Charter Hire corresponding to such step down otherwise the amount of the Minimum Insured Value shall be adjusted accordingly to account for the outstanding Charter Hire.

(e)    For the purpose of ascertaining the date of the Total Loss;

    (i)    an actual total loss of the Vessel shall be deemed to have occurred at noon (London time) on the actual date the Vessel was lost, but in the event of the date of the loss being unknown, the actual total loss shall be deemed to have occurred at noon (London time) on the date on which it is acknowledged by the insurers to have occurred;

    (ii)    a constructive, compromised, agreed or arranged total loss of the Vessel shall be deemed to have occurred at noon (London time) on the date that notice claiming such a total loss of the Vessel is given to the insurers, or, if the insurers do not admit such a claim, at the date and time at which a total loss is subsequently admitted by the insurers or adjudged by a competent court of law or arbitration tribunal to have occurred. Either the Owners, or with the prior written consent of the Owners and the Mortgagee, the Charterers shall be entitled to give notice claiming a constructive total loss, but prior to the giving of such notice there shall be consultation between the Charterers and the Owners and the party proposing to give such notice, shall be supplied with all such information as such party may request;

    (iii)    in the case of requisition for title or compulsory acquisition of the Vessel by any government or other competent authority (other than by way of requisition for hire), at noon (London time) on the date on which the relevant requisition for title or compulsory acquisition occurred; and

    (iv)    in the case of capture, seizure, arrest, detention hijacking, theft, condemnation as prize, confiscation or forfeiture of the Vessel (not falling within (c) above) by any government or by persons acting or purporting to act on behalf of any government, which deprives the Owners and the Charterers the use of the Vessel for more than fourteen (14) days (or more than one month, subject to the terms and conditions of Clause 45 and the relevant Loan Agreement and Finance Documents), upon the expiry of the relevant period of fourteen (14) days or one month (as applicable) after the date upon which the relevant capture, seizure, arrest, detention or confiscation occurred.

(f)      Subject to Clause 45(d), all monies payable under the insurance effected by the Charterers pursuant to Clauses 13 and 45, or other compensation, in respect of a Total Loss shall be received in full by the Owners (or the Mortgagee as assignees thereof depending on the terms of the Mortgage and any other Finance Document).

(g)      Payment in respect of a claim which is not a Total Loss of the Vessel shall be payable in accordance with the terms of the then applicable loss payable clause (as referred to in Clause 45(i) or, if there is no Mortgage at that time, on the same basis as contemplated by the terms of any loss payable clause required by the terms of the General Assignment.

(h)      The provisions of Clauses 13 and 45 of this Charter shall not apply in any way to the proceeds of any additional insurance cover effected by the Owners and/or the Charterers for their own account and benefit. For the avoidance of doubt such additional insurance cover placed by the Charterers shall only be effected with the prior consent of the Owners and the Mortgagee which shall only be forthcoming if and to the extent that the insurances required to be effected by the Charterers pursuant to Clauses 13 and 45 of this Charter permit such additional insurance cover and full recovery under the insurances required to be effected by the Charterers pursuant to Clauses 13 and 45 of this Charter will not be prejudiced.

(i)      During the period of the Mortgage, the Mortgagee shall be endorsed as a sole loss payee via a loss payable clause endorsed on the insurance policies and all insurance policies shall be capable of being and shall be assigned to the Mortgagee in accordance with the Loan Agreement and any Finance Documents. All loss payable clauses shall remain in full force and shall not be cancelled and neither shall the policies of the insurances be amended in any material way, except with prior written consent of the Owners and the Mortgagee.

(j)      The Owners have no obligation to provide the Charterers with any replacement vessel if, for whatever reason, the Vessel is not available to the Charterers at any time during the Charter Period.

## 46.    EVENT OF DEFAULT

(a)      Each of the following events shall be an **"Event of Default"** for the purposes of this Charter:

     (i)      if any instalment of hire or any other sum payable by the Charterers under this Charter shall not be paid after its due date, save, however, that such failure to pay on the due date shall not be an Event of Default if such failure is due to an administrative or technical error and payment is made within three (3) Banking Days of its due date; or

     (ii)      if the Charterers shall fail at any time to effect or maintain any insurance required to be effected and maintained under this Charter, or any insurer shall avoid or cancel any such insurances (prior to replacement cover being placed) or if any of the said insurances shall cease for any reason whatsoever to be in full force and effect prior to any replacement cover being placed; or

     (iii)      if any Relevant Party or any other person other than the Owners shall at any time fail to observe or perform any of their obligations under any of the Relevant Documents to which they are a party, other than those obligations referred to in sub-clause (i) or sub-clause (ii) of this Clause 46(a), and such failure to observe or

perform any such obligation is either not remediable or is not remedied within fourteen (14) days of the Owners becoming aware of any such failure to observe or perform or, if such failure to observe or perform would following the expiry of a shorter grace period under any Loan Agreement result in an event of default under that Loan Agreement, the applicable grace period permitted under that Loan Agreement; or

(iv) if any representation or warranty of any Relevant Party made in any Relevant Document to which they are a party or in any document or certificate furnished to the Owners in connection therewith shall prove to have been untrue, inaccurate or misleading in any material respect when made, provided, however, that such circumstances shall not be an Event of Default if the information was given innocently and is corrected or otherwise remedied within fourteen (14) days of the Owners becoming aware of the relevant circumstances; or

(v) if a petition shall be presented or an order shall be made or an effective resolution shall be passed for the administration, personal bankruptcy or winding-up of any Relevant Party or if a judicial manager or an administrative or other receiver shall be appointed to the whole or any substantial part of the property, undertaking or assets of any Relevant Party, or if an administrator of any Relevant Party shall be appointed or if anything analogous to any of the foregoing shall occur under the laws of Malta or Turkey; or

(vi) if any Relevant Party shall stop payments generally or shall cease to carry on or suspend all or a substantial part of their business or shall be unable to pay their debts, or shall admit in writing the inability to pay their debts, as they become due or shall otherwise become or be adjudicated insolvent; or

(vii) if any Relevant Party shall convene a meeting of all or any class or group of their creditors with a view to proposing or making, or shall propose or make, any arrangement or composition with or assignment for the benefit of all or any class or group of their creditors or shall declare or apply to any court or other tribunal for, a moratorium or suspension of payments with respect to all or a substantial part of their debts or liabilities; or

(viii) any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of any Relevant Party; or

(ix) if (A) the Vessel is arrested or detained, and such arrest or detention is not lifted within fourteen (14) days (or such longer period as the Owners and the Mortgagee shall agree in the light of all the circumstances); or

(x) if any financial indebtedness in excess of USD1,000,000 of a Relevant Party:

(a) is not paid when due or within any originally applicable grace period; or

(b) is declared to be, or otherwise becomes, due and payable before its specified maturity as a result of an event of default (however described); or

(c) is capable of being declared by a creditor to be due and payable before its specified maturity as a result of such an event.

(xi)  any event or series of events occurs which, in the opinion of the Owners, is likely to have a Material Adverse Effect; or

(xii)  if the Charterers cease to be the wholly owned direct or indirect subsidiary of the Parent Company without the written consent of the Owners; or

(xiii)  if the Charterers do not comply with any of the undertakings set out in any acknowledgement to be given to the Owners and/or the Mortgagee pursuant to any notice of assignment served on the Charterers as referred to in Clause 40(b); or

(xiv)  if any Guarantee is revoked or otherwise ceases to be in full force and effect or either Guarantor gives notice to the Owners to determine its obligations under its Guarantee; or

(xv)  any Event of Default (as defined in any Related Charter) occurs.

(b)  The Owners and the Charterers agree that it is a fundamental term and condition of this Charter that no Event of Default shall occur during the Charter Period and that the occurrence of an Event of Default shall entitle (but not oblige) the Owners at any time during the continuation of such Event of Default to accept the repudiation by the Charterers of this Charter constituted by the occurrence of such Event of Default.

(c)  Upon the Owners becoming aware of the occurrence of an Event of Default under this Charter, the Owners shall use reasonable efforts to notify the Charterers of such Event of Default provided, however, that Owner's failure to provide such notice to Charters shall not prevent Owner's from enforcing its rights as provided for in this Charter following the occurrence of such Event of Default.

47.  **OWNERS' RIGHTS**

(a)  At any time after the circumstances described at Clause 46(b), the Owners may, by notice to the Charterers, immediately or on such date as the Owners shall specify, terminate the chartering by the Charterers of the Vessel under this Charter, whereupon the Owners may at their option (but with no obligation so to do):

(i)  declare by notice given to the Charterers the aggregate amount of (i) the Agreed Termination Value and (ii) the Indemnity Sum to be immediately due and payable whereupon the same shall become immediately due and payable and the Charterers shall be obliged to pay the actual balance of the same to the Owners together with any interest in accordance with Clause 35(e); and/or

(ii)  take any action at law and under the Relevant Documents to collect the full amount as mentioned in Clause 47(a)(i) above; and/or

(iii)  unless that Charterers have paid to the Owners the full amount as mentioned in Clause 47(a)(i) above, by their agent or otherwise without further legal process, re-take the Vessel (wherever she may be) irrespective of whether the Charterers or any other person is in possession of the Vessel, and for that purpose the Owners or their agents may enter any dock, pier or other premises where the Vessel is then at or at any time thereafter located and the Charterers agree that the Owners