IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ICON AMAZING, LLC § | |
| § | |
| VERSUS § | |
| § | C.A. NO. 4:13-CV-01449 |
| AMAZING SHIPPING LTD., § | |
| GEDEN HOLDINGS, LTD. § | |
| § | |

### DEFENDANTS' OPPOSED MOTION TO VACATE ATTACHMENT AND DISMISS COMPLAINT

NOW INTO COURT, through undersigned counsel, come Defendants, Amazing Shipping Ltd. and Geden Holdings, Ltd., without waiving any defenses, particularly as to personal and subject matter jurisdiction, and venue, and not making a general appearance, and move this Court to vacate the May 24, 2013 Rule B attachment of M/T HERO and to dismiss Plaintiff's complaint for lack of federal admiralty jurisdiction.

### Lack of Federal Admiralty Jurisdiction

Simply put, this dispute is about the sale of a vessel, M/V AMAZING. Concerning this sale and financing, Plaintiff Icon's own Managing Director – Head of Shipping & Offshore, Mr. Tobias Backer admits:

> **"Icon's financings of the CENTER, AMAZING and FANTASTIC are secured financings, not time charter arrangements**."[1]

A vessel sale/finance arrangement including a bareboat charter with an obligation to purchase at the end of the term is a sale, not a charter.[2] It is well-

---

[1] Exhibit 5, Email dated 2 May 2013 from Plaintiff Icon's Mr. Tobias Backer to Mr. Mehmet Mat of Geden Lines. (emphasis added)

established in the Fifth Circuit that contracts for the sale of a ship are not maritime contracts, and are not within admiralty jurisdiction.[3]

Even if Plaintiff Icon Amazing LLC's ("Icon") allegations of fraudulent breach of the sales contract by undercapitalized alter ego entities were correct[4], which they are not, breach of a sales contract is not cognizable in admiralty. Accordingly, Icon should not have represented that attachment pursuant to Rule B of the Special Admiralty Rules was proper, since this is not an admiralty case within the subject matter jurisdiction of this Honorable Court.[5]

Here, Icon's own contracts and communications establish the underlying dispute and the substantial rights of the parties flow from a contract to sell M/V AMAZING.

### SALEFORM 1993 Memorandum of Agreement

The M/V AMAZING Sale Contract, including the installment payment financing in the form of a standard leaseback vessel sale/bareboat charter, is on Icon's own SALEFORM 1993 Memorandum of Agreement signed by both Icon and defendant Amazing Shipping Ltd. ("Amazing") in September 2010. See Exhibit 1, Icon/Amazing Saleform 1993 Memorandum of Agreement ("Sale MOA").

---

[2] *Parcel Tankers*, 1990 WL 257638, *1 (E.D. La. 1990); *All Car Leasing Service Co. v. Campbell*, 912 F.2d 468, 1990 WL 125337, *1 - *2 (9th Cir. 1990); *Cary Marine, Inc. v. Motorvessel Papillon*, 872 F.2d 751, 755-756 (6th Cir. 1989).

[3] *Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*, 230 F.2d 186, 188-189 (5th Cir. 1984); *S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160, 164; 1980 AMC 2947 (5th Cir. 1979); *Parcel Tankers Inc. v. M/T STOLT LUISA PANDO*, 1990 WL 257638 at *1; 1990 AMC 2934 (E.D.La. 1990)

[4] Defendants reserve their right to contest the alter ego allegations, and the other allegations contained in the Complaint, in the proper forum.

[5] Id. See also *T. Schoenbaum, Admiralty and Maritime Law* at § 3-10, p. 127 (contract for sale of a vessel is not within Admiralty jurisdiction), § 21-22, p. 507 (admiralty jurisdiction is prerequisite for marine attachment).

Accordingly, Icon cannot persuasively argue this dispute is not about a vessel sale, which dispute is outside of Admiralty jurisdiction and Rule B Attachment.

Sale MOA Rider Clause 17 establishes the Sale is contingent upon and inextricably linked to the installment financing standard leaseback vessel sale/bareboat charter. Stated another way, if defendant Amazing did not agree to the leaseback vessel sale/bareboat charter, then Icon would NOT sell AMAZING to defendant Amazing at the end of the charter term.

As is customary in such owner-financed vessel sale arrangements, instead of monthly mortgage payments, defendant Amazing agreed to charter back the vessel from Icon for seven years. Then (unlike a standard non-sale related, stand-alone bareboat or time charter), at the end of the seven-year (eighty-four month) sale/finance contract, Amazing is <u>obligated</u> to buy AMAZING from Icon for a set price.

This arrangement is the same as set forth in the controlling vessel sale case law. In *All Car Leasing Service Co. v. Campbell*,[6] the sale contract gave defendant the beneficial use of the vessel in exchange for eighty-four (84) monthly payments of $5,940. The seven-year contract also included a clause giving defendant the right to purchase the vessel at the conclusion of the contract period for a set price. Defendant defaulted on the payments, and Plaintiff (like Icon) sought money damages. The District Court held this purchase/leaseback arrangement was a sale, and not within federal court admiralty jurisdiction. The Ninth Circuit agreed.

---

[6] *All Car Leasing Service Co. v. Campbell*, 912 F.2d 468, 1990 WL 125337, *1 - *2 (9th Cir. 1990); see also *Cary Marine, Inc. v. Motorvessel Papillon*, 872 F.2d 751, 755-756 (6th Cir. 1989).

In *Parcel Tankers, Inc. v. M/T STOLT LUISA PANDO*,[7] the parties entered into a Memorandum of Agreement for the sale of the vessel which involved a five year time charter of the vessel and a Purchase Option contract for the sale of the vessel. As here, several years later a dispute arose between the parties, one claiming a breach of a vessel sale agreement, the other (like Icon) claiming a breach of a charter party in a vain effort to stay in federal court. The District Court held the substance of the Plaintiff's complaint clearly involved a contract of sale for a vessel, which is not maritime in nature.

The District Court then explored whether it was possible for the charter party to stand alone, or whether it was linked to a vessel sale/finance transaction, and found that "since this claim is based solely on a non-maritime clause of the charter, this Court does not have admiralty jurisdiction over Plaintiff's claim." *Id.* at *2.

Here, the Sale MOA and the sale finance/installment payment "charter party" leaseback with purchase obligation are all part of a single vessel sale/finance transaction, working in concert. The Saleform 1993 MOA is not severable from the "charter party" leaseback purchase obligation. One does not make sense and fulfill the parties' intent without the other. But even if the sale/finance "charter party" could stand alone, which it cannot, the considerable number of references to the Sale MOA contained in the charter compel the conclusion that this dispute is about a breach of a vessel sale agreement, not a breach of a conventional charter party.

---

[7] *Parcel Tankers, Inc. v. M/T STOLT LUISA PANDO*, 1990 WL 257638, *1 (E.D.La. 1990).

## BARECON 2001 "Charter Party"

The very first page of the vessel sale/finance charter party between Icon and Amazing expressly requires it be consistent with and "as per" the Sale MOA. See Exhibit 2, Revised Barecon 2001 charter party form ("Revised Barecon"), Part I at clauses 12 and 13. Like the *All Car* case above, the term of this vessel sale/finance charter is seven (7) years.

Revised Barecon Parts II, III and IV (which are printed form clauses) have been largely deleted in favor of the vessel sale/finance clauses set forth in the Rider Clauses (clauses drafted specifically for this contract).

The very first page of the vessel sale/finance Rider Clauses states that the charter is contingent upon the Sale MOA. See Exhibit 2, Rider Clause 32 "MOA and time for Delivery." Indeed, Rider Clause 32(a) states if the Sale MOA is cancelled, then the Charter is cancelled.

The Sale MOA also is expressly referenced at Rider Clauses 32 (b); 33; 38(a)(iv);38(c);44(h); 60.1.45 (describing Icon and Amazing as "Buyers" and "Sellers" of M/V AMAZING); 60.1.64 (describing "relevant documents" as the vessel finance charter and the Sale MOA).

As in the *All Car* and *Parcel Tanker* cases above, here too there is a Purchase Option at Rider Clause 50. This alone would be conclusive and require immediate release of M/T HERO.

But even more compelling to the analysis whether this is a non-maritime vessel sale/finance leaseback charter or a stand-alone non-sale related maritime charter party, is the Rider Clause 51 "PURCHASE OBLIGATION" -- at year seven

Amazing "…shall purchase the vessel (such obligation being the "**Purchase Obligation"**) for USD $21,500,000 …(the "**Purchase Obligation Price**")." Stand-alone non-sale related maritime charter parties do not compel the charterer to purchase the vessel at the end of the charter period. This dispute is about a vessel sale, and Icon's concern that the sale will not be consummated.

Icon's sole function under the charter is to collect payment installments throughout the term of the sale/financing, and then to collect the Purchase Obligation Price at the end of the term.

Icon's representation to this court that this is an Admiralty and Maritime case supporting Rule B attachment is simply not consistent with Icon's own Sale MOA and Revised Barecon.

From the start, this transaction was regarded as a vessel sale/loan, not as a charter. Icon itself has repeatedly referred to its relationship with Defendants as a "secured financing," and has stressed that it is not a bareboat charter, but a vessel sale/loan. Defendants Amazing and Geden Holdings Ltd. ("Geden") agree with Icon that the "bareboat charter" is in reality a vessel sale/financing, not a stand-alone charter, as evidenced by, among others, (i) references in the term sheet to defendant Amazing as "Borrower",[8] (ii) repeated messages from Icon, some as recent as May 2013, stressing that the transaction is a loan,[9] (iii) amortization schedules, broken down into components of "interest" and "principal" used to calculate "charter hire"

---

[8] See Exhibit 3, Icon/Amazing Term Sheet dated July 28, 2010 (Earnest Money Deposit Clause).
[9] See Exhibits 4, 5, 6, and 7 (Icon emails).

- 6 -

rates,[10] (iv) the requirement that defendant Amazing maintain a specified loan-to-value ratio or pay additional amounts in hire (See Exhibit 2, Clause 40(c) of the Charter), which is a standard feature of asset-based financing but not of bareboat charters, (v) covenants in the charter requiring delivery of periodic financial statements, as would be required in a loan (See Exhibit 2, Clause 44 of Charter), and (vi) other loan-like covenants in the charter, such as restrictions on doing any business other than operating the ship, incurring other indebtedness, and paying dividends (See Exhibit 2, Clause 44).

Icon, in its correspondence with Defendants, continually refers to itself as a "lender" and to the transaction as a "loan". See Exhibit 4, email message dated May 28, 2013 from Tobias Backer of Icon, stating, "We do not expect any special treatment, but rather to be treated the same as the **other secured lenders** to Geden." (emphasis added). Before any lawyers were involved, when Defendants' consultant Alix Partners in their restructuring proposal in shorthand simplification described the Icon contract as a bareboat charter, Icon was quick to object, stating, "We have evaluated your proposal and believe that there must be a misunderstanding. Icon's financings of the Center, Amazing and Fantastic are **secured financings**, not time charter arrangements." See Exhibit 5, email dated May 2, 2013 from Tobias Backer. (emphasis added). Icon repeatedly emphasized to Defendants that it viewed the transaction as a loan, and expected it to be treated as such: "From a legal perspective a capital lease – such as our deals – is **no different than a loan**. As such your lease with us is **in reality a senior/junior loan**. This

---

[10] See Exhibit 5, 8 (Icon emails with amortization schedules for AMAZING sale installment payments).

PD.9745803.1

is the way Icon approached this from day one and it is a way it would be address [sic] any kind of insolvency proceeding. As such, we are perplexed by why these deals would be dealt with differently than the loans." See Exhibit 6, email dated April 19, 2013 from Tobias Backer. (emphasis added).

The purchase obligation at the end of the term is a crucial component, and an integral part, of the subject vessel sale/finance charter. The amortization schedule, which was used to calculate the hire rate, shows the purchase price like a "balloon" payment at the end of a loan.[11] Any payments made due to a falling loan-to-value ratio (the "Permitted LTV" under Clause 40(c) of the Charter) would be applied to reduce the purchase price.[12] Both the purchase price and the charter hire payments were tied not to the market rate for charters, but to the "senior financing" obtained by Icon for the sale of the vessel. (See Exhibit 7, email dated December 26, 2012 from Sybille Andaur, "As already mentioned in previous correspondence, the payment of overdue charter payments is key as Icon wouldn't be able to pay the principal under the senior loans, should we not receive the overdue bareboat charter payments.")

Icon's own Sale MOA, Revised Barecon, and emails establish this is a dispute about a vessel sale contract.

### **Defendants' conduct has been in good faith and transparent**

Defendants are victims of the worldwide recession in the shipping market, in both (1) the dry bulk cargo sector, with charter rates dropping from their highs in

---

[11] See Exhibits 3 ("Value Maintenance Clause); 8.
[12] Id.

PD.9745803.1

2008 and remaining at low levels since the end of 2010 (See Exhibit 9, Wall Street Journal – MarketBeat dated January 18, 2012, noting that the Baltic Dry Index had fallen below 1000 for the first time since January 2009; Exhibit 10, DryShips, Inc. Daily Market Report demonstrates as of June 4, 2013, the Baltic Dry Index was 805); and (2) the tanker sector, (See Exhibit 11, "Frontline Rejects Oil Cargoes Amid Rout in Tanker Rates", Bloomberg.com, April 2, 2013).

Icon is a sophisticated commercial party, with considerable experience in finance leases and lending in the shipping industry. In the term sheet dated July 28, 2010, Icon describes itself as "the third largest independent equipment leasing and financing company in the United States according to the 2009 Monitor 100 Report, and the largest privately-held independent equipment leasing and finance company in the United States . . . . Icon has a particular specialty in maritime and offshore assets." See Exhibit 3, Icon's Term Sheet dated July 28, 2010.

To avoid bankruptcy, Defendants are seeking to restructure their financial relationships. Bankruptcy is not a possibility that is merely remote or theoretical, and has been employed by other shipping companies in the last few years, including the shipping companies OSG, Omega Navigation, Marco Polo Seatrade, General Maritime, B&H, TBS, and Eastwind. Defendants have been completely transparent in their restructuring process, keeping Icon informed at every step and working with Icon on a consensual solution (and, in fact, a copy of one such restructuring proposal was included by Icon as an exhibit to their complaint in this action). The restructuring proposals were not a "secretive" or furtive action, but a transparent

- 9 -
PD.9745803.1

discussion between Defendants and all vessel sale creditors, including Icon, providing all involved with the restructuring proposals and asking all vessel sale creditors to consider renegotiating existing agreements.

As discussed throughout with Icon, the Defendants have been making the charter payments that they can, paying 65% of the hire rate for the present time, which is the same amount that the "other lenders" are getting. Defendants have engaged Alix Partners, a reputable financial advisor, to work on a restructuring deal that will enable Defendants to keep operating and Icon and the other lenders to be paid. There was no attempt to simply walk away from the Sale MOA/Revised Barecon obligations or to avoid paying the installments completely. Defendants informed Icon what they were doing and asked Icon to discuss restructuring.

The court may wish to consider whether Icon is acting properly under the circumstances, by here proceeding to attach M/T HERO – a vessel completely unrelated to the M/V AMAZING sale transaction; and by Icon now alleging it has a charter when it has previously insisted throughout that its transaction is a vessel sale loan.

Icon knew or should have known that, unlike a stand-alone non-sale related conventional charter, a vessel sale/financing is not a maritime contract and therefore does not fall within this Court's Rule 9(h) jurisdiction and does not support the imposition of a Rule B attachment. Icon has chosen to seize a vessel unrelated to the Icon transaction so that the earnings of Icon's collateral (M/V AMAZING, M/V FANTASTIC and M/V CENTER) continue unaffected, while a

different lender (HSH Nordbank, the German bank holding a mortgage on M/V HERO) suffers. HERO is currently on time charter to Shell, and is unable to perform this charter due to the attachment.

### Contractual Forum Selection/Choice of Law Clause - England

Icon is an unsecured lender under an agreement that provides for dispute resolution in English Courts under English law. See Exhibit 1 Sale MOA Clause 19; Exhibit 2 Revised Barecon Rider Clause 58. Icon is wrongfully attempting to obtain security here Icon otherwise could not obtain under English law in the mutually agreed English forum — by alleging this is not a vessel sale dispute but is a stand-alone non-sale related conventional "charter," which until this attachment Icon vigorously denied.

By detaining a vessel unrelated to Icon's AMAZING sale/finance transaction, Icon intentionally and improperly is interfering with that unrelated vessel's ability to perform her existing charter obligations, and be paid, thereby exacerbating Geden's already precarious finances in the hopes this stranglehold will force Geden to provide security to which Icon is not entitled in law, admiralty, or equity.

### CONCLUSION

Icon contractually agreed to resolve any and all disputes concerning M/V AMAZING in England, according to English law. Icon has breached this agreement, particularly to the extent of its "alter-ego" and "fraud" claims which Icon improperly asks this Court to address.

But more troubling is Icon's representation to this Honorable Court that a Rule B attachment of M/T HERO was proper, when in fact this is a non-maritime dispute concerning the sale of M/V AMAZING.

Because this Honorable Court lacks jurisdiction, Rule B attachment of M/T HERO should be vacated, and Icon's complaint dismissed in favor of the proper, contractually agreed forum in England, subject to English law – which does <u>not</u> allow such prejudgment attachment.

                                                    Respectfully submitted,

*s/ Marc G. Matthews*
Marc G. Matthews
Texas Bar #24055921
Federal ID No. 705809
700 Louisiana Street, Suite 2600
Houston, Texas 77002
Telephone: (713) 626-1386
Telecopier: (713) 626-1388
marc.matthews@phelps.com

**ATTORNEY-IN-CHARGE FOR DEFENDANTS, AMAZING SHIPPING LTD., GEDEN HOLDINGS, LTD.**

OF COUNSEL:
**PHELPS DUNBAR LLP**
Brian D. Wallace (LA Bar #17191; Fed. ID 205890)
Patricia Hair (TX Bar #8713500; Fed. ID 2960)
wallaceb@phelps.com
hairp@phelps.com

and
Watson, Farley, and Williams (New York) LLP
100 Park Avenue, 31st Floor
New York, New York 10017

## **CERTIFICATE OF CONFERENCE**

      I certify that counsel for movant has conferred with counsel for respondent regarding the contents of this motion. Counsel for respondent is opposed. Counsel cannot agree about the disposition of this motion.

                                  *s/ Marc G. Matthews*
                                  Marc G. Matthews

## **CERTIFICATE OF SERVICE**

      I certify that a copy of the foregoing was electronically filed with the Clerk, with a copy served electronically by the Clerk or by the undersigned via certified mail, return receipt requested, on this the 4th day of June, 2013 upon all counsel of record.

                                  *s/ Marc G. Matthews*
                                  Marc G. Matthews