# BIMCO STANDARD BAREBOAT CHARTER
## CODE NAME: "BARECON 2001"

PART I

| | |
|---|---|
| 1. Shipbroker<br>N/A | 2. Place and date |
| 3. Owners/Place of business (Cl. 1)<br>ICON AMAZING, LLC<br>c/o ICON Capital Corp.<br>100 Fifth Avenue, 4th Floor<br>New York NY10011<br>USA<br>Tel: +1 212 418 4700<br>Fax: +1 212 418 4739<br>Email: dverlizzo@iconcapital.com | 4. Bareboat Charterers/Place of business (Cl. 1)<br>Amazing Shipping Ltd.<br>198, Old Bakery Street<br>Valletta, VLT 09<br>Malta<br>Tel: +90 212 319 2100<br>Fax: +90 212 283 1604<br>Email: gedenlines@gedenlines.com<br>chartering@gedenlines.com |
| 5. Vessel's name, call sign and flag (Cl. 1 and 3)<br>m.v. "AMAZING", 9HA2330, Malta | |
| 6. Type of Vessel<br>Bulk Carrier | 7. GT/NT<br>GT: 33,044/NT: 19,231 |
| 8. When/Where built<br>2010/COSCO Shipyard Group Co., Ltd. | 9. Total DWT (abt.) in metric tons on summer freeboard<br>Not less than 57,000 |
| 10. Classification Society (Cl. 3)<br>Bureau Veritas | 11. Date of last special survey by the Vessel's classification society<br>N/A |
| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3)<br>As per MOA dated even date hereto for the Vessel | |
| 13. Port or Place of delivery (Cl. 3)<br>See Clause 32 - in accordance with the MOA | 14. Time for delivery (Cl. 4)<br>See Clause 32 / 15. Cancelling date (Cl. 5)<br>15 October 2010 |
| 16. Port or Place of redelivery (Cl. 15)<br>At an international port mutually agreeable to Owners and Charterers and if no agreement is reached Singapore | 17. No. of months' validity of trading and class certificates upon redelivery (Cl. 15)<br>N/A |
| 18. Running days' notice if other than stated in Cl. 4<br>As agreed between the parties | 19. Frequency of dry-docking (Cl. 10(g))<br>As required by class |
| 20. Trading limits (Cl. 6)<br>Subject to Clause 6, World Wide always within I.W.L., but excluding any waters with US Embargo (which includes, without limitation, Cuba, the Islamic Republic of Iran and the Democratic People's Republic of Korea (aka North Korea)) | |
| 21. Charter period (Cl. 2)<br>Maximum 7 years from the Delivery Date as per Clause 50 | 22. Charter hire (Cl. 11)<br>See Clause 34 |
| 23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29)(Cl. 10(a)(ii))<br>For Charterers' account | |

First issued by The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974 as "Barecon 'A'" and "Barecon 'B'". Revised and amalgamated 1989. Revised 2001

Printed by BIMCO's idea

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen. Issued November 2001

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the eve[nt of any modification] made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no respons[ibility for any loss,] damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

EXHIBIT
2
tabbies

"BARECON 2001" STANDARD BAREBOAT CHARTER PART I

| | |
|---|---|
| 24. Rate of interest payable acc. to Cl. 11 (f) and, if applicable, acc. to PART IV<br>See Clause 35 | 25. Currency and method of payment (Cl. 11)<br>United States Dollars, see Clause 35 |
| 26. Place of payment; also state beneficiary and bank account (Cl. 11)<br>See Clause 35 | 27. Bank guarantee/bond (sum and place) (Cl. 24) (optional)<br>See Clause 39 |
| 28. Mortgage(s), if any (state whether 12(a) or (b) applies; if 12(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 12)<br>DVB Bank SE<br>Parklaan 2<br>3016<br>Rotterdam<br>The Netherlands<br>Clause 12b to apply. See Clause 40 | 29. Insurance (hull and machinery and war risks) (state value acc. to Cl. 13(f) or, if applicable, acc. to Cl. 14(k)) (also state if Cl. 14 applies)<br>See Clause 45. Clause 14 does not apply |
| 30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))<br>N/A | 31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))<br>See Clause 45 |
| 32. Latent defects (only to be filled in if period other than stated in Cl. 3)<br>N/A | 33. Brokerage commission and to whom payable (Cl. 27)<br>N/A |
| 34. Grace period (state number of clear banking days) (Cl. 28)<br>See Clause 46 | 35. Dispute Resolution (state 30(a), 30(b) or 30(c); if 30(c) agreed Place of Arbitration must be stated (Cl. 30)<br>See Clause 58 |
| 36. War cancellation (indicate countries agreed) (Cl. 26(f))<br>N/A | |
| 37. Newbuilding Vessel (indicate with "yes" or "no" whether PART III applies) (optional)<br>No | 38. Name and place of Builders (only to be filled in if PART III applies)<br>N/A |
| 39. Vessel's Yard Building No. (only to be filled in if PART III applies)<br>N/A | 40. Date of Building Contract (only to be filled in if PART III applies)<br>N/A |
| 41. Liquidated damages and costs shall accrue to (state party acc. to Cl. 1)<br>a) N/A<br>b)<br>c) | |
| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether PART IV applies) (optional)<br>No | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies) (optional)<br>Yes |
| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies)<br>Malta | 45. Country of the Underlying Registry (only to be filled in if PART V applies)<br>Malta |
| 46. Number of additional clauses covering special provisions, if agreed<br>32-60 | |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

| Signature (Owners) | Signature (Charterers) MEHMET |
|---|---|

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BARECON 2001" Standard Bareboat Charter

1. **Definitions** See also Clause 60
In this Charter, the following terms shall have the meanings hereby assigned to them:
*"The Owners"* shall mean the party identified in Box 3;
*"The Charterers"* shall mean the party identified in Box 4;
*"The Vessel"* shall mean the vessel named in Box 5 and with particulars as stated in Boxes 6 to 12.
*"~~Financial Instrument~~Finance Documents"* means the mortgage, deed of ~~c~~covenant, assignment of insurances or other such financial security instrument as annexed to this Charter and stated in Box 28, or such other mortgages or vessel related financial security instruments as may at a later date be granted by the Owners to any bank or financial institution in accordance with Clause 40.

2. **Charter Period**
In consideration of the hire detailed in Box 22, the Owners have agreed to let and the Charterers have agreed to hire the Vessel for the period stated in Box 21 ("The Charter Period").

3. **Delivery**
*(not applicable when Part III applies, as indicated in Box 37)*
~~(a) The Owners shall before and at the time of delivery exercise due diligence to make the Vessel seaworthy And in every respect ready in hull, machinery and equipment for service under this Charter.~~
The Vessel shall be delivered by the Owners and taken over by the Charterers at the port or place indicated in Box 13 ~~in such ready safe berth as the Charterers may Direct.~~
~~(b) The Vessel shall be properly documented on delivery in accordance with the laws of the flag State indicated in Box 5 and the requirements of the classification society stated in Box 10. The Vessel upon delivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 12.~~
(c) The delivery of the Vessel by the Owners and the taking over of the Vessel by the Charterers shall constitute a full performance by the Owners of all the Owners' obligations under this Clause 3, and thereafter the Charterers shall not be entitled to make or assert any claim against the Owners on account of any conditions, representations or warranties expressed or implied with respect to the Vessel ~~but the Owners shall be liable for the cost of but not the time for repairs or renewals occasioned by latent defects in the Vessel, her machinery or appurtenances, existing at the time of delivery under this Charter, provided such defects have manifested themselves within twelve (12) months after delivery unless otherwise provided in Box 32.~~

4. **Time for Delivery**
*(not applicable when Part III applies, as indicated in Box 37)*
~~The Vessel shall not be delivered before the date indicated in Box 14 without the Charterers' consent and the Owners shall exercise due diligence to deliver the Vessel not later than the date indicated in Box 15.~~
~~Unless otherwise agreed in Box 18, the Owners shall give the Charterers not less than thirty (30) running days' preliminary and not less than fourteen (14) running days' definite notice of the date on which the Vessel is expected to be ready for delivery.~~
~~The Owners shall keep the Charterers closely advised of possible changes in the Vessel's position.~~

5. **Cancelling**
*(not applicable when Part III applies, as indicated in Box 37)*
~~(a) Should the Vessel not be delivered latest by the cancelling date indicated in Box 15, the Charterers shall have the option of cancelling this Charter by giving the Owners notice of cancellation within thirty-six (36) running hours after the cancelling date stated in Box 15, failing which this Charter shall remain in full force and effect.~~
~~(b) If it appears that the Vessel will be delayed beyond the cancelling date, the Owners may, as soon as they are in a position to state with reasonable certainty the day on which the Vessel should be ready, give notice thereof to the Charterers asking whether they will exercise their option of cancelling, and the option must then be declared within one hundred and sixty-eight (168) running hours of the receipt by the Charterers of such notice or within thirty-six (36) running hours after the cancelling date, whichever is the earlier. If the Charterers do not then exercise their option of cancelling, the seventh day after the readiness date stated in the Owners' notice shall be substituted for the cancelling date indicated in Box 15 for the purpose of this Clause 5.~~
~~(c) Cancellation under this Clause 5 shall be without prejudice to any claim the Charterers may otherwise have on the Owners under this Charter.~~

6. **Trading Restrictions**
The Vessel shall be employed in lawful trades for the carriage of suitable lawful merchandise in such waters and environments as the Vessel's capabilities and specifications allow within the trading limits indicated in Box 20.
The Charterers undertake not to employ the Vessel or suffer the Vessel to be employed otherwise than in conformity with the terms of the contracts of insurance (including any warranties expressed or implied therein) without first obtaining the consent of the insurers to such employment and complying with such requirements as to extra premium or otherwise as the insurers may prescribe. Without prejudice to the foregoing, the Charterers undertake not to emply the Vessel or suffer the Vessel to be employed in any Listed Areas unless they have (i) received the prior consent of the Vessel's insurers and (ii) placed any additional war risks insurances, at its own expense, as may be required by the Vessel's insurers. Any additional war risks insurances placed as a consequence of the Vessel's employment in a Listed Area shall form part of the "Assigned Property" under the General Assignment.
The Charterers also undertake not to employ the Vessel or suffer her employment in any trade or business which is forbidden by US Embargo and/or the law of any country to which the Vessel may sail or is otherwise illicit or in carrying illicit or prohibited goods or in any manner whatsoever which may render her liable to condemnation, destruction, seizure or confiscation.
Notwithstanding any other provisions contained in this Charter it is agreed that nuclear fuels or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter. This exclusion does not apply to radio-isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purposes provided the Owners' prior approval has been obtained to loading thereof.

7. **Surveys on Delivery and Redelivery** See also Clause 32
*(not applicable when Part III applies, as indicated in Box 37)*
The Owners ~~and Charterers~~ shall ~~each~~ appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of delivery ~~and redelivery~~ hereunder. ~~The Owners shall bear all expenses of the On-hire Survey including loss of time, if any, and t~~The Charterers shall bear all expenses of the Off-hire Survey including loss of time, if any, at the daily equivalent to the rate of hire or pro rata thereof.

8. **Inspection**
The Owners and/or nominees (inclusive of the

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Mortgagee) shall have the right at any time after giving reasonable notice to the Charterers to inspect or survey the Vessel or instruct a duly authorised surveyor to carry out such survey on their behalf provided it does not interfere with operation of the Vessel and/or crew:-

(a) to ascertain the condition of the Vessel and satisfy themselves that the Vessel is being properly repaired and maintained. The costs and fees for such inspection or survey shall be paid by the Owners unless the Vessel is found to require repairs or maintenance in order to achieve the condition so provided;

(b) in dry-dock if the Charterers have not dry-docked ~~Her~~the Vessel in accordance with Clause 10(g). The costs and fees for such inspection or survey shall be paid by the Charterers; and

(c) for any other commercial reason they consider necessary (provided it does not unduly interfere with the commercial operation of the Vessel). The costs and fees for such inspection and survey shall be paid by the Owners.

All time used in respect of inspection, survey or repairs shall be for the Charterers' account and form part of the Charter Period.

The Charterers shall also permit the Owners to inspect the Vessel's log books whenever requested and shall whenever required by the Owners furnish them with full information regarding any casualties or other accidents or damage to the Vessel.

**9. Inventories, Oil and Stores**

An ~~complete~~ inventory list of the Vessel's entire equipment, outfit including spare parts, appliances and of all consumable stores on board the Vessel shall be made by the Charterers in conjunction with the Owners on delivery and again on redelivery of the Vessel. ~~The Charterers and the Owners, respectively, shall at the time of delivery and redelivery take over and pay for all bunkers, lubricating oil, unbroached provisions, paints, ropes and other consumable stores (excluding spare parts) in the said Vessel at the then current market prices at the ports of delivery and redelivery, respectively.~~ The Charterers shall ensure that all spare parts listed in the inventory and used during the Charter Period are replaced at their expense prior to redelivery of the Vessel.

**10. Maintenance and Operation**

(a)(i)Maintenance and Repairs - During the Charter Period the Vessel shall be in the full possession and at the absolute disposal for all purposes of the Charterers and under their complete control in every respect. The Charterers shall maintain the Vessel, her machinery, boilers, appurtenances and spare parts in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice and, ~~except as provided for in Clause 14(I), if applicable,~~ at their own expense they shall at all times keep the Vessel's Class fully up to date with the Classification Society indicated in Box 10 and maintain all other necessary certificates in force at all times.

(ii) New Class and Other Safety Requirements -- In the event of any improvement, structural changes or new equipment becoming necessary for the continued operation of the Vessel by reason of new class requirements or by compulsory legislation then the Charterers shall promptly comply with the same and the cost of compliance shall be for the Charterers' account. See also Clause 37. ~~costing (excluding the Charterers' loss of time) more than the percentage stated in Box 23, or if Box 23 is left blank, 5 per cent. of the Vessel's insurance value as stated in Box 29, then the extent, if any, to which the rate of hire shall be varied and the ratio in which the cost of compliance shall be shared between the parties concerned in order to achieve a reasonable distribution thereof as between the Owners and the Charterers having regard, inter alia, to the length of the period remaining under this Charter shall, in the absence of agreement, be referred to the dispute resolution method agreed in Clause 30.~~

(iii) Financial Security - The Charterers shall maintain financial security or responsibility in respect of third party liabilities as required by any government, including federal, state or municipal or other division or authority thereof, to enable the Vessel, without penalty or charge, lawfully to enter, remain at, or leave any port, place, territorial or contiguous waters of any country, state or municipality in performance of this Charter without any delay. This obligation shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof.

The Charterers shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the Charterers' sole expense and the Charterers shall indemnify the Owners against all consequences whatsoever (including loss of time) for any failure or inability to do so.

(b) Operation of the Vessel - The Charterers shall at their own expense and by their own procurement man, victual, navigate, operate, supply, fuel and, whenever required, repair the Vessel during the Charter Period and they shall pay all charges and expenses of every kind and nature whatsoever incidental to their use and operation of the Vessel under this Charter, including annual flag State fees and any foreign general municipality and/or state taxes. The Master, officers and crew of the Vessel shall be the servants of the Charterers for all purposes whatsoever, even if for any reason appointed by the Owners.

Charterers shall comply with the regulations regarding officers and crew in force in the country of the Vessel's flag or any other applicable law.

(c) The Charterers shall keep the Owners and the ~~m~~Mortgagee(s) advised of the intended employment, planned dry-docking and major repairs of the Vessel, as reasonably required.

(d) ~~Flag and~~ Name of Vessel – During the Charter Period, the Charterers shall have the liberty to paint the Vessel in their own colours, install and display their funnel insignia and fly their own house flag. The Charterers shall also have the liberty, with the Owners' consent, which shall not be unreasonably withheld, to change ~~the flag and/or~~ the name of the Vessel during the Charter Period. Painting and re-painting, instalment and re-instalment, registration and re-registration, if required by the Owners, shall be at the Charterers' expense and time.

(e) Changes to the Vessel – Subject to Clause 10(a)(ii) and Clause 37, the Charterers shall make no structural changes in the Vessel or changes in the machinery, boilers, appurtenances or spare parts thereof without in each instance first securing the Owners' approval thereof. If the Owners so agree, the Charterers shall, if the Owners so require, restore the Vessel to its former condition before the termination of this Charter.

(f) Use of the Vessel's Outfit, Equipment and Appliances - The Charterers shall have the use of all outfit, equipment, and appliances on board the Vessel at the time of delivery, provided the same or their substantial equivalent shall be returned to the Owners on redelivery in the same good order and condition as when received, ordinary wear and tear excepted. The Charterers shall from time to time during the Charter Period replace such items of equipment as shall be so

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

damaged or worn as to be unfit for use. The Charterers are to procure that all repairs to or replacement of any damaged, worn or lost parts or equipment be effected in such manner (both as regards workmanship and quality of materials) as not to diminish the value of the Vessel. The Charterers have the right to fit additional equipment at their expense and risk but the Charterers shall remove such equipment at the end of the period if requested by the Owners. Any equipment including radio equipment on hire on the Vessel at time of delivery shall be kept and maintained by the Charterers and the Charterers shall assume the obligations and liabilities of the Owners under any lease contracts in connection therewith and shall reimburse the Owners for all expenses incurred in connection therewith, also for any new equipment required in order to comply with radio regulations.

(g) Periodical Dry-Docking - The Charterers shall dry-dock the Vessel and clean and paint her underwater parts whenever the same may be necessary, but not less than any period as may be required by the Classification Society or flag state ~~once during the period stated in Box 19 or, if Box 19 has been left blank, every sixty (60) calendar months after delivery or such other period as may be required by the Classification Society or flag State.~~

**11. Hire** See also Clauses 34 and 35

(a) The Charterers shall pay hire due to the Owners punctually in accordance with the terms of this Charter in respect of which time shall be of the essence.

(b) ~~The Charterers shall pay to the Owners for the hire of the Vessel a lump sum in the amount indicated in Box 22 which shall be payable not later than every thirty (30) running days in advance, the first lump sum being payable on the date and hour of the Vessel's delivery to the Charterers.~~ Hire shall be paid continuously throughout the Charter Period.

(c) Payment of hire shall be made in cash without discount in the currency and in the manner indicated in Box 25 and at the place mentioned in Box 26.

(d) Final payment of hire, if for a period of less than thirty (30) running days, shall be calculated proportionally according to the number of days and hours remaining before redelivery and advance payment to be effected accordingly.

~~(e) Should the Vessel be lost or missing, hire shall cease from the date and time when she was lost or last heard of. The date upon which the Vessel is to be treated as lost or missing shall be ten (10) days after the Vessel was last reported or when the Vessel is posted as missing by Lloyd's, whichever occurs first. Any hire paid in advance to be adjusted accordingly.~~

(f) Any delay in payment of hire shall entitle the Owners to interest at the rate per annum as agreed in Box 24. If ~~Box 24 has not been filled in, the three months interbank offered rate in London (LIBOR or its successor) for the currency stated in Box 25, as quoted by the British Bankers' Association (BBA) on the date when the hire fell due, increased by 2 per cent., shall apply.~~

(g) Payment of interest due under sub-clause 11(f) shall be made within seven (7) running days of the date of the Owners' invoice specifying the amount payable or, in the absence of an invoice, at the time of the next hire payment date.

**12. Mortgage**
*(only to apply if Box 28 has been appropriately filled in)*

~~*) (a) The Owners warrant that they have not effected any mortgage(s) of the Vessel and that they shall not effect any mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.~~

*) (b) The Vessel chartered under this Charter is financed by a mortgage ~~according to the Financial Instrument.~~ according to the Finance Documents

The Charterers undertake to comply, and provide such information and documents to enable the Owners to comply, with all ~~such instructions or directions~~covenants and obligations in regard To the employment, insurances, operation, repairs and maintenance of the Vessel as laid down in the Finance Documents ~~Financial Instrument~~ or as may be directed from time to time during the currency of the Charter by the ~~m~~Mortgagee(s) in conformity with the Mortgage and the Finance Documents~~Financial Instrument~~. The Charterers confirm that, for this purpose, they have acquainted themselves with all relevant terms, conditions and provisions of the Mortgage and the Finance Documents~~Financial Instrument~~ and agree to acknowledge this in writing in any form that may be required by the ~~m~~Mortgagee(s). ~~The Owners warrant that they have not effected any mortgage(s) other than stated in Box 28 and that they shall not agree to any amendment of the mortgage(s) referred to in Box 28 or effect any other mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.~~

*) *(Optional, Clauses 12(a) and 12(b) are alternatives; indicate alternative agreed in Box 28).*

**13. Insurance and Repairs** See also Clause 45

(a) During the Charter Period the Vessel shall be kept insured by the Charterers at their expense against hull and machinery, war and Protection and Indemnity risks (and any risks against which it is compulsory to insure for the operation of the Vessel, including maintaining financial security in accordance with sub-clause 10(a)(iii)) in such form as the Owners shall in writing approve, which approval shall not be un-reasonably withheld. Such insurances shall be arranged by the Charterers to protect the interests of both the Owners and the Charterers and the mortgagee(s) (if any), and The Charterers shall be at liberty to protect under such insurances the interests of any managers they may appoint. Insurance policies shall cover the Owners and the Charterers according to their respective interests. Subject to the provisions of the ~~Financial Instrument~~ Finance Documents and this Charter, ~~if any,~~ and the approval of the Owners and the insurers, the Charterers shall effect all insured repairs and shall undertake settlement and reimbursement from the insurers of all costs in connection with such repairs as Well as insured charges, expenses and liabilities to the extent of coverage under the insurances herein provided for.

The Charterers also to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances.

All time used for repairs under the provisions of sub-clause 13(a) or in respect of any other repairs ~~and for repairs of latent defects according to Clause 3(c) above~~, including any deviation, shall be for the Charterers' account.

(b) If the conditions of the above insurances permit additional insurance to be placed by the parties, such cover shall be limited to the amount for each party set out in Box 30 and Box 31, respectively. The Owners or the Charterers as the case may be shall immediately furnish the other party with particulars of any additional insurance effected, including copies of any cover notes or policies and the written consent of the insurers of any such required insurance in any case where the consent of such insurers is necessary.

(c) The Charterers shall upon the request of the Owners, provide information and promptly execute such documents as may be required to enable the Owners to

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BARECON 2001" Standard Bareboat Charter

comply with the insurance provisions of the Finance Documents ~~Financial Instrument~~.

(d) Subject to the provisions of any Finance Documents ~~the Financial Instru- Ment~~ and this Charter, if any, should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause 13(a), all insurance payments for such loss shall be paid to the Owners who shall distribute the moneys between the Owners and the Charterers according to their respective interests. The Charterers undertake to notify the Owners and the ~~m~~Mortgagee(s), if any, of any occurrences in consequence of which the Vessel is likely to become a ~~t~~Total ~~l~~Loss ~~as defined in this Clause.~~

(e) The Owners shall upon the request of the Charterers, promptly execute such documents as may be required to enable the Charterers to abandon the Vessel to insurers and claim a constructive total loss.

(f) For the purpose of insurance coverage against hull and machinery and war risks under the provisions of sub-clause 13(a), the value of the Vessel is the sum indicated in Box 29.

~~14. Insurance, Repairs and Classification~~

~~*(Optional, only to apply if expressly agreed and stated in Box 29, in which event Clause 13 shall be considered deleted).*~~

~~(a) During the Charter Period the Vessel shall be kept insured by the Owners at their expense against hull and machinery and war risks under the form of policy or policies attached hereto. The Owners and/or insurers shall not have any right of recovery or subrogation against the Charterers on account of loss of or any damage to the Vessel or her machinery or appurt- enances covered by such insurance, or on account of payments made to discharge claims against or liabilities of the Vessel or the Owners covered by such insurance. Insurance policies shall cover the Owners and the Charterers according to their respective interests.~~

~~(b) During the Charter Period the Vessel shall be kept insured by the Charterers at their expense against Protection and Indemnity risks (and any risks against which it is compulsory to insure for the operation of the Vessel, including maintaining financial security in accordance with sub-clause 10(a)(iii)) in such form as the Owners shall in writing approve which approval shall not be unreasonably withheld.~~

~~(c) In the event that any act or negligence of the Charterers shall vitiate any of the insurance herein provided, the Charterers shall pay to the Owners all losses and indemnify the Owners against all claims and demands which would otherwise have been covered by such insurance.~~

~~(d) The Charterers shall, subject to the approval of the Owners or Owners' Underwriters, effect all insured repairs, and the Charterers shall undertake settlement of all miscellaneous expenses in connection with such repairs as well as all insured charges, expenses and liabilities, to the extent of coverage under the insurances provided for under the provisions of sub-clause 14(a). The Charterers to be secured reimbursement through the Owners' Underwriters for such expenditures upon presentation of accounts.~~

~~(e) The Charterers to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances.~~

~~(f) All time used for repairs under the provisions of sub-clauses 14(d) and 14(e) and for repairs of latent defects according to Clause 3 above, including any deviation, shall be for the Charterers' account and shall form part of the Charter Period.~~

~~The Owners shall not be responsible for any expenses as are incident to the use and operation of the Vessel for such time as may be required to make such repairs.~~

~~(g) If the conditions of the above insurances permit additional insurance to be placed by the parties such cover shall be limited to the amount for each party set out in Box 30 and Box 31, respectively. The Owners or the Charterers as the case may be shall immediately furnish the other party with particulars of any additional insurance effected, including copies of any cover notes or policies and the written consent of the insurers of any such required insurance in any case where the consent of such insurers is necessary.~~

~~(h) Should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause 14(a), all insurance payments for such loss shall be paid to the Owners, who shall distribute the moneys between themselves and the Charterers according to their respective interests.~~

~~(i) If the Vessel becomes an actual, constructive, compromised or agreed total loss under the insurances arranged by the Owners in accordance with sub-clause 14(a), this Charter shall terminate as of the date of such loss.~~

~~(j) The Charterers shall upon the request of the Owners, promptly execute such documents as may be required to enable the Owners to abandon the Vessel to the insurers and claim a constructive total loss.~~

~~(k) For the purpose of insurance coverage against hull and machinery and war risks under the provisions of sub-clause 14(a), the value of the Vessel is the sum indicated in Box 28.~~

~~(l) Notwithstanding anything contained in sub-clause 10(a), it is agreed that under the provisions of Clause 14, if applicable, the Owners shall keep the Vessel's Class fully up to date with the Classification Society indicated in Box 10 and maintain all other necessary certificates in force at all times.~~

~~15. Redelivery~~

~~At the expiration of the Charter Period the Vessel shall be redelivered by the Charterers to the Owners at a safe and ice-free port or place as indicated in Box 16, in such ready safe berth as the Owners may direct. The Charterers shall give the Owners not less than thirty (30) running days' preliminary notice of expected date, range of ports of redelivery or port or place of redelivery and not less than fourteen (14) running days' definite notice of expected date and port or place of redelivery. Any changes thereafter in the Vessel's position shall be notified immediately to the Owners.~~

~~The Charterers warrant that they will not permit the Vessel to commence a voyage (including any preceding ballast voyage) which cannot reasonably be expected to be completed in time to allow redelivery of the Vessel within the Charter Period. Notwithstanding the above, should the Charterers fail to redeliver the Vessel within The Charter Period, the Charterers shall pay the daily equivalent to the rate of hire stated in Box 22 plus 10 per cent. or to the market rate, whichever is the higher, for the number of days by which the Charter Period is exceeded. All other terms, conditions and provisions of this Charter shall continue to apply.~~

Subject to the provisions of Clause 10, the Vessel shall be redelivered to the Owners in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted.

The Vessel upon redelivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 17.

16. Non-Lien

The Charterers will not suffer, nor permit to be continued,

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners and/or the Mortgagees in the Vessel. The Charterers further agree to fasten to the Vessel Master's office and on the navigation bridge ~~in a conspicuous Place~~ and to keep so fastened during the Charter Period a notice reading as follows:
"This Vessel is the property of (name of Owners). It is under charter to (name of Charterers) and is mortgaged to DVB Bank SE and by the terms of the Charter Party and the Mortgage neither the Charterers nor the Master have any right, power or authority to create, incur or permit to be imposed on the Vessel any lien whatsoever."

**17. Indemnity** See also Clause 38
(a) The Charterers shall indemnify the Owners against any loss, damage or expense incurred by the Owners arising out of or in relation to the operation of the Vessel by the Charterers, and against any lien of whatsoever nature arising out of an event occurring during the Charter Period. If the Vessel be arrested or otherwise detained by reason of claims or liens arising out of her operation hereunder by the Charterers, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail.
Without prejudice to the generality of the foregoing, the Charterers agree to indemnify the Owners against all consequences or liabilities arising from the Master, officers or agents signing Bills of Lading or other documents.
(b) If the Vessel be arrested or otherwise detained by reason of a claim or claims against the Owners, the Owners shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail.
In such circumstances the Owners shall indemnify the Charterers against any loss, damage or expense incurred by the Charterers (including hire paid under this Charter) as a direct consequence of such arrest or detention.

**18. Lien**
The Owners to have a lien upon all cargoes, sub-hires and sub-freights belonging or due to the Charterers or any sub-charterers and any Bill of Lading freight for all claims under this Charter, ~~and the Charterers to have a lien on the Vessel for all moneys paid in advance and not earned.~~

**19. Salvage**
All salvage and towage performed by the Vessel shall be for the Charterers' benefit and the cost of repairing damage occasioned thereby shall be borne by the Charterers.

**20. Wreck Removal**
In the event of the Vessel becoming a wreck or obstruction to navigation the Charterers shall indemnify the Owners against any sums whatsoever which the Owners shall become liable to pay and shall pay in consequence of the Vessel becoming a wreck or obstruction to navigation.

**21. General Average**
The Owners shall not contribute to General Average.

**22. Assignment, Sub-Charter and Sale** See also Clauses 41 and 48
(a) The Charterers shall not assign this Charter without the prior written consent of the Owners and the Mortgagee nor sub-charter the Vessel on a bareboat basis except with the prior consent in writing of the Owners, ~~which shall not be unreasonably withheld,~~ and which shall be subject to such terms and conditions as the Owners and the Mortgagee shall approve.
~~(b) The Owners shall not sell the Vessel during the currency of this Charter except with the prior written consent of the Charterers, which shall not be unreasonably withheld, and subject to the buyer accepting an assignment of this Charter.~~

**23. Contracts of Carriage**
*) (a) The Charterers are to procure that all Bills of Lading issued under this Charter are the Charterers' Bills of Lading and that all documents issued during the Charter Period evidencing the terms and conditions agreed in respect of carriage of goods shall contain a paramount clause incorporating any legislation relating to carrier's liability for cargo compulsorily applicable in the trade; if no such legislation exists, the documents shall incorporate the Hague-Visby Rules. The documents shall also contain the New Jason Clause and the Both-to-Blame Collision Clause.
~~*) (b) The Charterers are to procure that all passenger tickets issued during the Charter Period for the carriage of passengers and their luggage under this Charter shall contain a paramount clause incorporating any legislation relating to carrier's liability for passengers and their luggage compulsorily applicable in the trade; if no such legislation exists, the passenger tickets shall incorporate the Athens Convention Relating to the Carriage of Passengers and their Luggage by Sea, 1974, and any protocol thereto.~~
*) *Delete as applicable.*

**24. Bank Guarantee**
*(Optional, only to apply if Box 27 filled in)*
~~The Charterers undertake to furnish, before delivery of the Vessel, a first class bank guarantee or bond in the sum and at the place as indicated in Box 27 as guarantee for full performance of their obligations under this Charter.~~

**25. Requisition/Acquisition** See also Clause 45
(a) In the event of the Requisition for Hire of the Vessel by any governmental or other competent authority (hereinafter referred to as "Requisition for Hire") irrespective of the date during the Charter Period when "Requisition for Hire" may occur and irrespective of the length thereof and whether or not it be for an indefinite or a limited period of time, and irrespective of whether it may or will remain in force for the remainder of the Charter Period, this Charter shall not be deemed thereby or thereupon to be frustrated or otherwise terminated and the Charterers shall continue to pay the stipulated hire in the manner provided by this Charter until the time when the Charter would have terminated pursuant to any of the provisions hereof always provided however that in the event of "Requisition for Hire" any Requisition Hire or compensation received or receivable by the Owners shall be payable to the Charterers during the remainder of the Charter Period or the period of the "Requisition for Hire" whichever be the shorter.
~~(b) In the event of the Owners being deprived of their ownership in the Vessel by any Compulsory Acquisition of the Vessel or requisition for title by any governmental or other competent authority (hereinafter referred to as "Compulsory Acquisition"), then, irrespective of the date during the Charter Period when "Compulsory Acquisition" may occur, this Charter shall be deemed terminated as of the date of such "Compulsory Acquisition". In such event Charter Hire to be considered as earned and to be paid up to the date and time of such "Compulsory Acquisition".~~

**26. War**
(a) For the purpose of this Clause, the words "War

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BARECON 2001" Standard Bareboat Charter

Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) ~~The Vessel, unless the written consent of the Owners be first obtained, shall not continue to or go through any port, place, area or zone (whether of land or sea), or any waterway or canal, where it reasonably appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, the Owners shall have the right to require the Vessel to leave such area.~~

(c) The Vessel shall not load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

~~(d) If the insurers of the war risks insurance, when Clause 14 is applicable, should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such insurers as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.~~

(e) The Charterers shall have the liberty:

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement.

(f) In the event of outbreak of war (whether there be a declaration of war or not) (i) between any two or more countries ~~of the following countries: the United States of America; Russia; the United Kingdom; France; and the People's Republic of China, (ii) between any two or more of the countries stated in Box 36, both the Owners and the Charterers shall have the right to cancel this Charter, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 15, if the Vessel has cargo on board after discharge thereof at destination, or if debarred under this Clause from reaching or entering it at a near, open and safe port as directed by the Owners, or if the Vessel has no cargo on board, at the port at which the Vessel then is or if at sea at a near, open and safe port as directed by the Owners. In all cases~~ hire shall continue to be paid in accordance with Clause 11 and Clauses 34 and 35 and ~~except as aforesaid all~~ other provisions of this Charter shall apply until the end of the Charter Period.
~~Redelivery.~~

~~27. Commission~~

~~The Owners to pay a commission at the rate indicated in Box 33 to the Brokers named in Box 33 on any hire paid under the Charter. If no rate is indicated in Box 33, the commission to be paid by the Owners shall cover The actual expenses of the Brokers and a reasonable fee for their work.~~

~~If the full hire is not paid owing to breach of the Charter by either of the parties the party liable therefor shall indemnify the Brokers against their loss of commission. Should the parties agree to cancel the Charter, the Owners shall indemnify the Brokers against any loss of commission but in such case the commission shall not exceed the brokerage on one year's hire.~~

28. **Termination** See also Clauses 46 and 47

~~(a) Charterers' Default~~

~~The Owners shall be entitled to withdraw the Vessel from the service of the Charterers and terminate the Charter with immediate effect by written notice to the Charterers if:~~

~~(i) the Charterers fail to pay hire in accordance with Clause 11. However, where there is a failure to Make punctual payment of hire due to oversight, negligence, errors or omissions on the part of the Charterers or their bankers, the Owners shall give the Charterers written notice of the number of clear banking days stated in Box 34 (as recognised at the agreed place of payment) in which to rectify the failure, and when so rectified within such number of days following the Owners' notice, the payment shall stand as regular and punctual. Failure by the Charterers to pay hire within the number of days stated in Box 34 of their receiving the Owners' notice as provided herein, shall entitle the Owners to withdraw the Vessel from the service of the Charterers and terminate the Charter without further notice;~~

~~(ii) the Charterers fail to comply with the requirements of: (1) Clause 6 (Trading Restrictions) (2) Clause 13(a) (Insurance and Repairs) provided that the Owners shall have the option, by written notice to the Charterers, to give the Charterers a specified number of days grace within which to rectify the failure without prejudice to the Owners' right to withdraw and terminate under this Clause if the Charterers fail to comply with such notice;~~

~~(iii) the Charterers fail to rectify any failure to comply with the requirements of sub-clause 10(a)(i) (Maintenance and Repairs) as soon as practically possible after the Owners have requested them in writing so to do and in any event so that the Vessel's insurance cover is not prejudiced.~~

~~(b) Owners' Default~~

~~If the Owners shall by any act or omission be in breach of their obligations under this Charter to the extent that the Charterers are deprived of the use of the Vessel and such breach continues for a period of fourteen (14) running days after written notice thereof has been given by the Charterers to the Owners, the Charterers shall be entitled to terminate this Charter with immediate effect by written notice to the Owners.~~

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BARECON 2001" Standard Bareboat Charter

~~(c) Loss of Vessel~~
~~This Charter shall be deemed to be terminated if the Vessel becomes a total loss or is declared as a constructive or compromised or arranged total loss. For the purpose of this sub-clause, the Vessel shall not be deemed to be lost unless she has either become an actual total loss or agreement has been reached with her underwriters in respect of her constructive, compromised or arranged total loss or if such agreement with her underwriters is not reached it is adjudged by a competent tribunal that a constructive loss of the Vessel has occurred.~~

~~(d) Either party shall be entitled to terminate this Charter with immediate effect by written notice to the other party in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of the other party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed, or if it suspends payment, ceases to carry on business or makes any special arrangement or composition with its creditors.~~

(e) The termination of this Charter shall be without prejudice to all rights accrued due between the parties prior to the date of termination and to any claim that either party might have.

**29. Repossession** See also Clause 47

In the event of the termination of this Charter in accordance with the applicable provisions of ~~Clause 28~~ Clause 47~~;~~ the Owners shall have the right to repossess the Vessel from the Charterers at her current or next port of call or at sea, or at a port or place convenient to them without hindrance or interference by the Charterers, courts or local authorities. Pending physical repossession of the Vessel in accordance with this Clause 29 and Clause 47, the Charterers shall hold the Vessel as gratuitous bailee only to the Owners and shall continue to maintain class and insure the Vessel as required by the terms of this Charter notwithstanding the termination of the chartering of the Vessel. ~~The Owners shall arrange for an authorised representative to board the Vessel as soon as reasonably practicable following the termination of the Charter.~~ The Vessel shall be deemed to be repossessed by the Owners from the Charterers upon the boarding of the Vessel by the Owners' representative. All arrangements and expenses relating to the settling of wages, disembarkation and repatriation of the Charterers' Master, officers and crew shall be the sole responsibility of the Charterers.

**30. Dispute Resolution** See Clause 58

*) ~~(a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.~~

~~The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.~~

~~The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.~~

~~Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.~~

~~In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.~~

*) ~~(b) This Contract shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and any dispute arising out of or in connection with this Contract shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgement may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.~~

~~In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc. current at the time when the arbitration proceedings are commenced.~~

*) ~~(c) This Contract shall be governed by and construed in accordance with the laws of the place mutually agreed by the parties and any dispute arising out of or in connection with this Contract shall be referred to arbitration at a mutually agreed place, subject to the procedures applicable there.~~

~~(d) Notwithstanding (a), (b) or (c) above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.~~

~~In the case of a dispute in respect of which arbitration has been commenced under (a), (b) or (c) above, the following shall apply:-~~

~~(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.~~

~~(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.~~

~~(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.~~

~~(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.~~

~~(v) Either party may advise the Tribunal that they have~~

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

~~agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.~~

~~(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.~~

~~(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.~~

~~*(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)*~~

~~(e) If Box 35 in Part I is not appropriately filled in, sub-clause 30(a) of this Clause shall apply. Sub-clause 30(d) shall Apply in all cases.~~

~~*) *Sub-clauses 30(a), 30(b) and 30(c) are alternatives; Indicate alternative agreed in Box 35.*~~

31. **Notices** See Clause 59

~~(a) Any notice to be given by either party to the other party shall be in writing and may be sent by fax, telex, registered or recorded mail or by personal service.~~

~~(b) The address of the Parties for service of such communication shall be as stated in Boxes 3 and 4 respectively.~~

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

"BARECON 2001" Standard Bareboat Charter

OPTIONAL PART

## PART III
## PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY

*(Optional, only to apply if expressly agreed and stated in Box 37)*

1. ~~Specifications and Building Contract~~

~~(a) The Vessel shall be constructed in accordance with the Building Contract (hereafter called "the Building Contract") as annexed to this Charter, made between the Builders and the Owners and in accordance with the specifications and plans annexed thereto, such Building Contract, specifications and plans having been counter-signed as approved by the Charterers.~~

~~(b) No change shall be made in the Building Contract or in the specifications or plans of the Vessel as approved by the Charterers as aforesaid, without the Charterers' consent.~~

~~(c) The Charterers shall have the right to send their representative to the Builders' Yard to inspect the Vessel during the course of her construction to satisfy themselves that construction is in accordance with such approved specifications and plans as referred to under sub-clause (a) of this Clause.~~

~~(d) The Vessel shall be built in accordance with the Building Contract and shall be of the description set out therein. Subject to the provisions of sub-clause 2(c)(ii) hereunder, the Charterers shall be bound to accept the Vessel from the Owners, completed and constructed in accordance with the Building Contract, on the date of delivery by the Builders. The Charterers undertake that having accepted the Vessel they will not thereafter raise any claims against the Owners in respect of the Vessel's performance or specification or defects, if any. Nevertheless, in respect of any repairs, replacements or defects which appear within the first 12 months from delivery by the Builders, the Owners shall endeavour to compel the Builders to repair, replace or remedy any defects or to recover from the Builders any expenditure incurred in carrying out such repairs, replacements or remedies. However, the Owners' liability to the Charterers shall be limited to the extent the Owners have a valid claim against the Builders under the guarantee clause of the Building Contract (a copy whereof has been supplied to the Charterers). The Charterers shall be bound to accept such sums as the Owners are reasonably able to recover under this Clause and shall make no further claim on the Owners for the difference between the amount(s) so recovered and the actual expenditure on repairs, replacement or remedying defects or for any loss of time incurred. Any liquidated damages for physical defects or deficiencies shall accrue to the account of the party stated in Box 41(a) or if not filled in shall be shared equally between the parties. The costs of pursuing a claim or claims against the Builders under this Clause (including any liability to the Builders) shall be borne by the party stated in Box 41(b) or if not filled in shall be shared equally between the parties.~~

2. ~~Time and Place of Delivery~~

~~(a) Subject to the Vessel having completed her acceptance trials including trials of cargo equipment in accordance with the Building Contract and specifications to the satisfaction of the Charterers, the Owners shall give and the Charterers shall take delivery of the Vessel afloat when ready for delivery and properly documented at the Builders' Yard or some other safe and readily accessible dock, wharf or place as may be agreed between the parties hereto and the Builders. Under the Building Contract the Builders have estimated that the Vessel will be ready for delivery to the Owners as therein provided but the delivery date for the purpose of this Charter shall be the date when the Vessel is in fact ready for delivery by the Builders after completion of trials whether that be before or after as indicated in the Building Contract. The Charterers shall not be entitled to refuse acceptance of delivery of the Vessel and upon and after such acceptance, subject to Clause 1(d), the Charterers shall not be entitled to make any claim against the Owners in respect of any conditions, representations or warranties, whether express or implied, as to the seaworthiness of the Vessel or in respect of delay in delivery.~~

~~(b) If for any reason other than a default by the Owners under the Building Contract, the Builders become entitled under that Contract not to deliver the Vessel to the Owners, the Owners shall upon giving to the Charterers written notice of Builders becoming so entitled, be excused from giving delivery of the Vessel to the Charterers and upon receipt of such notice by the Charterers this Charter shall cease to have effect.~~

~~(c) If for any reason the Owners become entitled under the Building Contract to reject the Vessel the Owners shall, before exercising such right of rejection, consult the Charterers and thereupon~~

~~(i) if the Charterers do not wish to take delivery of the Vessel they shall inform the Owners within seven (7) running days by notice in writing and upon receipt by the Owners of such notice this Charter shall cease to have effect; or~~

~~(ii) if the Charterers wish to take delivery of the Vessel they may by notice in writing within seven (7) running days require the Owners to negotiate with the Builders as to the terms on which delivery should be taken and/or refrain from exercising their right to rejection and upon receipt of such notice the Owners shall commence such negotiations and/or take delivery of the Vessel from the Builders and deliver her to the Charterers;~~

~~(iii) in no circumstances shall the Charterers be entitled to reject the Vessel unless the Owners are able to reject the Vessel from the Builders;~~

~~(iv) if this Charter terminates under sub-clause (b) or (c) of this Clause, the Owners shall thereafter not be liable to the Charterers for any claim under or arising out of this Charter or its termination.~~

~~(d) Any liquidated damages for delay in delivery under the Building Contract and any costs incurred in pursuing a claim therefor shall accrue to the account of the party stated in Box 41(c) or if not filled in shall be shared equally between the parties.~~

3. ~~Guarantee Works~~

~~If not otherwise agreed, the Owners authorise the Charterers to arrange for the guarantee works to be performed in accordance with the building contract terms, and hire to continue during the period of guarantee works. The Charterers have to advise the Owners about the performance to the extent the Owners may request.~~

4. ~~Name of Vessel~~

~~The name of the Vessel shall be mutually agreed between the Owners and the Charterers and the Vessel shall be painted in the colours, display the funnel insignia and fly the house flag as required by the Charterers.~~

5. ~~Survey on Redelivery~~

~~The Owners and the Charterers shall appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of re-delivery. Without prejudice to Clause 15 (Part II), the Charterers shall bear all survey expenses and all other costs, if any, including the cost of docking and undocking, if required, as well as all repair costs incurred. The Charterers shall also bear all loss of time spent in connection with any docking and undocking as well as repairs, which shall be paid at the rate of hire per day or pro rata.~~

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

"BARECON 2001" Standard Bareboat Charter

OPTIONAL PART

## PART IV
## HIRE/PURCHASE AGREEMENT

*(Optional, only to apply if expressly agreed and stated in Box 42)*

~~On expiration of this Charter and provided the Charterers have fulfilled their obligations according to Part I and II as well as Part III, if applicable, it is agreed, that on payment of the final payment of hire as per Clause 11 the Charterers have purchased the Vessel with everything belonging to her and the Vessel is fully paid for.~~

~~*In the following paragraphs the Owners are referred to as the Sellers and the Charterers as the Buyers.*~~

~~The Vessel shall be delivered by the Sellers and taken over by the Buyers on expiration of the Charter.~~

~~The Sellers guarantee that the Vessel, at the time of delivery, is free from all encumbrances and maritime liens or any debts whatsoever other than those arising from anything done or not done by the Buyers or any existing mortgage agreed not to be paid off by the time of delivery. Should any claims, which have been incurred prior to the time of delivery be made against the Vessel, the Sellers hereby undertake to indemnify the Buyers against all consequences of such claims to the extent it can be proved that the Sellers are responsible for such claims. Any taxes, notarial, consular and other charges and expenses connected with the purchase and registration under Buyers' flag, shall be for Buyers' account. Any taxes, consular and other charges and expenses connected with closing of the Sellers' register, shall be for Sellers' account.~~

~~In exchange for payment of the last month's hire instalment the Sellers shall furnish the Buyers with a Bill of Sale duly attested and legalized, together with a certificate setting out the registered encumbrances, if any. On delivery of the Vessel the Sellers shall provide for deletion of the Vessel from the Ship's Register and deliver a certificate of deletion to the Buyers.~~
~~The Sellers shall, at the time of delivery, hand to the Buyers all classification certificates (for hull, engines, anchors, chains, etc.), as well as all plans which may be in Sellers' possession.~~

~~The Wireless Installation and Nautical Instruments, unless on hire, shall be included in the sale without any extra payment.~~

~~The Vessel with everything belonging to her shall be at Sellers' risk and expense until she is delivered to the Buyers, subject to the conditions of this Contract and the Vessel with everything belonging to her shall be delivered and taken over as she is at the time of delivery, after which the Sellers shall have no responsibility for possible faults or deficiencies of any description.~~

~~The Buyers undertake to pay for the repatriation of the Master, officers and other personnel if appointed by the Sellers to the port where the Vessel entered the Bareboat Charter as per Clause 3 (Part II) or to pay the equivalent cost for their journey to any other place.~~

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

OPTIONAL PART

# PART V
# PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY

*(Optional, only to apply if expressly agreed and stated in Box 43)*

**1. Definitions**

For the purpose of this PART V, the following terms shall have the meanings hereby assigned to them:

"The Bareboat Charter Registry" shall mean the registry of the State whose flag the Vessel will fly and in which the Charterers are registered as the bareboat charterers during the period of the Bareboat Charter.

"The Underlying Registry" shall mean the registry of the state in which the Owners of the Vessel are registered as Owners and to which jurisdiction and control of the Vessel will revert upon termination of the Bareboat Charter Registration.

~~**2. Mortgage**~~

~~The Vessel chartered under this Charter is financed by a mortgage and the provisions of Clause 12(b) (Part II) shall apply.~~

~~**3. Termination of Charter by Default**~~

~~If the Vessel chartered under this Charter is registered in a Bareboat Charter Registry as stated in Box 44, and if the Owners shall default in the payment of any amounts due under the mortgage(s) specified in Box 28, the Charterers shall, if so required by the mortgagee, direct the Owners to re-register the Vessel in the Underlying Registry as shown in Box 45.~~

~~In the event of the Vessel being deleted from the Bareboat Charter Registry as stated in Box 44, due to a default by the Owners in the payment of any amounts due under the mortgage(s), the Charterers shall have the right to terminate this Charter forthwith and without prejudice to any other claim they may have against the Owners under this Charter.~~

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**Execution Version**

**Rider Clauses**

**to**

**Bareboat Charter Party**

**between**

**ICON AMAZING, LLC**

**(the "Owners")**

**and**

**AMAZING SHIPPING LTD.**

**(the "Charterers")**

**in respect of**

**m.v. "AMAZING"**

32. MOA AND TIME FOR DELIVERY

The Owners' obligations to charter the Vessel to the Charterers under this Charter are conditional upon delivery of the Vessel to the Owners by the Charterers pursuant to the MoA.

Immediately following the Vessel being delivered to, the Owners pursuant to the MoA, the Charterers shall, be deemed to have taken delivery of the Vessel under this Charter at the port or place of delivery under the MoA.

The date of delivery for the purpose of this Charter shall, unless the Owners require otherwise, be the date (the "**Delivery Date**") when the Vessel is in fact delivered by the Charterers to the Owners pursuant to the MoA, whether that be before or after the delivery window under the MoA, and the Owners shall be under no responsibility for any delay whatsoever in delivery of the Vessel to the Charterers under this Charter.

The Charterers undertake that in the event the Vessel is not delivered and accepted under the MoA for any reason which is not directly attributable to default on the part of the Owners, the Charterers will promptly upon the Owners' written demand reimburse the Owners in full for any liabilities, losses, costs or expenses incurred by the Owners in respect of such non-delivery. (See also Clause 38.)

Without prejudice to any other provisions of this Charter, the Owners and the Charterers shall on the Delivery Date sign a Protocol of Delivery and Acceptance evidencing delivery of the Vessel under this Charter.

A list of the mutually agreed inventory, spare parts and other equipment pertaining to the Vessel on board and on shore is attached hereto as a **Schedule 1**.

(a)     If the MoA is cancelled for any reasons whatsoever, then (i) this Charter shall be deemed to have been cancelled forthwith and (ii) the Owners obligations to charter the Vessel to the Charterers under this Charter shall terminate, in each case and without any liability whatsoever on the Owners towards the Charterers. The Charterers' indemnities set out in this Clause 32 and Clause 38 shall survive any such cancelation.

(b)     (i)     The Charterers have no rights whatsoever to refuse to accept delivery of the Vessel once the Vessel is delivered to the Owners under the MoA and the Charterers acknowledge and agree that the Owners make no condition, term, representation or warranty, express or implied (and whether statutory or otherwise) as to title (except for legal title in the name of the Owners), seaworthiness, merchantability, condition, design, operation, performance, capacity or fitness for use of the Vessel or as to the eligibility of the Vessel for any particular trade or operation or any other condition, term, representation or warranty whatsoever, express or implied, with respect to the Vessel. Delivery to the Charterers or (as the case may be) deemed delivery of the Vessel under this Charter shall be conclusive proof that, for the purpose of the obligations and liabilities of the Owners under this Charter or in connection herewith, the Vessel is at that time seaworthy, in accordance with the provisions of this Charter, in good working order and repair and without defect or inherent vice whether or not discoverable by the Charterers and free and clear of all Encumbrances whatsoever, save for the mortgage referred to in Clauses 12 and 40 of this Charter (and other than (x) any such arising from or in connection with the use or operation of the Vessel by the Charterers or any permitted sub-charterers and (y) any maritime liens).

        (ii)    The Charterers agree that the Owners shall be under no liability to supply any replacement vessel or any piece or part thereof during any period when the Vessel is unusable and shall not be liable to the Charterers or any other person as a result of the Vessel being unusable, and if any latent defect should occur, same to be repaired by the Charterers at their cost and time.

        (iii)   The Charterers hereby waive all their rights in respect of any condition, term, representation, or warranty express or implied (and whether statutory or otherwise) on the part of the Owners in respect of the Vessel and all their claims against the Owners howsoever and whensoever the same may arise at any time in respect of or arising out of the operation, condition, merchantability, design, capacity, fitness of use or performance of the Vessel and the chartering thereof under this Charter (including in respect of the seaworthiness or otherwise of the Vessel) and, in particular and without prejudice to the generality of the foregoing, the Owners shall be under no liability to the Charterers whatsoever and howsoever arising in respect of any losses, costs, charges, expenses, fees, payments, liabilities, penalties, fines, damages or other sanctions of a monetary nature in respect of the injury, death, loss, damage or delay of or to or in connection with any person (which expression includes, but is not limited to, states, governments, municipalities and local authorities) or property whatsoever, whether on board the Vessel or elsewhere, irrespective of whether or when or where such injury, death, loss, damage or delay shall arise or of whether it shall arise as a result of the Vessel not being seaworthy or otherwise or of whether or not the Vessel or any part thereof is in the possession or under the control of the Charterers.

(c)     The Charterers will upon delivery have title to and shall not pay for bunkers, lubricating oil, water and unbroached provisions, paints, oil, ropes and other consumable stores in the Vessel on delivery.

33.     CONDITIONS PRECEDENT

The provisions of clause 17 of the MoA shall have been satisfied to the satisfaction of the Owners.

34.     CHARTER HIRE

Commencing from the Delivery Date, the Charterers shall pay charter hire ("**Charter Hire**") to the Owners monthly in advance at the net rate of USD13,500 (United States Dollars thirteen thousand five hundred) per day.  The first payment of Charter Hire shall be payable on the Delivery Date with subsequent payments of Charter Hire being paid at one monthly intervals thereafter.

35.     PAYMENTS

(a)     Notwithstanding anything to the contrary contained in this Charter, the Charter Hire and other payments to be made by the Charterers under this Charter (whether by way of hire or otherwise) shall be made as follows;

(i)     not later than 10.00 a.m. (New York time) on the date on which the relevant payment is due under the terms of this Charter; and

(ii)    in United States Dollars in funds with the same day value to the Owners' account number as advised by the Owners in a separate letter to the Charterers prior to or on the Delivery Date of the Vessel under this Charter (or such other bank or banks as may from time to time be notified in writing by the Owners to the Charterers) for the account of the Owners under reference to the Vessel's name.

(b)     If any day for the making of any payment under this Charter shall not be a Banking Day the due date for payment of the same shall be the next following Banking Day unless, in the case of a payment of Charter Hire under this Charter, the next following Banking Day falls in the following calendar month, in which case the due date for the relevant payment of Charter Hire shall be the immediately preceding Banking Day.

(c)     All payments under this Charter shall be made net of all commissions (unless otherwise agreed) and without any set-off or counterclaim whatsoever and free and clear of any withholding or deduction for, or on account of, any present or future income, freight, stamp and other taxes, levies, imposts, duties, fees, charges, restrictions or conditions of any nature. If the Charterers are required by any authority in any country to make any withholding or deduction from any such payment, the Charterers shall make such deduction and pay such taxes to the appropriate taxation authority or government, and the sum due from the Charterers in respect of such payment will be increased to the extent necessary to ensure that, after the making of such withholding or deduction the Owners receive a net sum equal to the amount which they would have received had no such deduction or withholding been required to be made. The Charterers will promptly deliver to the Owners any receipts, certificates or other proof evidencing the amounts (if any) paid or payable, in respect of any such deduction or withholding as aforesaid.

(d)     The obligation of the Charterers to pay the Charter Hire and all other sums required to be paid under this Charter is absolute and unconditional and shall not be subject to any right of set-off, counterclaim, recoupment, defence, suspension, withholding, deferment or reduction. The Charterers shall not have any right to terminate this Charter or to be released, relieved, or discharged from any obligation or liability under this Charter by any circumstances whatsoever, including, without limitation:

(i)     any set-off, counterclaim, recoupment, defence or other right which the Charterers may at any time have against the Owners or any other person for any reason whatsoever;

(ii)    any change, extension, indulgence or other act or omission in respect of any indebtedness or obligation of the Charterers, or any sale, exchange, release or surrender of, or other dealing in, any security for any such indebtedness or obligation;

(iii)   any title defect or Encumbrance or any dispossession of the Vessel by title paramount of otherwise;

(iv)    any defect in the condition, design, operation, merchantability, seaworthiness or fitness for use or purpose of the Vessel or the ineligibility of the Vessel for any particular trade or use;

(v)     any damage to or loss (including a Total Loss, subject to the terms of this Charter), destruction, capture, seizure, judicial attachment or arrest, forfeiture or marshal's or other sale of the Vessel;

(vi)    any libel, attachment, levy, detention, sequestration or taking into custody of the Vessel or any restriction or prevention of or interference with or interruption or cessation in the use or possession thereof by the Charterers for any reason whatsoever, or any inability to engage in any particular trade;

(vii)   any insolvency, bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceedings by or against the Owners or the Charterers;

(viii)  any lack of due authorizations or documentation for the Vessel for any particular trade or use or invalidity or illegality of or other defect in this Charter; or

(ix)    any circumstances which, but for this provision, might operate to exonerate the Charterers from liability, whether in whole or in part, under this Charter,

whether or not the Charterers shall have notice or knowledge of any of the foregoing, it being the declared intention of the parties that the obligations of the Charterers to pay the Charter Hire and all other sums required to be paid under this Charter shall survive any frustration and the Charterers hereby waive any and all rights which they may now have or which at any time hereafter may be conferred upon them, by statute or otherwise, to terminate or cancel the demise of the Vessel due to the occurrence of any act of frustration, the terms of this Charter prevailing over any relevant statute or law, to the extent permitted by such statute or law. The Charterers shall not seek to recover all or any part of the Charter Hire or any other payments made by the Charterers under this Charter from the Owners for any reason whatsoever.

(e) In the event of failure by the Charterers to pay on the due date for payment thereof, or in the case of a sum payable on demand, the date of demand therefor, any hire or other amount payable by them under this Charter, the Charterers will pay to the Owners interest on such amount from the date of such failure to the date of actual payment (both before and after any relevant judgement or winding-up of the Charterers) at the rate equal to the default rate in Clause 7.8 of the Facility Agreement computed from the relevant due date. Interest payable by the Charterers as aforesaid shall be payable on demand.

(f) Any interest payable under this Charter shall accrue from day to day and shall be calculated on the actual number of days elapsed and a three hundred and sixty (360) day year.

36. MAINTENANCE AND OPERATIONS

(a) The Charterers undertake throughout the Charter Period that they will at their sole cost and expense maintain the Vessel and keep it in a good and efficient state of repair and safe operating condition, seaworthy in all respects and in accordance with good maintenance practice (fair wear and tear excepted having regard to the type and age of the Vessel).

(b) The technical and commercial management of the Vessel shall be the responsibility of the Charterers during the currency of this Charter. The Charterers shall appoint the Managers to undertake all the commercial and technical management of the Vessel and shall not change the commercial and/or technical management of the Vessel without the prior written consent of the Owners and the Mortgagee (which shall not be unreasonably withheld so long as the Mortgagee provides its prior written consent under the Mortgage or any other Finance Document) and shall procure that (i) the Managers do not sub-contract or delegate the commercial or technical management of the Vessel to any third party without the prior written consent of the Owners and the Mortgagee and (ii) that the Managers provide a Manager's Undertaking in a form acceptable to the Mortgagee. Notwithstanding the preceding provisions, subject to the terms and conditions of the Finance Documents, if an Event of Default occurs the Owners shall be entitled to appoint on behalf of the Charterers (and at the Charterers' expense) a replacement commercial and/or technical manager for the Vessel for such part of the Charter Period and on such terms and conditions as the Owners may require and the Charterers shall be responsible for any fees payable to that outgoing Managers as a result of such termination. The Owners shall then procure that the new Managers provide a Manager's Undertaking in a form acceptable to the Mortgagee.

(c) Notwithstanding anything to the contrary set out in Clause 10 above, the Charterers shall procure that the Vessel throughout the Charter Period is maintained in accordance with first class maintenance practices.

37. IMPROVEMENT AND ADDITIONS

The Charterers shall have the right to fit additional equipment and to make severable improvements and additions at their expense and risk, provided such additional equipment, improvements and additions do not diminish or otherwise reduce the market value of the Vessel or impair the utility, marketability and remaining economic life of the Vessel (in which case the approval of the Owners shall be required (which approval the Owners may give or withhold in their absolute discretion) and may be removed from the Vessel without causing any damage to the Vessel (any such removal and damage being made good by the Charterers at their time and expense), or the Owners may elect to keep the equipment, free of charge. Any such

improvements and/or additions which affect the structure, stability, speed, type of vessel or class shall be subject to the approval of the Owners (which approval the Owners may give or withhold in their absolute discretion) and the Vessel's Classification Society.

38.     INDEMNITY

(a)     The Charterers agree, from time to time on demand, to indemnify and keep indemnified the Owners against:

(i)     any costs, charges or expenses which the Charterers have agreed to pay under this Charter and which shall be claimed or assessed against or paid in by the Owners; and

(ii)     all Losses suffered or incurred by the Owners arising directly or indirectly out of the design, manufacture, delivery, non-delivery, purchase, importation, registration, chartering, sub-chartering, possession, control, use, operation, condition, maintenance, repair, replacement, refurbishment, conversion, upgrade, modification, overhaul, insurance, sale or other disposal, return or storage or of loss of or damage to the Vessel or otherwise in connection with the Vessel, including any and all claims in tort or in contract by any sub-charterer of the Vessel or by the holders of any bills of lading issued by the Charterers, provided always that the indemnity in respect of Losses contained in this sub-clause (ii) shall not extend to any Losses of the Owners as a consequence of the value of the Vessel at the end of the Charter Period unless such Losses shall have resulted from any breach by the Charterers of the terms of this Charter; and

(iii)     all Losses suffered or incurred by the Owners in preventing or attempting to prevent the arrest, confiscation, seizure, taking in execution, impounding, forfeiture or detention of the Vessel, or in securing the release of the Vessel therefrom including, without limitation, any Losses incurred in discharging any liens over the Vessel;

(iv)     all Taxes, imposed on or payable by the Owners which are directly or indirectly connected to the acquisition by the Owners of the Vessel under the MoA and the chartering of the Vessel by the Owners to the Charterers under this Charter; and

(v)     all Taxes (other than Tax on the overall net income of the Owners), imposed on or payable by the Owners which are directly or indirectly connected to the ownership, operation, trading, and/or manning of the Vessel and/or receipt of hire from the Charterers and/or any transfer of ownership of the Vessel to the Charterers pursuant to the provisions of Clause 47, Clause 50 or Clause 51;

(vi)     any Losses incurred by the Owners arising from any Environmental Claim or as a result of any pollution caused by the Vessel including, without limitation, any oil, liquid, gas or other substance spilling or emanating or threatening to spill or emanate from the Vessel;

(vii)     any Losses incurred or suffered by the Owners as a result of or in connection with any Event of Default (whether or not the same results in a termination of the chartering of the Vessel under Clauses 46 and 47) including, without limitation, all Losses incurred or suffered by the Owners under any Loan Agreement as a result of any such Event of Default;

(viii)    all Losses of whatsoever kind and nature, imposed on, incurred or suffered by, or asserted against the Owners in any way relating to or arising in respect of the insurances over the Vessel or to incidents covered by such insurances; and

(ix)    any costs, charges or expenses which are directly or indirectly connected to the transfer of ownership of the Vessel to the Charterers pursuant to the provisions of Clause 47, Clause 50 or Clause 51 and discharging or reassigning any of the Encumbrances created pursuant to the Relevant Documents.

(x)    any costs, charges or expenses incurred by the Owners under any of the Loan Agreements in respect of transaction expenses, funding costs, breakage costs, currency conversion costs, costs incurred as a result of any requirement from any central bank, or any fiscal, monetary or other authority (including as a result of the implementation, application or compliance with the Basel II Accord or any other Basel II Regulation).

(xi)    any additional payments made by the Owners to the Mortgagee pursuant to any Loan Agreement necessary to ensure that the Mortgagee receives a net sum equal to the sum the Mortgagee would have received before any deductions or withholding from any payment required by any law have been made.

(xii)    any costs, charges or expenses which are directly or indirectly connected with the provision of additional security by the Owners to the Mortgagee pursuant to any Loan Agreement but only to the extent that it arises as a result of a breach of Clause 40(c).

(xiii)    any costs, charges or expenses arising as a result of any enforcement or other legal process being taken against the Vessel, or the Owners, as a result of a default (caused directly or indirectly by the Charterers) under any Loan Agreement.

(b)    If as a result of a judgment against the Charterers or the liquidation of the Charterers under any applicable law or for any other reason, any payment to be made by the Charterers under or in connection with this Charter is made or is recovered in a currency other than the currency (the "**currency of obligation**") in which it is payable pursuant to this Charter then, to the extent that the payment (when converted into the currency of obligation at the rate of exchange on the date of payment or, in the case of a liquidation, the latest date for the determination of liabilities permitted by the applicable law) falls short of the amount to be paid by the Charterers under this Charter, the Charterers shall as a separate and independent obligation, fully indemnify the Owners, from time to time on demand, against the amount of the shortfall; and for the purposes of this sub-clause "rate of exchange" means the actual rate at which the Owners are able on the relevant date to purchase the currency of obligation in New York with that other currency.

(c)    In order to provide a fixed rate of charter hire and at the Charterers' request, the Owners have entered or may from time to time enter into certain loan agreements and/or financing agreements (before and hereinafter referred to as the "**Loan Agreements**" and as further described at Clause 60), together with certain interest hedging swap agreements in respect of the Loan Agreements (before and hereafter referred to as the "**Swap Agreements**" and as further described at Clause 60) covering the whole or part of the Charter Period, and the Charterers shall fully indemnify the Owners, from time to time on demand, for any Losses incurred by the Owners under or in connection with any Loan Agreement (including, without limitation, break costs, unwind costs, late funding costs, prepayment

fees and legal fees (but excluding for the avoidance of doubt any swap break costs under any Swap Agreement) due to (i) the delayed delivery of the Vessel under the MoA for any reason other than directly arising as a result of a default by the Owners under the MoA or (ii) non-delivery of the Vessel under the MoA for any reason other than directly arising as a result of a default by the Owners under the MoA (and in such circumstances, this indemnity shall also cover the Bank Fees) or (iii) any early termination of the chartering of the Vessel under this Charter pursuant to Clauses 46 and 47, or (iv) a Total Loss or (v) the Charterers exercise of the Purchase Option (whether or not the sale under the Purchase Option actually occurs) according to Clause 50.  If the Charterers are considering exercising the Purchase Option, they may request the Owners to inform them of the potential loss or gain that such exercise could trigger in terms of break fees, prepayment fees and unwind costs under any Loan Agreement prior to declaring the Purchase Option. Notwithstanding the foregoing, the Charterers will not be responsible for Losses incurred by the Owners from interest rate derivate transactions over and above that required to hedge up to the maximum amount of interest accruing in respect of the loans under the Loan Agreements.

Notwithstanding the aforementioned indemnity, the Charterers shall not be liable to pay any break costs or unwind costs in relation to the exercise of the Purchase Option on the 7th anniversary date of Delivery Date or on any anniversary date thereafter.

(d)     Without prejudice to the foregoing provisions of this Clause 38, all costs and expenses arising in connection with the registration of the Vessel in the name of the Owners under the flag of Malta (including registration of the Mortgage) or in connection with the maintenance of such registration (including annual tonnage tax fees) shall be borne by the Charterers.

(e)     The Charterers will indemnify the Owners from time to time on demand for all amounts paid or payable by the Owners to the Mortgagee in connection with the Owners' obligations under any Loan Agreement and/or the Mortgage (or any other Finance Documents) to reimburse the Mortgagee for all costs, premiums and expenses paid or incurred by the Mortgagee in connection with any Mortgagees' Insurances.

(f)     Upon any termination of the chartering of the Vessel pursuant to Clauses 46 and 47 the Charterers shall fully indemnify the Owners, from time to time on demand, from and against all Losses of whatsoever kind and nature imposed on, incurred or suffered by, or asserted against the Owners in any way relating to or arising in connection therewith including, without limitation, in relation to recovering possession of, and in moving (inclusive of pilotage and towage fees), navigating, storing (inclusive of port fees), insuring and maintaining the Vessel until she is at the designated port of the Owners as referred to in Clause 47(c) and in carrying out any works, drydocking, surveys, repairs or modifications as referred to in Clauses 47(c) and 47(d).

(g)     The indemnities contained in this Clause 38, and each other indemnity contained in this Charter, shall survive any termination or other ending of this Charter and any breach of, or repudiation or alleged repudiation by the Charterers or the Owners of this Charter.

39.     GUARANTEE AND SECURITY

The performance by the Charterers of all their obligations under this Charter shall be:

(a)     guaranteed by the Parent Company via the Parent Guarantee; and

(b) secured by the Charterers via the General Assignment.

All the aforementioned documents shall be in form and substance acceptable to the Owners and the Mortgagee.

40. MORTGAGES

(a) The Charterers agree that the Owners shall be entitled, on or at any time after the Delivery Date, to grant to DVB Bank SE or any other reputable bank or financial institution (each a "**Mortgagee**" and as further described at Clause 60) (i) one or more mortgages and deeds of covenants (if applicable) on the Vessel (each and together with the relevant deed of covenants, a "**Mortgage**") and (ii) one or more assignment(s), pledge or charge (as applicable) of this Charter, the earnings generated by this Charter, the insurances and requisition compensation over the Vessel, the Sub-Charters, the Owner's rights under the Parent Guarantee, the Owners' rights under its earnings or retention account(s) and all other rights of the Owners under the Relevant Documents (inclusive of the property assigned, pledged or charged thereunder), including, without limitation, the General Assignment, all as security for any loan or hedging facilities arranged by the Owners under any Loan Agreement and any Swap Agreement) in relation to the finance or re-finance of the acquisition cost of the Vessel, or for cross collateralization purposes to constitute part of a security package securing the funding of the acquisition cost of the Related Vessel by the Related Owner. Provided that on any such re-finance the aggregate amount of the debt shall not be increased to an amount in excess of the Purchase Obligation Price.

(b) The Charterers agree with the Owners to (i) sign an acknowledgement to and agree to be bound by any notices of any assignment of this Charter, the earnings generated by this Charter, the insurances and requisition compensation over the Vessel and the Owner's rights under the Parent Guarantee in relation to any assignment executed in favour of the Mortgagee and (ii) to enter into the General Assignment for the purposes described in Clause 40(a) and to sign any acknowledgements in respect of such General Assignment in favour of the Mortgagee.

(c) If the Fair Market Value falls below the Permitted LTV, the Charterers shall at the option of the Charterers (i) provide additional Security to the Owners to the satisfaction of the Owners and/or (ii) pay to the Owners additional Charter Hire within 30 days of the breach of the Permitted LTV sufficient to satisfy the Permitted LTV. In the event that payment of additional Charter Hire is made, the Purchase Option Price, the Agreed Termination Value, the Minimum Insured Value and Purchase Obligation Price shall be reduced by the amount equal to the Future Value.

41. SALE /DISPOSAL OF VESSEL

(a) The Owners may, at any time during the Charter Period transfer the ownership of the Vessel to any third party and the benefit of the security documents referred to at Clause 39 so long as (i) the prospective owners agree to take over the benefit and burden of this Charter, (ii) such ownership change does not result in any reflagging of the Vessel, (iii) such ownership change does not result in the Charterers being obliged to increase any payment under this Charter pursuant to Clause 35(c), (iv) such ownership change does not increase the actual or contingent obligations of the Charterers under this Charter and (v) the new owners undertake to be bound by exactly the same terms as this Charter.

(b)     The Charterers agree and undertake to enter into all necessary documents as the Owners shall reasonably require to complete or perfect the transfer of the Vessel (with the benefit and burden of this Charter and the security documents referred to at Clause 39) pursuant to Clause 41(a) above, any costs or expenses whatsoever arising in relation thereto to be borne by the Owners.

42.     THE VESSEL'S FLAG

The Vessels shall from the Delivery Date and throughout the Charter Period be registered in the name of the Owners under Maltese flag.  Any request by the Charterers of a change in the Vessel's flag shall require the prior written consent of the Owners and the Mortgagee. All costs (including, without limitation, all costs and expense related to changing the Vessel's ownership structure, if required by the flag state or to maintain the equivalent Tax treatment arising from the Owners' ownership of the Vessel and all costs and expenses in restructuring any loan or hedging facilities provided under any Loan Agreement and/or any Swap Agreement) related to the change in the Vessel's flag shall in such case be for the Charterers' account.

Should Owners require any change in the Vessel's flag, the prior written consent of the Mortgagee and the Charterers shall be obtained (such consent not to be unreasonably withheld). All costs (including, without limitation, all costs and expense related to changing the Vessel's ownership structure, if required by the flag state or to maintain the equivalent Tax treatment arising from the Owners' ownership of the Vessel and all costs and expenses in restructuring any loan or hedging facilities provided under any Loan Agreement and/or any Swap Agreement) related to change in the Vessel's flag shall in such case be for the Owners' account.

Notwithstanding the aforementioned, the Owners shall be entitled to change the Vessel's flag without the prior written consent of the Charterers (and subject to the terms of the relevant Loan Agreement and Finance Documents) at any time during which an Event of Default is continuing and all costs (including those referred to above) related to the change in the Vessel's flag shall be for the account of the Charterers.

43.     REPRESENTATIONS AND WARRANTIES

The Charterers acknowledge that the Owners have entered into this Charter in full reliance on the representations and warranties by the Charterers set out in this Clause 43.  The Charterers make the representations and warranties set out in this Clause 43 to the Owners on the date of this Charter:

(i)     the Charterers are duly incorporated and validly existing as a limited liability company under the laws of Malta;

(ii)    the Charterers have the power to conduct their business as it is now carried on, to own and hold or lease their assets, to execute, deliver and perform their obligations under the Relevant Documents to which they are a party, and all necessary corporate, shareholder and other action has been taken to authorise the execution, delivery and performance of those Relevant Documents;

(iii)   each Relevant Document to which they are a party constitutes, or will upon execution constitute, the valid and legally binding and enforceable obligations of the Charterers ranking at least pari passu with all other unsecured obligations and liabilities (actual or contingent) of the Charterers other than those mandatorily preferred by law;

(iv)    the entry into and performance by the Charterers of each Relevant Document to which they are a party does not, and will not during the Charter Period, violate (A) any relevant law or regulation or any governmental of official authority or body, or (B) the constitutional documents of the Charterers or (C) any document to which the Charterers are a party or which is binding on the Charterers or any of their assets;

(v)    all consents, licences, approvals, authorisations filings and registrations required by the Charterers in connection with the entry into, performance, validity and enforceability of the Relevant Documents to which they are a party or to make such Relevant Documents admissible in evidence in the Republic of Malta have been obtained and are, or will prior to the Delivery Date be, in full force and effect;

(vi)    no litigation, arbitration or administrative proceeding of or before any court, arbitral body or agency is taking place, pending or, to the knowledge of the Charterers threatened against the Charterers or against any of their assets, which if adversely determined, could have a Material Adverse Effect;

(vii)    no Event of Default, and no event which with the giving of notice and/or lapse of time and/or relevant determination would constitute an Event of Default, has occurred and is continuing;

(viii)    all filings and registrations required by the Charterers in connection with the entry into, performance, validity and enforceability of the Relevant Documents to which they are a party have been effected or will be effected prior to the time period set out in Clause 39;

(ix)    the Charterers are not required by their jurisdiction of incorporation to make any deduction for or on account of Tax from any payment they may make under this Charter;

(x)    the choice of English law as the governing law of the Relevant Documents (other than the Mortgage) (and in the case of the Mortgage the choice of Maltese law as the governing law) to which they are a party and to which are expressed to be governed by English or (in the case of the Mortgage) Maltese law will be recognised in the jurisdiction of incorporation of the Charterers, and any judgment obtained in England in relation to any such Relevant Document will be recognised and enforced in the jurisdiction of incorporation of the Charterers;

(xi)    under the law of jurisdiction of incorporation of the Charterers it is not necessary that the Relevant Documents to which they are a party (other than as described in Clause 39) be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration or similar tax be paid on or in relation to those Relevant Documents or the transactions contemplated by those Relevant Documents;

(xii)    all factual information provided by the Charterers to the Owners and/or the Mortgagee was true and accurate in all material respects as at the date it was provided and the Charterers are not aware of any material facts or circumstances which have not been disclosed to the Owners and which might, if disclosed, have adversely affected the decision of a person considering whether or not to enter into a sale and leaseback transaction for the Vessel with the Charterers.

The representations and warranties contained in this Clause 43, shall be deemed to be repeated by the Charterers as of the Delivery Date and on each date for the payment of Charter Hire under this Charter as if made with reference to the facts and circumstances existing on each such date,

and the rights of the relevant party in respect of this Charter shall survive delivery of the Vessel under this Charter.

44.    UNDERTAKINGS

The Charterers undertake and agree that throughout the Charter Period they will:

(a)    provide to the Owners (for its own information and for passing to the Mortgagee):

(i)    as soon as possible, but in no event later than ninety (90) days after the end of each financial year of the Charterers, the Charterers' management accounts and financial statements (together with an English translation thereof) for such financial year, (each set of accounts and financial statements delivered under this Clause shall be certified by a director or the Chief Financial Officer of the Charterers as giving a true and fair view of the financial condition and operations of the Charterers as at the date as at which those financial statements were drawn up);

(ii)   as soon as possible, but in no event later than one hundred and twenty (120) days after the end of each financial year of the Guarantor, the Guarantor's audited accounts and financial statements for such financial year, such accounts and financial statements to be prepared in English in accordance with IFRS consistently applied (each set of accounts and financial statements delivered under this Clause shall be certified by a director or the Chief Financial Officer of the Guarantor as giving a true and fair view of the financial condition and operations of the Guarantor as at the date as at which those financial statements were drawn up);

(iii)  as soon as possible, but in no event later than sixty (60) days after the end of each quarterly accounts period of the Charterers the Charterers' quarterly accounts to be prepared in English (each set of accounts delivered under this Clause shall be certified by a director or the Chief Financial Officer of the Charterers as fairly representing the financial condition and operations of the Charterers as at the date as at which those accounts were drawn up);

(iv)   as soon as possible, but in no event later than sixty (60) days after the end of each quarterly accounts period of the Guarantor the Guarantor's quarterly accounts to be prepared in English (each set of accounts delivered under this Clause shall be certified by a director or the Chief Financial Officer of the Guarantor as fairly representing the financial condition and operations of the Guarantor as at the date as at which those accounts were drawn up);

(v)    as soon as practicable after the same are instituted (or, in the case of any Guarantor, once the Charterers are aware of the same), details of any litigation, arbitration or administrative proceedings involving the Charterers and/or any Guarantor which are likely to be adversely determined and, if adversely determined, would have a Material Adverse Effect;

(vi)   at or about each anniversary of the Delivery Date during the Charter Period, an up to date confirmation of class (without condition or recommendation (provided however that the Charterers shall have the opportunity to remedy such recommendations/qualifications within the time allotted by the Classification Society)) issued by the Classification Society together with overdue details of any

improvements, structural changes or new equipment made or added to the Vessel over the previous twelve (12) months as a consequence of Clause 10(a)(ii) and any other material improvements, structural changes or new equipment made or added to the Vessel over the previous twelve (12) months and to which the Owners' prior consent was not required pursuant to Clause 37 or any other term of this Charter;

(vii)  at or about each anniversary of the Delivery Date during the Charter Period, one up to date valuation for the Vessel to be assessed by an Approved Broker appointed by the Charterers in the manner described in the definition of Fair Market Value and such valuation shall count towards determining the Fair Market Value; and

(viii)  from time to time such additional financial or other information relating to the Charterers, the Vessel (including her employment, position and engagements) and their business as may be reasonably requested by the Owners;

(b)  notify the Owners and the Mortgagee in writing of any Event of Default (or event of which they are aware which, with the giving of notice and/or lapse of time or other applicable condition would constitute an Event of Default);

(c)  obtain, promptly renew from time to time and comply with, and will whenever so required, promptly furnish certified copies to the Owners of, all such authorisations, approvals, consents and licences as may be required under any applicable law or regulation to enable each Relevant Party to perform their obligations under the Relevant Documents to which they are a party or required for the validity or enforceability of those Relevant Documents;

(d)  not, without the prior written consent of the Owners and the Mortgagee change or permit any change in the owning structure of the Charterers and thus maintain the Charterers as a wholly owned subsidiary of the Parent Company;

(e)  at all times ensure the Vessel is operated in compliance with all applicable laws, international and port state conventions, codes and regulations including, without limitation, the ISM Code, the ISPS Code and Annex VI and ensure such compliance by the crews, employees, agents and representatives of the Charterers and the Managers;

(f)  send to the Owners a copy of the Certificate of Financial Responsibility issued pursuant to the United States Oil Pollution Act 1990 if the Vessel is to operate in waters which require compliance with the United States Oil Pollution Act 1990, or copies of such certificates or other documentation evidencing compliance by Charterers with similar requirements under any other jurisdiction where the Vessel may operate;

(g)  notify the Owners and the Mortgagee in writing promptly upon becoming aware of the same:

(i)  of any Environmental Claim against the Charterers (or any other person) which is current, pending or threatened; and

(ii)  of any facts or circumstances which will or are reasonably likely to result in any Environmental Claim being commenced or threatened against the Charterers (or any other person),

in relation to the Vessel.

(h)    following an inspection of the Vessel by the Owners or their representatives pursuant to Clause 6 of the MoA, comply with any requests from the Owners for repairs to the Vessel if required to ensure that the Vessel is maintained in the class and condition required by this Charter and if the Charterers dispute the need for any such repairs the matter shall be referred to the Classification Society whose decision on such matter shall be binding on the Owners and the Charterers;

(i)    at all times procure that the Owners shall be allowed to inspect the operating and insurance records of the Vessel, at reasonable times and on reasonable notice;

(j)    keep the Vessel classed with Bureau Veritas or DNV (or such other IACS member as the Owners and the Mortgagee (as required by the Mortgage and any other Finance Document) may approve in writing) with the class notation as set out in Part I Box 10, and free from conditions and recommendations provided however that the Charterers shall have the opportunity to remedy such recommendations/qualifications within the time allotted by the Classification Society;

(k)    notify the Owners and the Mortgagee of any accident to the Vessel involving repairs where the costs of repairs will or are likely to exceed USD250,000;

(l)    promptly upon becoming aware of the same, notify the Owners and the Mortgagee of any arrest of the Vessel or the exercise or purported exercise of any lien on the Vessel;

(m)    provide the Owners with ongoing class records upon reasonable request and as soon as reasonably practicable after such request and to provide the Owners with any survey reports obtained for the Vessel as soon as reasonably practicable following their issuance;

(n)    do the following:

    (i)    comply with all Environmental Law in relation to using and operating the Vessel;

    (ii)    obtain, maintain and ensure compliance with all requisite Environmental Permits in relation to using and operating the Vessel; and

    (iii)    implement procedures to monitor compliance with and to prevent liability under any Environmental Law applicable to the use and operation of the Vessel.

(o)    carry on and conduct their business in a proper and efficient manner, keep in existence all its material rights and privileges and maintain its books and records in a proper and efficient manner;

(p)    permit the inspection of its financial records and accounts in respect of the Vessel from time to time by the Owners;

(q)    comply in all respects with all laws and contractual obligations to which it is subject;

(r)    save for as required by this Charter, not without the prior written consent of the Owners and the Mortgagee create nor permit to subsist any Encumbrance or other third party rights over any of their present or future assets or undertaking nor dispose of any of those assets or of all or part of that undertaking;

(s)    not without the prior written consent of the Owners and the Mortgagee enter into any amalgamation, demerger, merger or corporate reconstruction;

(t) not without the prior written consent of the Owners and the Mortgagee engage in any business other than the operation, chartering and management of the Vessel;

(u) not without the prior written consent of the Owners and the Mortgagee borrow any money or incur any capital expenditure;

(v) except in the ordinary course of business, not without the prior written consent of the Owners and the Mortgagee incur any liability to any third party;

(w) not without the prior written consent of the Owners make any loan nor enter into any guarantee or indemnity or otherwise voluntarily assume any actual or contingent liability in respect of any obligation of any other person except for loans made in the ordinary course of business in connection with the chartering, operation or repair of the Vessel;

(x) not without the prior written consent of the Owners and the Mortgagee pay any dividends or make any other distributions to shareholders at any during which an Event of Default in continuing;

(y) not without the prior written consent of the Owners and the Mortgagee reduce its registered share capital;

(z) not without the prior written consent of the Owners and the Mortgagee to lay the Vessel up; and

(aa) in the event of a capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture of the Vessel, use their best endeavours to procure that the Vessel is released and returned to the possession of the Owner or the Charterer (as applicable) within fourteen (14) days after such capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture in question.

45. (a) INSURANCES, TOTAL LOSS AND COMPULSORY ACQUISITION

For the purposes of this Charter, the term "**Total Loss**" shall mean:

(i) an actual, constructive, arranged, agreed or compromised total loss of the Vessel; or

(ii) the requisition for title or compulsory acquisition of the Vessel by any government or other competent authority (other than by way of requisition for hire); or

(iii) capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture of a Vessel (not falling within (ii) above), unless that Vessel is released and returned to the possession of the Owner or the Charterer within fourteen (14) days (and the Owner and the Charterer shall use their best endeavours for the release and return of the Vessel within such fourteen (14) days, or, at the request of the Charterer (and subject to the prior written consent of the Owner and the Lenders in their discretion) within one month after the capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture in question.

(b) The Charterers undertake with the Owners that throughout the Charter Period;

(i) without prejudice to their obligations under Clause 13 of this Charter, they will keep the Vessel insured in the name of the Owners and the Charterers on the basis of Institute Time Clauses terms, as amended (or such other terms as may be approved by the Owners) (and against such further risks as may from time to time be required by the Mortgagee pursuant to the Mortgage and any other Finance Documents), with insurers (including Protection & Indemnity and war risks associations) who are a member of International Group of P&I Clubs (including the London Blocking and Trapping addendum) and as shall be reasonably acceptable to the Owners with deductibles reasonably acceptable to the Owners and the Mortgagee (it being agreed and understood by the Charterers that there shall be no element of self-insurance or insurance through captive insurance companies without the prior written consent of the Owners);

(ii) the policies in respect of the insurances against fire and usual marine risks and the policies or entries in respect of the insurances against war risks (including the London Blocking and Trapping addendum), shall, in each case, be endorsed to the effect that the full payment of a claim for a Total Loss will be made to the Owners or the Mortgagee (as the case may be depending on the terms of the Mortgage and any other Finance Document);

(iii) without the need for any request, the Charterers shall procure from time to time that duplicates of all cover notes, policies and certificates of entry shall be furnished to the Owners (for their or the Mortgagee's custody) promptly following their issuance or renewal;

(iv) the Charterers shall procure that the insurers and the war risk and protection and indemnity associations with which the Vessel is entered, shall (A) furnish the Mortgagee with a letter or letters of undertaking in such form as may from time to time be reasonably required by the Owners and the Mortgagee, and (B) supply to the Owners and the Mortgagee such information in relation to the insurance effected, or to be effected, with them as the Owners and the Mortgagee may from time to time reasonably require; and

(v) the Charterers will punctually pay all insurance premiums and calls on the Vessel (and if requested by the Owners, provide the Owners promptly with all relevant receipts) timely renew the insurance policies and the certificates of entry and shall use all reasonable efforts to procure that the policies and other instruments evidencing the insurances (other than the protection and indemnity cover) are endorsed to the effect that the insurers shall give to the Owners and the Mortgagee not less than ten (10) days prior written notifications of any amendment, suspension, cancellation or termination of the insurances.

(c) Notwithstanding anything to the contrary contained in Clauses 13 and 45(b) of this Charter, the Vessel shall be kept insured during the Charter Period in respect of marine and war risks (including the London Blocking and Trapping addendum) on hull and machinery basis (as opposed to increased value or total loss only basis) and all other further risks as may be required from time to time by the Mortgagee pursuant to the Mortgage and any other Finance Documents for an amount equal to the higher of (such amount being in USD and referred to as the **"Applicable Insurance Amount"**) (A) the Fair Market Value determined on or around each date of placing or renewing the insurances and (B) the amount specified in column (b) in the table set out below in respect of the relevant year during the Charter Period specified in column (a) against such amount (which

such insurance amount is hereinafter referred to as the "**Minimum Insured Value**"):

| (a) Period | (b) Minimum Insured Value (USD) |
|---|---|
| Year 1 (commencing from the Delivery Date) | USD 36,250,000 on the Delivery Date reducing by USD 3,425 per day thereafter subject to Clause 45(d) below |
| Year 2 (commencing from the 1st anniversary of the Delivery Date) | USD 35,000,000 on the 1st Anniversary of the Delivery Date reducing by USD 4,658 per day thereafter subject to Clause 45(d) below |
| Year 3 (commencing from the 2nd anniversary of the Delivery Date) | USD 33,300,000 on the 2nd anniversary of the Delivery Date reducing by USD 6,849 per day thereafter subject to Clause 45(d) below |
| Year 4 (commencing from the 3rd anniversary of the Delivery Date) | USD 30,800,000 on the 3rd anniversary of the Delivery Date reducing by USD 11,781 per day thereafter subject to Clause 45(d) below |
| Year 5 (commencing from the 4th anniversary of the Delivery Date) | USD 26,500,000 on the 4th anniversary of the Delivery Date reducing by USD 2,740 per day thereafter subject to Clause 45(d) below |
| Year 6 (commencing from the 5th anniversary of the Delivery Date) | USD 25,500,000 on the 5th anniversary of the Delivery Date reducing by USD 5,479 per day thereafter subject to Clause 45(d) below |
| Year 7 (commencing from the 6th anniversary of the Delivery Date) | USD 23,500,000 on the 6th anniversary of the Delivery Date reducing by USD 5,479 per day thereafter subject to Clause 45(d) below |

(d) In the event that the Vessel becomes a Total Loss, the Charterers shall continue to pay Charter Hire until payment of the insurance proceeds in respect of the Total Loss in an amount no less than the then Minimum Insured Value is made in full and received by the Owners. Subject to (i) the prior consent of the Mortgagee under the terms and conditions of any Loan Agreement or Finance Document and (ii) no Payment Event of Default continuing, the Charterers shall be entitled to receive from the Owners all insurance proceeds in respect of the Total Loss received by the Owners in excess of the aggregate of the Minimum Insured Value, the Indemnity Sum and any interest accrued thereon pursuant to this Charter.

If payment of all insurance proceeds in respect of the Total Loss in the amount specified above in this Clause 45(d) has not been made within 90 (ninety) days of a Total Loss, the

Charterers shall pay to the Owners, on demand, an aggregate amount equivalent to (i) the then Minimum Insured Value (ii) the Indemnity Sum and (iii) any interest accrued under this Charter less, if applicable, the amount of any insurance proceeds actually paid to the Owners or, as the case may be, the Mortgagee at that stage in respect of the Total Loss (such aggregate payment amount being the "**Charterers' Insurance Proceed Payment**"). After the day the Charterers have paid the Charterers' Insurance Proceed Payment to the Owners, the Charterers shall be under no further obligation to pay Charter Hire and, subject to (i) the prior consent of the Mortgagee under the terms and conditions of any Loan Agreement or Finance Document and (ii) no Payment Event of Default continuing, the Owners shall assign any interest it has in all the insurances in respect of the Vessel to the Charterers and shall notify the relevant insurers of such assignment.

The Owners and Charterers agree that the amount of the Minimum Insured Value shall only step down as contemplated by Clause 45(c) to the extent that the Owners shall have actually received all Charter Hire corresponding to such step down otherwise the amount of the Minimum Insured Value shall be adjusted accordingly to account for the outstanding Charter Hire.

(e) For the purpose of ascertaining the date of the Total Loss;

(i) an actual total loss of the Vessel shall be deemed to have occurred at noon (London time) on the actual date the Vessel was lost, but in the event of the date of the loss being unknown, the actual total loss shall be deemed to have occurred at noon (London time) on the date on which it is acknowledged by the insurers to have occurred;

(ii) a constructive, compromised, agreed or arranged total loss of the Vessel shall be deemed to have occurred at noon (London time) on the date that notice claiming such a total loss of the Vessel is given to the insurers, or, if the insurers do not admit such a claim, at the date and time at which a total loss is subsequently admitted by the insurers or adjudged by a competent court of law or arbitration tribunal to have occurred. Either the Owners, or with the prior written consent of the Owners and the Mortgagee, the Charterers shall be entitled to give notice claiming a constructive total loss, but prior to the giving of such notice there shall be consultation between the Charterers and the Owners and the party proposing to give such notice, shall be supplied with all such information as such party may request;

(iii) in the case of requisition for title or compulsory acquisition of the Vessel by any government or other competent authority (other than by way of requisition for hire), at noon (London time) on the date on which the relevant requisition for title or compulsory acquisition occurred; and

(iv) in the case of capture, seizure, arrest, detention hijacking, theft, condemnation as prize, confiscation or forfeiture of the Vessel (not falling within (c) above) by any government or by persons acting or purporting to act on behalf of any government, which deprives the Owners and the Charterers the use of the Vessel for more than fourteen (14) days (or more than one month, subject to the terms and conditions of Clause 45 and the relevant Loan Agreement and Finance Documents), upon the expiry of the relevant period of fourteen (14) days or one month (as applicable) after the date upon which the relevant capture, seizure, arrest, detention or confiscation occurred.

(f) Subject to Clause 45(d), all monies payable under the insurance effected by the Charterers pursuant to Clauses 13 and 45, or other compensation, in respect of a Total Loss shall be received in full by the Owners (or the Mortgagee as assignees thereof depending on the terms of the Mortgage and any other Finance Document).

(g) Payment in respect of a claim which is not a Total Loss of the Vessel shall be payable in accordance with the terms of the then applicable loss payable clause (as referred to in Clause 45(i) or, if there is no Mortgage at that time, on the same basis as contemplated by the terms of any loss payable clause required by the terms of the General Assignment.

(h) The provisions of Clauses 13 and 45 of this Charter shall not apply in any way to the proceeds of any additional insurance cover effected by the Owners and/or the Charterers for their own account and benefit. For the avoidance of doubt such additional insurance cover placed by the Charterers shall only be effected with the prior consent of the Owners and the Mortgagee which shall only be forthcoming if and to the extent that the insurances required to be effected by the Charterers pursuant to Clauses 13 and 45 of this Charter permit such additional insurance cover and full recovery under the insurances required to be effected by the Charterers pursuant to Clauses 13 and 45 of this Charter will not be prejudiced.

(i) During the period of the Mortgage, the Mortgagee shall be endorsed as a sole loss payee via a loss payable clause endorsed on the insurance policies and all insurance policies shall be capable of being and shall be assigned to the Mortgagee in accordance with the Loan Agreement and any Finance Documents. All loss payable clauses shall remain in full force and shall not be cancelled and neither shall the policies of the insurances be amended in any material way, except with prior written consent of the Owners and the Mortgagee.

(j) The Owners have no obligation to provide the Charterers with any replacement vessel if, for whatever reason, the Vessel is not available to the Charterers at any time during the Charter Period.

46. <u>EVENT OF DEFAULT</u>

(a) Each of the following events shall be an "**Event of Default**" for the purposes of this Charter:

(i) if any instalment of hire or any other sum payable by the Charterers under this Charter shall not be paid after its due date, save, however, that such failure to pay on the due date shall not be an Event of Default if such failure is due to an administrative or technical error and payment is made within three (3) Banking Days of its due date; or

(ii) if the Charterers shall fail at any time to effect or maintain any insurance required to be effected and maintained under this Charter, or any insurer shall avoid or cancel any such insurances (prior to replacement cover being placed) or if any of the said insurances shall cease for any reason whatsoever to be in full force and effect prior to any replacement cover being placed; or

(iii) if any Relevant Party or any other person other than the Owners shall at any time fail to observe or perform any of their obligations under any of the Relevant Documents to which they are a party, other than those obligations referred to in sub-clause (i) or sub-clause (ii) of this Clause 46(a), and such failure to observe or

perform any such obligation is either not remediable or is not remedied within fourteen (14) days of the Owners becoming aware of any such failure to observe or perform or, if such failure to observe or perform would following the expiry of a shorter grace period under any Loan Agreement result in an event of default under that Loan Agreement, the applicable grace period permitted under that Loan Agreement; or

(iv)   if any representation or warranty of any Relevant Party made in any Relevant Document to which they are a party or in any document or certificate furnished to the Owners in connection therewith shall prove to have been untrue, inaccurate or misleading in any material respect when made, provided, however, that such circumstances shall not be an Event of Default if the information was given innocently and is corrected or otherwise remedied within fourteen (14) days of the Owners becoming aware of the relevant circumstances; or

(v)   if a petition shall be presented or an order shall be made or an effective resolution shall be passed for the administration, personal bankruptcy or winding-up of any Relevant Party or if a judicial manager or an administrative or other receiver shall be appointed to the whole or any substantial part of the property, undertaking or assets of any Relevant Party, or if an administrator of any Relevant Party shall be appointed or if anything analogous to any of the foregoing shall occur under the laws of Malta or Turkey; or

(vi)   if any Relevant Party shall stop payments generally or shall cease to carry on or suspend all or a substantial part of their business or shall be unable to pay their debts, or shall admit in writing the inability to pay their debts, as they become due or shall otherwise become or be adjudicated insolvent; or

(vii)   if any Relevant Party shall convene a meeting of all or any class or group of their creditors with a view to proposing or making, or shall propose or make, any arrangement or composition with or assignment for the benefit of all or any class or group of their creditors or shall declare or apply to any court or other tribunal for, a moratorium or suspension of payments with respect to all or a substantial part of their debts or liabilities; or

(viii)   any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of any Relevant Party; or

(ix)   if (A) the Vessel is arrested or detained, and such arrest or detention is not lifted within fourteen (14) days (or such longer period as the Owners and the Mortgagee shall agree in the light of all the circumstances); or

(x)   if any financial indebtedness in excess of USD1,000,000 of a Relevant Party:

     (a)   is not paid when due or within any originally applicable grace period; or

     (b)   is declared to be, or otherwise becomes, due and payable before its specified maturity as a result of an event of default (however described); or

     (c)   is capable of being declared by a creditor to be due and payable before its specified maturity as a result of such an event.

(xi) any event or series of events occurs which, in the opinion of the Owners, is likely to have a Material Adverse Effect; or

(xii) if the Charterers cease to be the wholly owned direct or indirect subsidiary of the Parent Company without the written consent of the Owners; or

(xiii) if the Charterers do not comply with any of the undertakings set out in any acknowledgement to be given to the Owners and/or the Mortgagee pursuant to any notice of assignment served on the Charterers as referred to in Clause 40(b); or

(xiv) if any Guarantee is revoked or otherwise ceases to be in full force and effect or either Guarantor gives notice to the Owners to determine its obligations under its Guarantee; or

(xv) any Event of Default (as defined in any Related Charter) occurs.

(b) The Owners and the Charterers agree that it is a fundamental term and condition of this Charter that no Event of Default shall occur during the Charter Period and that the occurrence of an Event of Default shall entitle (but not oblige) the Owners at any time during the continuation of such Event of Default to accept the repudiation by the Charterers of this Charter constituted by the occurrence of such Event of Default.

(c) Upon the Owners becoming aware of the occurrence of an Event of Default under this Charter, the Owners shall use reasonable efforts to notify the Charterers of such Event of Default provided, however, that Owner's failure to provide such notice to Charters shall not prevent Owner's from enforcing its rights as provided for in this Charter following the occurrence of such Event of Default.

47. OWNERS' RIGHTS

(a) At any time after the circumstances described at Clause 46(b), the Owners may, by notice to the Charterers, immediately or on such date as the Owners shall specify, terminate the chartering by the Charterers of the Vessel under this Charter, whereupon the Owners may at their option (but with no obligation so to do):

(i) declare by notice given to the Charterers the aggregate amount of (i) the Agreed Termination Value and (ii) the Indemnity Sum to be immediately due and payable whereupon the same shall become immediately due and payable and the Charterers shall be obliged to pay the actual balance of the same to the Owners together with any interest in accordance with Clause 35(e); and/or

(ii) take any action at law and under the Relevant Documents to collect the full amount as mentioned in Clause 47(a)(i) above; and/or

(iii) unless that Charterers have paid to the Owners the full amount as mentioned in Clause 47(a)(i) above, by their agent or otherwise without further legal process, re-take the Vessel (wherever she may be) irrespective of whether the Charterers or any other person is in possession of the Vessel, and for that purpose the Owners or their agents may enter any dock, pier or other premises where the Vessel is then at or at any time thereafter located and the Charterers agree that the Owners

may enter upon any premises belonging to or in the occupation or under the control of the Charterers for such purpose; and/or

(iv)    unless the Charterers have paid to the Owners the full amount as mentioned in Clause 47(a)(i), declare by notice given to the Charterers that the Vessel should be promptly re-delivered by the Charterers to the Owners whereupon the Charterers shall be obliged to cause the Vessel to be re-delivered to the Owners with all reasonable dispatch and at a safe port within permitted insurance limits designated by the Owners; and/or

(v)    unless that Charterers have paid to the Owners the full amount as mentioned in Clause 47(a)(i), with or without re-taking possession of the Vessel and without demand or performance of other demand, advertisement or notices of any kind to the Charterers, to sell, lease or otherwise dispose of the Vessel, whether in its then condition or after further preparation or processing, either at public or private sale or at any broker's board or elsewhere, for cash or for credit, with or without warranties or representations and upon such terms and conditions as the Owners in its sole discretion may deem acceptable.

(b)    If the Owners make a declaration under Clause 47(a)(i) and the Charterers pay to the Owners the full amount as mentioned in that Clause, subject to (i) no contract for the sale of the Vessel having been entered into by the Owners, (ii) the prior consent of the Mortgagee if required under any Loan Agreement or Finance Document and (iii) no Payment Event of Default continuing, the Owners shall transfer the title it then has to the Vessel on a strictly "as is/where is" basis without recourse to the Owners and at the Charterers' sole cost and expense. The Owners agree to deliver to the Charterers a bill of sale executed and (if required) notarised and to transfer to the Charterers the title which the Owners had in respect of the Vessel without representation or warranty, express or implied, as to the seaworthiness, value, condition, design, merchantability or operation of the Vessel, or as to the fitness of the Vessel for any particular use, or as to the eligibility of the Vessel for any particular trade, or as to the Vessel's freedom from any charters or any other representation or warranty whatsoever, express or implied, with respect to the Vessel and under no circumstances whatsoever shall the Owners be liable or responsible to the Charterers for any actual direct or consequential damages in respect of the sale of the Vessel to the Owners.

(c)    If the Owners repossess the Vessel as contemplated by Clauses 29 and 47(a)(iii), the Owners shall be entitled to navigate the Vessel to a safe port within permitted insurance limits designated by the Owners and to appoint (at the Charterers' cost and expense) a surveyor for the purpose of determining the structure, state, condition and class of the Vessel at that time. If the surveyor determines that the Vessel does not conform to the structure, state, condition and class set out in Clause 15 and more particularly described at Clause 51, the Owners shall be entitled to arrange (at the Charterers' cost and expense) all works, drydockings, surveys, repairs or modifications necessary to ensure compliance with Clauses 15 and 51.

(d)    If the Owners re-deliver the Vessel as contemplated by Clause 47(a)(iv), the Owners shall be entitled to appoint (at the Charterers' cost and expense) a surveyor at the port of re-delivery for the purpose of determining the structure, state, condition and class of the Vessel at the time of re-delivery. If the surveyor determines that the Vessel does not conform to the structure, state, condition and class set out in Clause 15 and more particularly described at Clause 51, the Owners shall be entitled to arrange (at the

Charterers' cost and expense) all works, drydockings, surveys, repairs or modifications necessary to ensure compliance with Clauses 15 and 51.

(e) No remedy referred to in this Clause 47 is intended to be exclusive, but each shall be cumulative. Save for as expressly stated in this Clause 47, the exercise or purported exercise of any one remedy shall not prevent the simultaneous or later exercise of any other remedy nor shall it prevent the later exercise of the same remedy. Any delay of exercise of any remedy shall not constitute a waiver of such remedy or any other remedy, and each remedy shall survive the termination of the chartering of the Vessel pursuant to this Clause 47 and any breach of, or repudiation or alleged repudiation by the Charterers or the Owners of this Charter. No waiver, express or implied, by the Owners of any Event of Default shall in any case constitute a waiver of any subsequent Event of Default. Nothing in this Charter shall prevent the Owner from exercising any rights or powers granted by law.

(f) To the extent permitted by applicable law, the Charterers waive all claims, damages and demands against the Owners arising out of the Owners repossession, removal, retention, use or sale of the Vessel. The Charterers agree that, if any notification of intended disposal of the Vessel is required by law, such notification shall be deemed reasonably and properly given at least five (5) days before such intended disposition.

(g) If:

(i) the Owners make a declaration under Clause 47(a)(i); and

(ii) the Charterers fail to pay the amount required to be paid by Clause 47(a)(i) within the time periods specified therein; and

(iii) the Owners sell the Vessel pursuant to its rights under Clause 47(a)(v); and

(iv) the net sale proceeds amount is less than the aggregate of the Agreed Termination Value that should have been paid under Clause 47(a)(i), the Indemnity Sum and any interest accrued under this Charter, the Charterers shall pay, within thirty (30) days of demand, the full amount of the shortfall to the Owners. The Owners and the Charterers each agree that the payment obligation of the Charterers under this Clause 47(g)(iv) above is a reasonable pre-estimate of the damages suffered by the Owners arising from the termination of the chartering of the Vessel and represent liquidated damages. If the net sale proceeds are greater than the Agreed Termination Sum then any surplus shall be paid to the Charterers.

48. ASSIGNMENT AND SUB-CHARTER

(a) The Charterers agree that any time charter, voyage charter or other employment contract entered into by the Charterers in respect of the Vessel shall not relieve or discharge the Charterers from any of their obligations contained in this Charter or any of the other Relevant Documents to which they are a party nor the Guarantors under any of the Relevant Documents to which they are respectively a party to.

(b) The Charterers undertake to procure that for the duration of the Charter Period all Earnings shall be payable to the Owners' Earnings Account.

(c) The Charterers shall not enter into any time charter or other employment contract of any duration with trading limits which would contravene US Embargo or at any time agree

that any sub-charterer may trade the Vessel to any area which would be in contravention of any US Embargo.

49. OWNERS' COVENANTS ETC.

The Owners' undertake with the Charterers that prior to the occurrence of an Event of Default, the Owners will not interfere with the quiet use, operation, possession, commercial exploitation and enjoyment of the Vessel by the Charterers otherwise than pursuant to the Owners' rights under the Relevant Documents (and then subject to any restrictions on the exercise of those rights under the Relevant Documents) or rights which may arise under applicable law. The aforementioned undertaking is without prejudice to any rights of the Mortgagee under any Mortgage and any other Finance Document.

50. PURCHASE OPTION

Subject to the prior written consent of the Mortgagee and provided that (i) no Event of Default is continuing and/or (ii) the Owners have not terminated the chartering of the Vessel under Clause 47 and/or (iii) the Vessel has not become Total Loss, the Charterers shall from the date falling 4 years after the Delivery Date (as further detailed below) be entitled to exercise an option to purchase (such option being the **"Purchase Option"**) the Vessel on the anniversary dates of the Delivery Date as specified below at the purchase option price (the **"Purchase Option Price"**), being the amount specified below for the relevant anniversary date:

(a) from the 4th year anniversary — USD 26,500,000 subject to this Clause 50 reducing by USD 2,740 per day until the 5th year anniversary

(b) from the 5th year anniversary — USD 25,500,000 subject to this Clause 50 reducing by USD 5,479 per day until the 6th year anniversary

(c) from the 6th year anniversary — USD 23,500,000 subject to this Clause 50 reducing by USD 5,479 per until day falling 1 day prior to the 7th year anniversary

If the Charterers wish to exercise their Purchase Option as specified at Clause 50(a) to (c) above, the Charterers shall give the Owners written notice of such exercise not less than three (3) months before the relevant anniversary date. The Charterers shall provide the Owners with (30), (15), (10) and (5) days' notice of the estimate delivery date and (3) and (1) day's definite notice of delivery. Once exercised, the Purchase Option shall be irrevocable in the case of the Charterers and shall not be withdrawn by the Charterers. Payment of the Purchase Option Price, the Indemnity Sum, outstanding interest and any accrued Charter Hire under this Charter shall be against transfer of ownership of the Vessel from the Owners to the Charterers on the completion date.

Provided (i) the Charterers pay the Purchase Option Price, the Indemnity Sum and any outstanding interest under this Charter in full on or before the completion date, (ii) the Owners have not terminated the chartering of the Vessel under Clause 47 and (iii) the Vessel has not become a Total Loss, the Owners shall be obliged to deliver to the Charterers, at the Charterers' sole cost and expense, a bill of sale executed and (if required) notarized in respect of the Vessel and to transfer to the Charterers the title which the Owners had in respect of the Vessel, free of the Mortgage on the completion date. With respect to such sale the Vessel shall be taken over by the Charterers, on a strictly "as is/where is" basis without recourse and, the Owners make no

representation or warranty, express or implied, as to the seaworthiness, value, condition, design, merchantability or operation of the Vessel, or as to the quality of the material, equipment or workmanship in the Vessel, or as to the fitness of the Vessel for any particular use, or as to the eligibility of the Vessel for any particular trade, or as to the Vessel's freedom from any charters (other than charters to which the Owners are a party) or any other representation or warranty whatsoever, express or implied, with respect to the Vessel and under no circumstances whatsoever shall the Owners be liable or responsible to the Charterers for any actual direct or consequential damages in respect of the foregoing. Provided the Purchase Option Price, Indemnity Sum, outstanding interest and any accrued Charter Hire has been paid, the Owners shall transfer title in the Vessel to the Charterers notwithstanding that an Event of Default has occurred.

Upon completion of the sale following the Charterers' exercise of the Purchase Option and full performance thereunder, this Charter and all further rights and obligations of the parties under this Charter (except for indemnities and other obligations of the Charterers that by their nature should survive the termination or expiry of this Charter as more particularly described at Clause 38(g)) shall expire.

The Owners and the Charterers agree that the Purchase Option Price shall only step down as contemplated by this Charter to the extent that the Owners shall have actually received all Charter Hire corresponding to such step down, otherwise the Purchase Price Option shall be adjusted accordingly to account for the outstanding Charter Hire.

51.   PURCHASE OBLIGATION

Upon the expiry of the Charter Period and provided that the Charterers have not exercised the Purchase Option, the Charterers shall purchase the Vessel (such obligation being the "**Purchase Obligation**") for USD 21,500,000 (United States Dollars twenty one million five hundred thousand) (the "**Purchase Obligation Price**").

Provided (i) the Charterers pay the Purchase Obligation Price and any outstanding interest under this Charter in full on or before the completion date, (ii) no Event of Default is continuing on the completion date, (iii) the Owners have not terminated the chartering of the Vessel under Clause 47 and (iv) the Vessel has not become a Total Loss, the Owners shall be obliged to deliver to the Charterers, at the Charterers' sole cost and expense, a bill of sale executed and (if required) notarized in respect of the Vessel and to transfer to the Charterers the title which the Owners had in respect of the Vessel, free of the Mortgage on the completion date. With respect to such sale the Vessel shall be taken over by the Charterers, on a strictly "as is/where is" basis without recourse and, the Owners make no representation or warranty, express or implied, as to the seaworthiness, value, condition, design, merchantability or operation of the Vessel, or as to the quality of the material, equipment or workmanship in the Vessel, or as to the fitness of the Vessel for any particular use, or as to the eligibility of the Vessel for any particular trade, or as to the Vessel's freedom from any charters (other than charters to which the Owners are a party) or any other representation or warranty whatsoever, express or implied, with respect to the Vessel and under no circumstances whatsoever shall the Owners be liable or responsible to the Charterers for any actual direct or consequential damages in respect of the foregoing. Provided the Purchase Option Price, Indemnity Sum, outstanding interest and any accrued Charter Hire has been paid, the Owners shall transfer title in the Vessel to the Charterers notwithstanding that an Event of Default has occurred.

52. CONFIDENTIALITY

The parties shall keep the negotiations and contents of this Charter and any information (not commonly known to public domain) that they may have received at any time in relation to the business, strategies or financial affairs of the other party in the strictest confidence. The parties may nevertheless disclose such information when required by the Mortgagee (or any of its affiliates), law, regulatory rules and regulations, governmental authorities or relevant stock exchange or to their professional advisers (including, without limitation, legal, accounting and tax advisers). This confidentiality undertaking shall survive the termination of or expiry of this Charter.

Notwithstanding the aforementioned, the Charterers hereby irrevocably directly authorise the Mortgagee, any of their co-lenders / syndicate members, or its or their assigns to give, divulge and reveal from time to time information and details relating to its accounts, this Charter, the MoA and any other Relevant Document to (i) any relevant authorities, (ii) the Mortgagee's, any facility agent's and any swap provider's (in the context of financing in respect of the Vessel) respective head office, relevant branches, relevant affiliates, shareholders and (iii) any other relevant parties to the abovementioned documentation or any Loan Agreement between the Mortgagee and the Owners or any security document related thereto; and (iv) any other person, regarding funding, operational arrangement or other transaction in relation thereto, including without limitation, for purposes in connection with any enforcement or assignment or transfers of any of the rights and obligations of the Mortgagee and the Owners shall be held harmless by the Charterers in relation to any disclosure as referred to in this paragraph of Clause 52.

53. INCONSISTENCY

In case of any inconsistency between the standard terms of this Charter and Rider Clauses 32 – 60 the Rider Clauses shall prevail.

54. OWNERS REFINANCING

(a) Subject to the terms of this Clause 54 (a), the Owners shall, at all times, be entitled to refinance any Loan Agreement and, at any time after any Loan Agreement has been repaid, raise new finance, in each case, with a reputable bank or financial institution. Any refinance of any Loan Agreement, raising of new finance or material amendment to any Loan Agreement shall be permitted without the consent of the Charterers provided that in each case any amendment, refinancing or new financing does not impose upon the Charterers greater obligations or liabilities whether financial or any other additional burden than those imposed as a result of the terms of the facility agreement (as from time to time amended, varied or supplemented) dated 2010 between, amongst others, the Owners the Related Bareboat Charterers, (ii) DVB and NordLB as lenders and co-arrangers (together, the **"Lenders"**) and (iii) DVB in various capacities (the **"Facility Agreement"**) and any related security documents. In the event of refinancing all costs associated with it shall be borne by the Owners. The outstanding indebtedness under any new facility shall not be greater than the Purchase Option Price applicable at the time of such refinancing.

(b) Providing the conditions to Clause 54(a) are met, at the Owners' reasonable request, the Charterers shall, at no cost to Charterers and provided that the same does not interfere with the operation, possession or management of the Vessel, provide all such documents, perform such acts and provide all assistance required by the Owners to enable at any time a refinancing or restructuring of any Loan Agreement.

55. THIRD PARTY RIGHTS

Other than the Mortgagee or its affiliates, a person who is not a party to this Charter has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Charter.

56. AMENDMENTS

No variation or amendment of this Charter shall be valid unless in writing and signed on behalf of the Owners and the Charterers. Furthermore, the Owners and the Charterers each agree not to amend, vary or terminate this Charter without the prior written consent of DVB (acting in its capacity as agent). However, the aforementioned right of DVB shall only apply for so long as they are the Mortgagee.

57. NO LIENS

The Charterers irrevocably and unconditionally waive in favour of the Owners all rights to any liens that may arise from time to time in their favour over the Vessel.

58. JURISDICTION

(a) This Charter and any non-contractual obligations arising from or in connection with this Charter shall in all respects be governed by and interpreted in accordance with English law.

(b) The Owners and the Charterers each irrevocably agrees that the courts of England are to have jurisdiction to settle any dispute arising from or in connection with this Charter and relating to any non-contractual obligations arising from or in connection with this Charter and that any proceedings may be brought in those courts.

(c) Each of the Owners and the Charterers irrevocably waives any objection which it may now or in the future have to the laying of the venue of any proceedings in any court referred to in this Clause and any claim that those proceedings have been brought in an inconvenient or inappropriate forum, and irrevocably agrees that a judgment in any proceedings commenced in any such court shall be conclusive and binding on it and may be enforced in the courts of any other jurisdiction.

(d) Without prejudice to any other mode of service allowed under any relevant law, the Charterers:

(i) irrevocably appoints Geden Operations Ltd, whose office is currently at 2nd Floor, 77 Gracechurch Street, London, EC3V ODL as their agent for service of process in relation to any proceedings before the English courts; and

(ii) agrees that failure by a process agent to notify the Charterers of the process will not invalidate the proceedings concerned.

(e) Without prejudice to any other mode of service allowed under any relevant law, the Owners:

(i) irrevocably appoints ICON Capital Corp. whose office is currently at 78 Pall Mall, London, United Kingdom, SW1Y 5ES as their agent for service of process in relation to any proceedings before the English courts; and

(ii) agrees that failure by a process agent to notify the Owners of the process will not invalidate the proceedings concerned.

59. NOTICES

(a) Any communication to be made under or in connection with this Charter shall be in English made in writing and, unless otherwise stated, may be made by fax or letter.

(b) The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each party to this Charter for any communication or document to be made or delivered under or in connection with this Charter are:

(i) in the case of the Charterers, c/o Genel Denizcilik Nakliyati A.S., Yapi Kredi Plaza A Blok Kat 12, Levent, Istanbul, Turkey 34330 (fax no: 90 212 325 5814) marked for the attention of: Mehmet Mat; and

(ii) in the case of the Owners, c/o ICON Capital Corp. 100 Fifth Avenue, Fourth Floor, New York, NY 10011, USA (fax no. +1 (212) 418 4739) marked for the attention of David Verlizzo,

or any substitute address, fax number, department or officer as each party to this Charter may specifically notify to the other parties to this Charter by not less than five (5) Banking Days' notice.

(c) Any communication or document made or delivered by one party to this Charter to another under or in connection this Charter will only be effective:

(i) if by way of fax, when received in legible form; or

(ii) if by way of letter, when it has been left at the relevant address or three (3) Banking Days after being deposited in the post postage prepaid in an envelope addressed to it at that address if it is being sent to an address in the same country as the sender (or upon receipt if it is being sent internationally by post) or four (4) Banking Days after being handed to a reputable international courier service in an envelope addressed to it at that address if it is being sent internationally,

and, if a particular department or officer is specified as part of its address details provided under Clause 59(b), if addressed to that department or officer.

60. DEFINITIONS

60.1 In this Charter, unless the context otherwise requires, the following expressions shall have the following meanings:

60.1.1 **"Agreed Termination Value"** means, in respect of the applicable period in column (a) below the amount specified in column (b) below:

| (a) Period | (b) Agreed Termination Value (USD) |
|---|---|
| Year 1 (commencing from the Delivery Date) | USD 36,250,000 on the Delivery Date reducing by USD 3,425 per day |

| | |
|---|---|
| | thereafter subject to Clause 45(d) below |
| Year 2 (commencing from the 1st anniversary of the Delivery Date) | USD 35,000,000 on the 1st Anniversary of the Delivery Date reducing by USD 4,658 per day thereafter subject to Clause 45(d) below |
| Year 3 (commencing from the 2nd anniversary of the Delivery Date) | USD 33,300,000 on the 2nd anniversary of the Delivery Date reducing by USD 6,849 per day thereafter subject to Clause 45(d) below |
| Year 4 (commencing from the 3rd anniversary of the Delivery Date) | USD 30,800,000 on the 3rd anniversary of the Delivery Date reducing by USD 11,781 per day thereafter subject to Clause 45(d) below |
| Year 5 (commencing from the 4th anniversary of the Delivery Date) | USD 26,500,000 on the 4th anniversary of the Delivery Date reducing by USD 2,740 per day thereafter subject to Clause 45(d) below |
| Year 6 (commencing from the 5th anniversary of the Delivery Date) | USD 25,500,000 on the 5th anniversary of the Delivery Date reducing by USD 5,479 per day thereafter subject to Clause 45(d) below |
| Year 7 (commencing from the 6th anniversary of the Delivery Date) | USD 23,500,000 on the 6th anniversary of the Delivery Date reducing by USD 5,479 per day thereafter subject to Clause 45(d) below |
| 7th Anniversary of the Delivery Date | USD 21,500,000 |

60.1.2 "**Annex VI**" means Annex VI (Regulations for the Prevention of Air Pollution from Ships) to the International Convention for the Prevention of Pollution from Ships 1973 (as modified in 1978 and 1997).

60.1.3 "**Applicable Insurance Amount**" has the meaning given to it in Clause 45(c).

60.1.4 "**Approved Broker**" means any of Maersk, SSY, Clarksons, Maritime Strategies International Ltd. or any other broker approved by the Owner and the Lenders.

60.1.5 **"Arrangement Fee"** means USD335,000 (United States Dollars three hundred and thirty five thousand) payable by the Charterers to the Owners on the Delivery Date.

60.1.6 **"Banking Day"** means days on which banks are open for the transaction of general business in Singapore, London and New York.

60.1.7 **"Bank Fees"** means the aggregate amount of structuring, arrangement, commitment and agency fees paid by the Owners to DVB or any other Finance Party (or any of their affiliates) under the Loan Agreement existing at the date of this Charter, as the amount thereof shall be apportioned on a pro-rata basis between the Owners and the Related Owner to take account of the aggregate financing covered by the aforementioned Loan Agreement for the Vessel and the Related Vessel.

60.1.8 **"Builder"** means Cosco Shipyard Group Co., Ltd. a corporation organized and existing under the laws of the People's Republic of China.

60.1.9 **"Charter"** means the BARECON 2001 Bareboat Charter Party between the Owners and the Charterers for the Vessel together with Rider Clauses 32-60.

60.1.10 **"Charterers"** means Amazing Shipping Ltd., a company incorporated under the laws of the Republic of Malta with its registered address at 198, Old Bakery Street, Valletta, VLT 09, Malta of the Republic of Malta.

60.1.11 **"Charterers' Insurance Proceed Payment"** has the meaning given to it in Clause 45(d).

60.1.12 **"Charter Hire"** has the meaning given to it in Clause 34.

60.1.13 **"Charter Period"** means the term specified in Clause 21.

60.1.14 **"Classification Society"** means Bureau Veritas or DNV or any other classification society for the Vessel as the Owners may approve from time to time being a member of the International Association of Classification Societies.

60.1.15 **"Delivery Date"** has the meaning given to it in Clause 32.

60.1.16 **"Documentation Expenses"** means all costs, legal expenses and fees reasonably incurred by the Owners in relation to the Relevant Documents.

60.1.17 **"DVB"** means DVB Bank SE incorporated under the laws of the Federal Republic of Germany and acting as security agent through its office at Parklaan 2, 3016, Rotterdam, The Netherlands, who shall be the Mortgagee as of the Delivery Date.

60.1.18 **"Earnings"** means all hires, freights, pool income and any other sums payable to or for the account of the Charterers in respect of the Vessel, including (without limitation) all damages and other payments (whether awarded by any court or arbitral tribunal or by agreement or otherwise) for breach, termination or variation of any contract for the operation, employment or use of the Vessel under each Sub-Charter.

60.1.19 **"Encumbrance"** means a mortgage, charge, assignment, pledge, lien or other security interest securing any obligation of any person or any agreement or arrangement having a similar effect.

60.1.20 **"Environmental Claim"** means any claim, proceeding, formal notice or investigation by any person in respect of Environmental Law.

60.1.21 **"Environmental Law"** means any applicable law or regulation which relates to:

(i) the pollution or protection of the environment;

(ii) harm to or the protection of human health:

(iii) the conditions of the workplace; or

(iv) any emission or substance capable of causing harm to any living organism or the environment.

60.1.22 **"Environmental Permits"** means any permit and other authorisation and the filing of any notification, report or assessment required under any Environmental Law for the operation of the Vessel.

~~60.1.23 **"Event of Default"** has the meaning given to it in Clause 46.~~

60.1.24 **"Existing Time Charter"** means the time charter dated 16 August 2010 between the Charterers and Progress Bulk Carriers Ltd. in respect of the Vessel as the same may be amended, supplemented or novated from time to time.

60.1.25 **"Facility Agreement"** has the meaning given in Clause 54(a).

60.1.26 **"Fair Market Value"** means in respect of the Vessel, the fair market value of the Vessel which shall be conclusively determined on a charter-free basis, with or without physical inspection, on the basis of a sale for prompt delivery on normal arms length terms between a willing buyer and willing seller by firms of shipbrokers approved and appointed by the Mortgagee from time to time (and in a form approved by the Mortgagee and addressed to the Mortgagee) which shall include: (a) one (1) valuation by a firm of shipbrokers appointed by the Mortgagee (which shall be Maritime Strategies International Ltd. unless the Mortgagee advises otherwise) and (b) if requested by the Charterers, one (1) valuation from another Approved Broker, in which case the fair market value of a Vessel shall be conclusively determined by the average of the two (2) valuations. If there is a difference between the two (2) valuations in excess of ten per cent (10%) when calculated according to the following formula:-

$(X - Y) / Y$

where:

X = the amount of the valuation with the higher value

Y= the amount of the valuation with the lower value,

the Charterers may select a third Approved Broker and the fair market value of the Vessel shall be determined by the average of the three (3) valuations.

60.1.27 **"Finance Documents"** means the documents defined as such in the Loan Agreements.

60.1.28 **"Finance Parties"** has the meaning ascribed thereto in the Loan Agreements (if applicable).

60.1.29 **"Future Value"** means additional Charter Hire paid pursuant to Clause 40(c) which shall be calculated using an interest rate of 11.5% from the date on which the additional Charter Hire was made until the date of each Purchase Option and the Purchase Obligation.

60.1.30 **"General Assignment"** means the assignment securing, amongst other things, the Charterers' obligations under this Charter made or to be made by the Charterers in favour of the Owners in relation to, amongst other things, the rights of the Charterers to or under (i) the insurances over the Vessel and (ii) the Sub-Charters.

60.1.31 **"Guarantee"** means the Parent Guarantee.

60.1.32 **"Guarantor"** means the Parent Company.

60.1.33 **"Indemnity Sum"** the aggregate from time to time of any outstanding indemnity payments payable by the Charterers to the Owners pursuant to Clause 38 or any other provision of this Charter.

60.1.34 **"ISM Code"** means the International Management Code for the Safe Operation of Ships and for Pollution Prevention.

60.1.35 **"ISPS Code"** means the International Ship and Port Facility Security Code.

60.1.36 **"Listed Areas"** means the areas set out in the JWC War, Strikes, Terrorism and Related Perils Listed Areas of 25 November 2009 as published on the LMA (www.lmalloyds.com) and IUA (www.iua.co.uk) websites and as may from time to time be revised and updated.

60.1.37 **"Loan Agreements"** has the meaning given to it in Clause 38(c) and shall include the Facility Agreement and any other loan or financing agreement replacing such Facility Agreement in the event of a refinancing of the acquisition cost of the Vessel and **"Loan Agreement"** means any one of them.

60.1.38 **"Losses"** means all losses, costs, charges, expenses, fees, payments, liabilities, penalties, fine, damages, injuries, claims, demands, awards, judgments or other sanctions of a monetary nature.

60.1.39 **"Managers"** means Genel Denizcilik Nakliyati AS or other commercial and technical managers of the Vessel as the Charterers may appoint subject to the Owners' and Mortgagees' approval or as the Owners may appoint on behalf of the Charterers, in each case, pursuant to Clause 36 (but subject to the terms and conditions of the Loan Agreement).

60.1.40 **"Material Adverse Effect"** means a material adverse effect on:

(a) the business, operations, property or condition (financial or otherwise) of any Relevant Party; or

(b) the ability of any Relevant Party to perform its obligations under any Relevant Document to which it is a party; or

(c) the rights or remedies of the Owners under any of the Relevant Documents to which they are a party.

60.1.41 "**Material Amendment**" means, in respect of any time charter, voyage charter or other employment contract, any amendment, variation or change in relation to the hire paid, the terms of payment, the charter period, the counterparty, any guarantee, any guarantor and/or the areas of trade.

60.1.42 "**MIAPP**" means mortgagees' interest additional perils (pollution).

60.1.43 "**MII**" means mortgagees' interest insurance.

60.1.44 "**Minimum Insured Value**" has the meaning given to it in Clause 45(c).

60.1.45 "**MoA**" means the memorandum of agreement of even date herewith made between the Charterers as sellers and the Owners as buyers in respect of the Vessel (as the same may be amended from time to time).

60.1.46 "**Mortgage**" has the meaning given to it in Clause 40.

60.1.47 "**Mortgagee**" has the meaning given to it in Clause 40 and shall mean DVB as of the Delivery Date and shall include any other bank or financial institution replacing such Mortgagee in the event of a refinancing of the acquisition cost of the Vessel.

60.1.48 "**Mortgagees' Insurances**" means all policies of mortgagees' interest insurance and mortgagees' additional perils (oil pollution) insurance from time to time taken out by the Mortgagee in relation to the Vessel.

60.1.49 "**NordLB**" means Norddeutsche Landesbank Girozentrale acting through its office at Friedrichswall 10, D-30151 Hannover, The Federal Republic of Germany.

60.1.50 "**Owners**" means ICON Amazing, LLC a company organised under the laws of the Marshall Islands with its registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands, MH 96960.

60.1.51 "**Parent Company**" means Geden Holdings Ltd. a company incorporated according to the laws of the Republic of Malta whose registered office is at 85 St. John's Street, Valletta, Malta.

60.1.52 "**Parent Guarantee**" means the guarantee and indemnity made or to be made by the Parent Company in favour of the Owners in relation to, amongst other things, the Charterers' obligations under this Charter.

60.1.53 "**Payment Event of Default**" means the failure by any Related Bareboat Charterers to pay on the due date any instalment of hire or any other sum payable

by that Related Bareboat Charterers under the Related Charter to which it is a party.

60.1.54 "**Permitted LTV**" means during year one and year two of the Charter Period 125% of the aggregate amount advanced to the Owners pursuant to the Loan Agreements, and during the remainder of the Charter Period, 130% of the aggregate amount advanced to the Owners pursuant to the Loan Agreements.

60.1.55 "**Purchase Obligation**" has the meaning given to it in Clause 51.

60.1.56 "**Purchase Obligation Price**" has the meaning given to it in Clause 51.

60.1.57 "**Purchase Option**" has the meaning given to it in Clause 50.

60.1.58 "**Purchase Option Price**" has the meaning given to it in Clause 50.

60.1.59 "**Purchase Price**" means USD33,500,000 (United States Dollars thirty three million five hundred thousand).

60.1.60 "**Related Bareboat Charterers**" means Fantastic Shipping Ltd. a company incorporated under the laws of Malta and with its registered office at 198, Old Bakery Street, Valletta, VLT 09, Malta.

60.1.61 "**Related Charter**" means the bareboat charter made on or about the date of this Charter between the Related Owner (as owner) and the Related Bareboat Charterers (as charterer) in relation to the vessel named m.v. "FANTASTIC".

60.1.62 "**Related Owner**" means ICON Fantastic, LLC a company organised under the laws of the Marshall Islands with its registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands, MH 96960.

60.1.63 "**Related Vessel**" means m.v. "FANTASTIC".

60.1.64 "**Relevant Documents**" means this Charter, the MoA, the Related Charter, the General Assignment and the Parent Guarantee.

60.1.65 "**Relevant Parties**" means the Charterers and the Parent Company and "**Relevant Party**" means any one of them.

60.1.66 "**Security**" means a mortgage, charge, pledge, lien or other security interest securing the obligation of any person or any other agreement or arrangement having similar effect.

60.1.67 "**Sub-Charters**" means the Existing Time Charter and all other time charters, consecutive voyage charters or other contracts of employment entered into from time to time during the Charter Period by the Charterer in respect of the Vessel with a duration of twelve (12) months or more (with or without the exercise of possible options) and "**Sub-Charter**" means any one of them.

60.1.68 "**Subsidiary**" means a subsidiary within the meaning of section 1159 of the Companies Act 2006.

60.1.69 "**Swap Agreements**" has the meaning given to it in Clause 38(c) and shall include any other agreements replacing any swap agreement entered into on or around the date of this Charter in the event of a refinancing of the acquisition cost of the Vessel.

60.1.70 "**Tax**" means any tax, levy, import, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same) and "**Taxes**" shall be construed accordingly.

60.1.71 "**Total Loss**" has the meaning given to it in Clause 45(a).

60.1.72 "**USD**" means available and freely transferable and convertible funds in lawful currency of the United States of America

60.1.73 "**Vessel**" means the vessel m.v. "AMAZING" registered under the flag of Malta.

For and on behalf of Charterers:

Name: MEHMET MAT
Title: CFO

For and on behalf of Owners:

Name:
Title:

# SCHEDULE 1

## Spare Parts, Inventory and Other Equipment