IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ICON AMAZING, L.L.C., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. H-13-1449 |
| | § | |
| AMAZING SHIPPING, LTD. *and* | § | |
| GEDEN HOLDINGS, LTD., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

On June 11, 2013, the Court entered an Order (Document No. 36) granting Defendants' Opposed Motion to Vacate Attachment and Dismiss Complaint (Document No. 22). The Court's ruling was based on the motion, submissions, applicable law, and oral arguments presented to the Court on Monday, June 10, 2013, at a hearing in open court. The Court's determination was grounded on the finding that the Court lacked subject-matter jurisdiction. This memorandum opinion sets forth the Court's factual findings and legal conclusions supporting that determination. The Court notes, however, that practically this matter is moot as the attached vessel, the *M/V Hero,* was released pursuant to Plaintiff's request on June 11, 2013.[1]

---

[1] The Court held a Rule E hearing on Defendants' motion to vacate the attachment on June 10, 2013. Based on the expedited nature of the issue, the Court issued a short order granting the motion to vacate on June 11, 2013. That same day, Plaintiff moved to stay the order vacating the attachment until the Court could issue its findings and reasons supporting the order to vacate. The Court granted Plaintiff's motion to stay on the following day. In the

## I. BACKGROUND

*A.     The Basis of the Transaction at Issue*[2]

In 2007, Defendant Amazing Shipping Ltd. ("Amazing Shipping") contracted to build the *M/V Amazing* (the "*Amazing*") at a cost of $33,500,000.00. According to Amazing Shipping, when the *Amazing* was finished and launched, she was not worth her cost. The *Amazing* could not earn even half the freight income initially contemplated in 2007. Amazing Shipping took delivery of the ship from the shipyard in August 2010, with DVB Bank providing financing of the construction cost.

Amazing Shipping determined that it needed to refinance and pay off DVB Bank, or it would lose the vessel. Amazing Shipping contends that it anticipated the market would improve in the near future, freights would increase, and the vessel would become profitable. Although Amazing Shipping could find no bank that would take the risk, Plaintiff Icon Amazing, L.L.C. ("Icon") offered to provide the needed financing. Unlike a conventional ship mortgage, in which the bank or finance

---

meantime, however, Plaintiff contacted the United States Marshals Service and instructed that the *Hero* be released. In short, despite the Court's grant of the stay, Plaintiff, itself, effectuated the release of the Rule B attachment. Thus, the *rem* at issue—the *Hero*—is no longer within this Court's geographic jurisdiction, which is a prerequisite of Rule B attachment. Therefore, even had the Court reconsidered the Plaintiff's position and found merit, the Court, in practicality, is without the ability to exercise jurisdiction because the ship has left the port.

[2] The following facts are derived from Defendants' oral argument at the Court's June 10, 2013, Rule E hearing.

company takes a collateral security interest in a vessel enforceable by a maritime lien during the mortgage loan payment period, Icon proposed a sale/lease-back/sale transaction for the *Amazing* during a seven-year vessel sale/finance period.[3] This transaction was memorialized by a sale of the *Amazing* to Icon in the Memorandum of Agreement ("MOA") and a subsequent lease-back charter agreement that obligates Amazing Shipping to purchase the *Amazing* at the conclusion of the charter period (the "Barecon 2001"). In addition, Defendant Geden Holdings, Ltd. ("Geden"), the parent company of Amazing Shipping, guaranteed Amazing Shipping's obligations under the Barecon 2001 (Amazing Shipping and Geden collectively referred to as "Defendants"). Amazing Shipping subsequently defaulted under the charter party terms of the Barecon 2001.

B.     *The Pending Case*

On May 20, 2013, Icon filed a verified complaint (the "Verified Complaint"), seeking the attachment of the *M/V Hero* (the "*Hero*"), a vessel owned by another subsidiary of Geden, pursuant to Rule B of the Supplemental Rules for Admiralty or

---

[3] *See Defendant's Opposed Motion to Vacate the Attachment and Dismiss the Complaint*, Document No. 22, Exhibit 3 (Letter Agreement, dated July 28, 2010) (outlining the ship sale finance transaction) [hereinafter *Term Sheet*]; *see also generally* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 9-5, at 516–21 (3d ed. 2001) (Preferred Ship Mortgages).

3

Maritime Claims.[4] Icon's Verified Complaint seeks attachment of the *Hero* in an effort to obtain security for certain claims it has asserted or intends to assert against Defendants in relation to the *Amazing*.[5] On the same day that the Verified Complaint was filed, a Writ of Maritime Attachment and Garnishment issued from this Court, directing the attachment of the *Hero*.[6] On May 26, 2013, six days later, the master of the *Hero* was served with the attachment papers.

On June 4, 2013, Defendants filed their Opposed Motion to Vacate Attachment and Dismiss Complaint (Document No. 22), arguing that the underlying dispute arises from a non-maritime vessel sale/financing transaction, that such transactions are not maritime in nature, and that this Court therefore lacks subject-matter jurisdiction over the dispute. On June 10, 2013, the Court conducted an oral hearing on Defendants' motion.

Having considered the pleadings on file, the evidence submitted, the oral arguments of each party, and the applicable law, the Court determines that

---

[4] Although the *Hero* is a vessel owned by a subsidiary of Geden—a single vessel entity, Hero Shipping, Ltd.—Icon contends that as the parent company, Geden is operating as the alter ego of both Hero Shipping and Amazing Shipping and that the *Hero* is therefore properly sought under Rule B attachment in this lawsuit.

[5] *Verified Complaint*, Document No. 1.

[6] *Order for Issuance of Writ of Maritime Attachment and Garnishment of Vessel*, Document No. 12.

4

Defendants' motion should be granted, the attachment should be vacated, and the case should be dismissed because this Court lacks subject-matter jurisdiction over the dispute. The Court issued a brief order so stating on June 11, 2013.[7] The Court's order specifically stated, "[t]he Court will issue a memorandum opinion, setting forth its specific findings and reasons at a later date."[8] Nonetheless, later that same day, Icon filed an Emergency Motion for Stay of Order Vacating Attachment (Document No. 37), requesting that the effect of the Court's order vacating the attachment and dismissing the Complaint be stayed pending publication of the Court's written reasons for its order. On the following day, June 12, 2013, the Court granted Plaintiff's motion to stay, pending the issuance of this memorandum opinion.

In support of the June 11, 2013 Order, the Court makes the following findings of fact and conclusions of law. Any finding of fact that should be construed as a conclusion of law is hereby adopted as such. Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.

## II. FINDINGS OF FACT

(1) At the transaction's closing, effective October 1, 2010, Icon and Amazing Shipping entered into a Memorandum of Agreement (the "MOA") regarding

---

[7] *Order*, dated June 11, 2013, Document No. 36.

[8] *Order*, dated June 11, 2013, Document No. 36.

the refinancing of the *Amazing* (the "*Amazing*").[9]  Pursuant to the terms of the MOA, Amazing Shipping agreed to sell, and Icon agreed to purchase, the *Amazing* for the price of $33,500,000.00.[10]  Icon further agreed to immediately return beneficial possession of the *Amazing* to Amazing Shipping in exchange for the payment of daily "charter hire" to Icon under a BIMCO Standard Bareboat Charter  (the "Barecon 2001") executed simultaneously with the MOA.[11]  The day-rate owed by Amazing Shipping to Icon under the Barecon 2001 was $13,500.00.[12]

(2)   The terms of the Barecon 2001 gave Amazing Shipping the option to purchase the *Amazing* from Icon on each anniversary of the commencement of the agreement beginning with the fourth anniversary.  The Barecon 2001 also **obligated** Amazing Shipping to purchase the *Amazing* for a fixed-price, balloon payment of $21,500,000.00 at the conclusion of the seven-year term

---

[9] *See Verified Complaint*, Document No. 1, Exhibit A; *Defendant's Opposed Motion to Vacate the Attachment and Dismiss the Complaint*, Document No. 22, Exhibit 1 (Memorandum of Agreement) [hereinafter *MOA*].

[10] *MOA*, *supra* note 9, at 1, § 1.

[11] *See Verified Complaint*, Document No. 1, Exhibit B; *Defendant's Opposed Motion to Vacate the Attachment and Dismiss the Complaint*, Document No. 22, Exhibit 2 (BIMCO Standard Bareboat Charter, Code Name: "Barecon 2001") [hereinafter *Barecon 2001*].

[12] *Barecon 2001*, *supra* note 11, at 17, § 34 (Rider Clauses at 3).

6

of the charter, if the option to purchase had not been exercised earlier. Specifically, the Barecon 2001 includes the following rider clause: "PURCHASE OBLIGATION": at year seven Amazing Shipping "shall purchase the vessel (such obligation being the 'Purchase Obligation') for USD $21,500,000 . . . (the 'Purchase Obligation Price')."[13]

(3)     Amazing Shipping's performance of its obligations under the agreements between it and Icon was fully guaranteed by Geden.[14]

(4)     Parts II, III, and IV of the Barecon 2001 (which contain form, boilerplate language that typically applies to conventional maritime bareboat charter parties) have been largely or entirely deleted, and replaced by extensive Rider Clauses.[15]

(5)     Documents submitted for the Court's consideration show that from the start, the transaction was regarded as a vessel sale/financing, not as a conventional maritime charter. Icon repeatedly referred to its transaction with Defendants as a "secured financing," and stressed that the transaction is not a bareboat charter, but a vessel sale/financing. These submissions include but are not

---

[13] *Barecon 2001, supra* note 11, at 39, § 51 (Rider Clauses at 25).

[14] *Verified Complaint*, Document No. 1, Exhibit 3 (Guarantee and Indemnity) [hereinafter *Guarantee*].

[15] *Barecon 2001, supra* note 11, *passim.*

limited to (a) a reference in the term sheet to Amazing Shipping as "Borrower";[16] (b) repeated messages from Icon, some as recent as May 2013, stressing that the transaction is a loan;[17] (c) amortization schedules, broken down into components of "interest" and "principal" used to calculate what is termed "charter hire" rates;[18] (d) the requirement that Amazing Shipping maintain a specified loan-to-value ratio or pay additional amounts in hire;[19] (e) covenants in the charter requiring delivery of periodic financial statements, as would be required in a loan;[20] and (f) other loan-like covenants in the charter, such as a limitation on the ability to change ownership structure and

---

[16] *Term Sheet*, *supra* note 3, at 4 (Earnest Money Deposit Clause).

[17] *Defendant's Opposed Motion to Vacate the Attachment and Dismiss the Complaint*, Document No. 22, Exhibit 4 (referring to themselves as a "secured creditor"); *id.*, Exhibit 5 (clarifying that "Icon's financing[] of the . . . *Amazing* . . . [is] a secured financing[], not a time charter agreement"); *id.*, Exhibit 6 ("One cannot look upon our deals as conventional charters").

[18] *Defendant's Opposed Motion to Vacate the Attachment and Dismiss the Complaint*, Document No. 22, Exhibit 5 (email from Icon setting forth amortization schedules for *Amazing* installment payments); *id.*, Exhibit 8 (Amortization Chart).

[19] *Barecon 2001*, *supra* note 11, at 23, § 40(c) (Rider Clauses at 9); *see also Term Sheet*, *supra* note 3, at 2 (Value Maintenance Clause).

[20] *Barecon 2001*, *supra* note 11, at 26–27, § 44 (Rider Clauses at 12–13).

restrictions on doing any business other than operating the ship, incurring other indebtedness, and paying dividends.[21]

(6)   In its correspondence with Defendants, Icon has repeatedly referred to itself as a "lender" and to the transaction as a "loan."   Tobias Backer, whose advertised area of expertise is vessel finance and who serves as the Managing Director—Head of Shipping & Offshore for Icon, stated, "We do not expect any special treatment, but rather to be treated the same as the **other secured lenders** to Geden."[22]   He also stated that this and related transactions "are secured financings, not time charter arrangements,"[23] and that "one cannot look upon our deals as conventional charters."[24]   Icon repeatedly emphasized to Defendants that it viewed the transaction as a loan, and expected it to be treated as such: "From a legal perspective a capital lease—such as our deals—is **no different than a loan**.  As such your lease with us is **in reality a senior/junior loan**.   This is the way Icon approached this from day

---

[21] *Barecon 2001, supra* note 11, at 27–29, § 44(d), (u)–(y) (Rider Clauses at 12–15).

[22] *Defendant's Opposed Motion to Vacate the Attachment and Dismiss the Complaint*, Document No. 22, Exhibit 4 at 1 (Email from Tobias Backer, dated May 28, 2013) (emphasis added).

[23] *Defendant's Opposed Motion to Vacate the Attachment and Dismiss the Complaint*, Document No. 22, Exhibit 5 at 1–2 (Email from Tobias Backer, dated May 2, 2013).

[24] *Defendant's Opposed Motion to Vacate the Attachment and Dismiss the Complaint*, Document No. 22, Exhibit 6 (Email from Tobias Backer, dated April 19, 2013).

one . . . . As such, we are perplexed by why these deals would be dealt with differently than the loans."[25] Because of his purported expertise and his position of leadership within Icon, the Court affords great weight to Mr. Backer's characterizations of the transaction.

(7)   Icon's own amortization table[26] establishes that the monthly payments due under the Barecon 2001 were simply principal and interest payments on the $33,500,000.00 amortized vessel sale/loan amount. It is apparent to the Court that the payments owed by Amazing Shipping (and guaranteed by Geden) under the Barecon 2001 do not constitute market "charter hire" as that term is understood in the maritime industry.  Rather, the day rate in the Barecon 2001 is, in fact, the repayment of principal and interest, calculated not to remunerate the vessel owner with market-rate charter hire, but to amortize a loan provided by Icon to Amazing Shipping as a vessel sale/financing of the *Amazing*.

(8)   The Barecon 2001 contains a Loan-to-Value clause (the "LTV Clause"), concerning the residual value of the vessel.[27] Conventional maritime bareboat

---

[25] *Defendant's Opposed Motion to Vacate the Attachment and Dismiss the Complaint*, Document No. 22, Exhibit 6 (emphasis added).

[26] *Defendant's Opposed Motion to Vacate the Attachment and Dismiss the Complaint*, Document No. 22, Exhibit 8 (Icon Amortization Table).

[27] *Barecon 2001*, *supra* note 11, at 23, § 40(c) (Rider Clauses at 9); *see also Term Sheet*, *supra* note 3, at 2 (Value Maintenance Clause).

charter parties do not contain an LTV Clause.[28] The LTV Clause acts to transfer the risk of loss of the *Amazing*'s value during the term of the charter party to Amazing Shipping. In other words, as the *Amazing*'s value decreased, Amazing Shipping's monthly payment obligations would increase to compensate for the loss in vessel value. Placing the risk of loss of vessel value on Amazing Shipping is entirely consistent with the fact that at the end of the transaction, Amazing Shipping will be the ultimate owner.

(9)     The relevant agreements between the parties were all executed and came into force at the same time—the closing of the transaction—as evidenced by the MOA, the Barecon 2001, the Guarantee and Indemnity, and the Bill of Sale and Protocols dated September 29/October 1, 2010.[29]

(10)    Of considerable note is the fact that a substantial portion of Icon's claimed damages are based on the LTV Clause of the Barecon 2001 and not on the unsatisfied portions of Amazing Shipping's monthly Barecon 2001 installment payment obligations. Specifically, Icon seeks to recover $2,910,109.00 in

---

[28] Compare *Barecon 2001*, *supra* note 11, Pts. II–III (conventional bareboat charter party terms and clauses), with *Barecon 2001*, *supra* note 11, at 15–50 (Rider Clauses added after deletion of most of Parts II and III).

[29] *MOA*, *supra* note 9; *Barecon 2001*, *supra* note 11; *Guarantee*, *supra* note 14; *Response to Defendants' Motion to Vacate Attachment and Dismiss Complaint*, Document No. 32, Exhibit C (Bill of Sale).

damages based on the declining value of the *Amazing*, which represents additional security.[30]

(11)   Finally, Icon is a financing company, not a company traditionally focused on maritime commerce, trade, or shipping.

## III. CONCLUSIONS OF LAW

(12)   Supplemental Rules B and E of the Federal Rules of Civil Procedure govern attachment of assets in a maritime action.   Rule E allows for "any person claiming an interest in [the property arrested] . . . [to] be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated." FED. R. CIV. P. E(f) (Supplemental Rules for Admiralty or Maritime Claims). The Plaintiff, therefore, bears the burden of establishing a right to attachment. *Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006), *abrogated on other grounds by Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir. 2009). To meet this burden, the Plaintiff must show (1) a valid *prima facie* admiralty claim against the defendant; (2) the defendant cannot be found within the district; (3) the defendant's property is within the district; and (4) there is no legal bar to attachment—either statutory or maritime in nature.

---

[30] *Verified Complaint*, Document No. 1 at 5, ¶ 14.

*Id.* at 445. The first inquiry is the primary issue in this case.[31] The parties dispute whether Plaintiff has met its burden of showing that this Court has admiralty jurisdiction.

(13)   Not all contracts involving vessels or seamen are maritime in nature. *See Kossick v. United Fruit Co.*, 365 U.S. 731, 735–36 (1961). In fact, "contracts for the sale of vessels are not within admiralty jurisdiction, but charter parties are." *Clem Perrin Marine Towing, Inc. v. Pan. Canal Co.*, 730 F.2d 186, 188 (5th Cir. 1984). This bright-line rule was first established by the Second Circuit in *The Ada*, 250 F.194 (2d Cir. 1918).

(14)   To determine whether a contract is truly maritime in nature, the Court must examine the agreed transaction between the parties in order to determine the nature and character of the agreement and the "principal objective" of the parties. *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 25 (2004).[32] "To ascertain

---

[31] As of the date of the issuance of this memorandum opinion, the *Hero* is no longer within the court's jurisdiction, having been released from attachment at Icon's instruction, thus at this time, the third element is not fulfilled. In addition, there also appears to be an issue under the third element as to whether the *Hero* is property of the Defendants, considering it is legally owned by Hero Shipping, Ltd., an entity that is not a party to this suit. Nonetheless, the parties have not directly raised this issue before the Court, and thus, is not the subject of this Order.

[32] *See also All Car Leasing Serv. Co. v. Campbell*, No. 86-3680, 1990 WL 125337, at *1–2 (9th Cir. Aug. 29, 1990) (analyzing whether the transaction was intended to be a demise charter or a vessel sale). The Court notes that, although unpublished, the Ninth Circuit's opinion in *Campbell* is persuasive and further supports this Court's final conclusion.

whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case." *Id.* at 23. "Nor can we simply look to the place of the contract's formation or performance. Instead, the answer 'depends upon . . . the nature and character of the contract,' and the true criterion is whether it has 'reference to maritime service or maritime transactions.'" *Id.* at 24 (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)). Known as the "conceptual approach," the Supreme Court adopted this approach in its 2004 opinion *Norfolk Southern Railway Co. v. Kirby. Id.* at 25. The Supreme Court has further "reiterated that the 'fundamental interest giving rise to maritime jurisdiction is the protection of maritime *commerce.*'" *Id.* (quoting *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603 (1991)).

(15)   At least one district court has determined that the Supreme Court's *Kirby* opinion abrogated the general rule established by the Second Circuit in *The Ada* that a contract for the sale of a ship is non-maritime in nature. *Kalafrana Shipping Ltd. v. Sea Gull Shipping Co., Ltd.*, 591 F. Supp. 2d 505 (S.D.N.Y. 2008). But, despite the district court's opinion in *Kalafrana*, other district

courts have refused to adopt that interpretation.[33] And Plaintiffs have not

identified, nor has the Court found any, Circuit Courts of Appeals that have

taken the view espoused in *Kalafrana*. This Court, therefore, is bound by

precedent. Until the Fifth Circuit expressly adopts a different position, the

Court finds that as a general rule the contract for the sale of a vessel does not

sound in admiralty. *Clem Perrin Marine Towing, Inc.*, 730 F.2d at 188.[34]

(16)   The Court finds that Icon has not met its burden of proving admiralty

jurisdiction, but rather that the following factors weigh in favor of finding that

the Barecon 2001 and the surrounding agreements more properly resemble a

vessel sale/financing contract than a true charter party.

---

[33] *See, e.g.*, *Unicorn Bulk Traders, Ltd. v. Fortune Mar. Enters., Inc.*, No. 08 Civ. 9710(PGG), 2009 WL 125751, at *2 (S.D.N.Y. Jan. 20, 2009); *Polestar Mar. Ltd. v. Nanjing Ocean Shipping Co. Ltd.*, 631 F. Supp. 2d 304, 306–07 (S.D.N.Y. 2009) (refusing to adopt the view that *Kirby* abrogated the general rule that a contract for the sale of a vessel does not fall within federal admiralty jurisdiction); *Vrita Marine Co. Ltd. v. Seagulf Trading LLC*, 572 F. Supp. 2d 411, 411 (S.D.N.Y. 2008); *Exmar Shipping, N.V. v. Polar Shipping, S.A.*, No. 06-cv-12991(HB), 2008 WL 3992290, at *3 (S.D.N.Y. Aug. 27, 2008); *see also* R. Force, *The Aftermath of Norfolk Southern Railway v. James N. Kirby, PTY Ltd.: Jurisdiction and Choice-of-Law Issues*, 83 TUL. L. REV. 1393, 1399–1403 (June, 2009) (discussing cases for the principle that the ship sale contract is still not a maritime contract after *Kirby*).

[34] While the Fifth Circuit has expressed some discontent with this general rule, the Plaintiff has cited no case, nor has the Court found one, whereby the Fifth Circuit indicates an abrogation of the general rule. *But see Jack Neilson, Inc. v. Tug PEGGY*, 428 F.2d 54, 58 (5th Cir. 1970) (labeling the general rule as "petrified").

(a)   First, the Barecon 2001 **compels** the purchase of the *Amazing* at the end of the charter term, as discussed in this Order's Findings of Fact, which weighs in favor of finding that the agreement is a vessel sale/financing contract.

(b)   Second, as set forth in the Findings of Fact, the payments at issue in this case were not established as a market-rate charter hire.   The Court finds that the "charter-hire" payments are actually installment payments of the full purchase/loan price. The Court finds that the payments are high enough to establish that it is a disguised sale.[35]

(c)   Third, as mentioned in the Findings of Fact, the Verified Complaint contains not only a claim for unpaid charter, but also a claim for $2,910,109.00 for additional security, pursuant to the LTV Clause. The Court finds that this is a claim against the sales contract itself, not merely the agreement to charter.[36] This demonstrates the integrated

---

[35] This is further supported by the fact that the payments have been described by Icon itself as paying down principal and interest, consistent with a sale financing.

[36] This fact makes this case distinguishable from another Fifth Circuit case, whereby the charter party was found to be severable from the sale agreement. *See Jack Neilson, Inc. v. Tug PEGGY*, 428 F.2d 54, 58 (5th Cir. 1970). Although the terms of the agreements at issue in *Tug PEGGY* and this case are similar at first glance, the Plaintiff in *Tug PETTY* amended its complaint to eliminate claims related to the purchase price and only requested damages specifically related to the "lease." *Id.* at 55.

nature of the vessel sale/financing transaction and that the transaction cannot be pulled apart to support a claim sounding in admiralty.

(17)   Moreover, applying the principles set forth by the Supreme Court in *Kirby*, the Court finds that the agreement at issue here has the nature and character of a vessel sale contract. The Court finds that the "true objective" of the parties was the payment of a loan and the eventual sale of the *Amazing* to Amazing Shipping.

(18)   Because the underlying transaction itself is a non-maritime vessel sale/financing, Geden's guarantee of Amazing Shipping's obligations under the relevant agreements is similarly non-maritime in nature.

(19)   Based on the foregoing, and after analyzing the relevant agreements and other documents submitted by the parties, hearing the oral arguments of counsel, and having its questions answered by counsel for the parties, the Court finds that the Barecon 2001, including the day-rate charter hire contained therein, is not a conventional maritime charter party, but is instead one inseparable component of a larger non-maritime vessel sale/financing transaction. The Court finds that the charter party cannot be severed from the overall vessel sale/financing transaction between the parties and is therefore non-maritime in nature.

## IV. SUMMATION OF FINDINGS & CONCLUSIONS

In sum, Icon has not met its burden of establishing admiralty jurisdiction. From the outset the parties intended this to be a vessel sale/financing transaction, with Amazing Shipping (as both the initial and ultimate owner) selling the *Amazing* to Icon on the condition that Icon (as financing owner) immediately return beneficial possession of the vessel to Amazing Shipping and then, over seven years of monthly loan amortization payment installments and a balloon payment obligation, Amazing Shipping would retake legal title to the *Amazing* from Icon. There was never any question but that at the end of the seven-year financing period Icon would have sold the *Amazing* back to Amazing Shipping.

Further, the Court notes that Icon, through its counsel, has argued that it will be left without recourse if the attachment is vacated. However, Icon's counsel, Derek Walker, stated on the record in open court that Icon "would have to go to some other friendlier jurisdiction, like South Africa or Australia or elsewhere where attachments are fairly common, to start this over again to get security to go to England some day to fight the merits."[37] First, the Court notes that this statement itself illustrates that Icon will have recourse outside this Court's admiralty jurisdiction. Second, both parties concede that their agreement contemplates adjudication of disputes in the

---

[37] Pursuant to the Court's request, a transcript excerpt of this statement by Icon's counsel has been filed as part of the record on the docket as Document Number 45.

English Courts, something that is still a viable option. Lastly, the loan transaction was structured in such a way that Icon owns the title to the *Amazing*. This was intentional. Had Icon wanted to take a true maritime mortgage, it could have. Rather, it chose to structure the arrangement as a sale/lease-back/sale so that it would own the *Amazing* as collateral.

Having determined that the character of the putative "charter party" was fixed from the outset as a sale contract and not as a conventional bareboat charter, the Court need proceed no further. Because the transaction is a single, integrated vessel sale/financing agreement, it is a non-maritime contract and this Court lacks subject-matter jurisdiction. The attachment of the *Hero* must therefore be vacated and Icon's complaint dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

## V. CONCLUSION

Based on the foregoing, the Court hereby

AFFIRMS the previous Order of the Court, dated June 11, 2013 (Document No. 36), ordering that Defendants' Opposed Motion to Vacate Attachment and Dismiss Complaint (Document No. 22) is **GRANTED**.

The Court will issue a separate final judgment.

SIGNED at Houston, Texas, on this __*18*__ day of June, 2013.

DAVID HITTNER
United States District Judge